# 21-1975

## United States Court of Appeals for the Second Circuit

---

NEW YORK STATE TELECOMMUNICATIONS ASSOCIATION, INC., CTIA - THE WIRELESS ASSOCIATION, ACA CONNECTS - AMERICA'S COMMUNICATIONS ASSOCIATION, USTELECOM - THE BROADBAND ASSOCIATION, NTCA - THE RURAL BROADBAND ASSOCIATION, SATELLITE BROADCASTING AND COMMUNICATIONS ASSOCIATION, on behalf of their respective members,

*Plaintiffs-Appellees*,

v.

LETITIA A. JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant*.

---

On Appeal from the United States District Court for the Eastern District of New York

---

## BRIEF FOR APPELLANT

---

BARBARA D. UNDERWOOD
 *Solicitor General*
STEVEN C. WU
 *Deputy Solicitor General*
ERIC DEL POZO
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-8019

Dated: November 24, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.....................................................................iii

PRELIMINARY STATEMENT................................................................. 1

JURISDICTIONAL STATEMENT ........................................................... 4

QUESTIONS PRESENTED .................................................................... 4

STATEMENT OF THE CASE ................................................................. 5

    A.   The Necessity of Broadband Internet Access and Its
           Inaccessibility to Low-Income New Yorkers .......................... 5

    B.   The Federal Communications Commission's (FCC's)
           Classification of Broadband Internet Service ......................... 9

        1.   The distinction between classification as a Title I
              information service and classification as a Title II
              telecommunications service............................................... 9

        2.   Pre-2018 regulatory classifications of broadband
              service and related judicial decisions............................. 12

        3.   The 2018 order reclassifying broadband service as
              an information service.................................................... 14

    C.   New York's Affordable Broadband Act (ABA)........................ 16

    D.   This Lawsuit ........................................................................ 19

STANDARD OF REVIEW AND  SUMMARY OF ARGUMENT ........... 22

ARGUMENT ....................................................................................... 26

i

**Page**

POINT I

THE DISTRICT COURT ERRED IN HOLDING THAT THE ABA IS
BARRED BY FIELD PREEMPTION ............................................................ 26

    A.    Federal Communications Law Expressly Acknowledges
           a Role for State Regulation of Broadband Providers,
           Including Their In-State Business Practices. ........................ 28

    B.    The Communications Act's Grant of Regulatory
           Authority to the FCC Over Interstate Communications
           Services Does Not Impliedly Preempt the Field. .................. 35

    C.    The District Court Misplaced Its Reliance on *Ivy
           Broadcasting.* .......................................................................... 41

POINT II

THE DISTRICT COURT ERRED IN HOLDING THAT THE ABA IS
BARRED BY CONFLICT PREEMPTION ...................................................... 45

    A.    The FCC's Decision to Classify Broadband Service as an
           Information Service Lacks Implied Preemptive Effect. ......... 47

    B.    The ABA Does Not Conflict with the Statutory
           Definition of "Telecommunications Carrier." ........................ 56

CONCLUSION ............................................................................................ 62

ii

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*ACA Connects v. Frey,*
471 F. Supp. 3d 318 (D. Me. 2020) ...................................................... 34

*AT&T Commc'ns of Ill., Inc. v. Illinois Bell Tel. Co.,*
349 F.3d 402 (7th Cir. 2003) .............................................................. 59

*Beneficial Nat'l Bank v. Anderson,*
539 U.S. 1 (2003) ............................................................................... 43

*Bethlehem Steel Co. v. New York State Labor Relations Bd.,*
330 U.S. 767 (1947) ........................................................................... 50

*Bond v. United States,*
572 U.S. 844 (2014) ........................................................................... 27

*Capital Cities Cable, Inc. v. Crisp,*
467 U.S. 691 (1984) ........................................................................... 37

*Chamber of Commerce v. Whiting,*
563 U.S. 582 (2010) ..................................................................... 57, 58

*Cipollone v. Liggett Grp.,*
505 U.S. 504 (1992) ..................................................................... 31, 54

*City of Dallas v. FCC,*
165 F.3d 341 (5th Cir. 1999) .............................................................. 59

*Comcast Corp. v. FCC,*
600 F.3d 642 (D.C. Cir. 2010) ................................................ 13, 38, 48

*Critcher v. L'Oreal USA, Inc.,*
959 F.3d 31 (2d Cir. 2020) ................................................................ 22

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ........................................................................... 61

*English v. General Elec. Co.,*
496 U.S. 72 (1990) ............................................................................. 36

## Cases                                                                 Page(s)

*Farina v. Nokia Inc.*,
  625 F.3d 97 (3d Cir. 2010) ................................................................ 59

*Fisher v. NOS Commc'ns*,
  495 F.3d 1052 (9th Cir. 2007) .......................................................... 29

*Global NAPs, Inc. v. Verizon New England, Inc.*,
  454 F.3d 91 (2d Cir. 2006) ............................................................... 36

*Goldberg v. Sweet*,
  488 U.S. 252 (1989) .......................................................................... 33

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
  742 F.3d 414 (9th Cir. 2014) ............................................................ 59

*Head v. New Mexico Bd. of Examiners in Optometry*,
  374 U.S. 424 (1963) .......................................................................... 36

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  725 F.3d 65 (2d Cir. 2013) ...................................................... 45, 46, 61

*Irregulators v. FCC*,
  953 F.3d 78 (D.C. Cir. 2020) ........................................................... 55

*Ivy Broad. Co. v. American Tel. & Tel. Co.*,
  391 F.2d 486 (2d Cir. 1968) ..................................................... passim

*Johnson v. American Towers, LLC*,
  781 F.3d 693 (4th Cir. 2015) ........................................................... 29

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020) ................................................................. 27, 38

*Louisiana Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) .......................................................... 21, 39, 40, 48

*Marcus v. AT&T Corp.*,
  138 F.3d 46 (2d Cir. 1998) ..................................................... passim

**Cases**                                                      **Page(s)**

*Marsh v. Rosenbloom,*
499 F.3d 165 (2d Cir. 2007) ............................................................ 46

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ............................................................... 27, 45

*Metropolitan Life Ins. Co. v. Taylor,*
481 U.S. 58 (1987) ........................................................................ 43

*Mozilla Corp. v. FCC,*
940 F.3d 1 (D.C. Cir. 2019) ..................................................... passim

*National Ass'n of Regulatory Util. Comm'rs v. FCC,*
533 F.2d 601 (D.C. Cir. 1976) ....................................................... 50

*National Cable & Telecommunications Association v. Brand
X Internet Services,*
545 U.S. 967 (2005) ...................................................................... 12

*New York State Dep't of Soc. Servs. v. Dublino,*
413 U.S. 405 (1973) ...................................................................... 36

*New York Tel. Co. v. FCC,*
631 F.2d 1059 (2d Cir. 1980) ........................................................ 52

*Nordlicht v. New York Tel. Co.,*
799 F.2d 859 (2d Cir. 1986) .......................................................... 42

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.,*
769 F.3d 105 (2d Cir. 2014) .......................................................... 33

*People v. Charter Commc'ns, Inc.,*
162 A.D.3d 553 (1st Dep't 2018) ......................................... 34, 52, 54

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.,*
485 U.S. 495 (1988) ................................................... 39, 46, 48, 52

*Qwest Corp. v. Minnesota Pub. Utils. Comm'n,*
684 F.3d 721 (8th Cir. 2012) ......................................................... 59

| Cases | Page(s) |
|---|---|

*Ray v. Atlantic Richfield Co.*,
435 U.S. 151 (1978)........................................................................ 50

*Rush Prudential HMO, Inc. v. Moran*,
536 U.S. 355 (2002)........................................................................ 29

*Smith v. GTE Corp.*,
236 F.3d 1292 (11th Cir. 2001)...................................................... 29

*SPGGC, LLC v. Blumenthal*,
505 F.3d 183 (2d Cir. 2007) .......................................................... 33

*Sullivan v. American Airlines, Inc.*,
424 F.3d 267 (2d Cir. 2005) .......................................................... 42

*TCG N.Y., Inc. v. City of White Plains*,
305 F.3d 67 (2d Cir. 2002) ............................................................ 31

*TV Pix, Inc. v. Taylor*,
304 F. Supp. 459 (D. Nev. 1968)............................................. 37, 60

*United States Telecom Ass'n v. FCC*,
825 F.3d 674 (D.C. Cir. 2016) ................................................ 5, 9, 14

*United States v. Lopez*,
514 U.S. 549 (1995)........................................................................ 27

*United States v. Southwest Cable Co.*,
392 U.S. 157 (1968)........................................................................ 37

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014) ................................................ passim

*Virginia Uranium, Inc. v. Warren*,
139 S. Ct. 1894 (2019).................................................................... 46

*Wyeth v. Levine*,
555 U.S. 555 (2009)................................................................. passim

**Laws**                                                           **Page(s)**

*Federal*

47 U.S.C.

§ 151 ................................................................................. 2, 57

§ 152 ............................................................................. 9, 33, 39

§ 152 note ..................................................................... 58, 60

§ 153 ......................................................................... passim

§ 160 .............................................................. 10, 15, 54, 55

§ 201 ................................................................................ 10

§ 202 ................................................................................ 10

§ 253 .......................................................................... 31, 32

§ 332 ................................................................................ 11

§ 414 ................................................................................ 29

§ 1302 ................................................................. 29, 30, 60

§ 1305 ................................................................................ 5

*New York*

General Business Law § 399-zzzzz ................................. 17, 18, 32

Ch. 56, 2021 N.Y. Laws ................................................. 16

## Administrative Materials

*In re Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities,*
20 FCC Rcd. 14853 (2005) ................................................. 12

*In re Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks,*
22 FCC Rcd. 5901 (2007) ................................................. 12

*In re Inquiry Concerning High-Speed Access to Internet Over Cable & Other Facilities,*
17 FCC Rcd. 4798 (2002) ................................................. 12

*In re Protecting & Promoting the Open Internet,*
30 FCC Rcd. 5601 (2015) ............................................ 13, 55

**Administrative Materials**                                                          **Page(s)**

*In re Restoring Internet Freedom*,
    33 FCC Rcd. 311 (2018) ............................................................ passim

**Miscellaneous Authorities**

FCC, *Connecting America: The National Broadband Plan* (2010),
    https://transition.fcc.gov/national-broadband-plan/national-
    broadband-plan.pdf ............................................................................... 5

New York Broadband Program Off., *About, The New NY
    Broadband Program*, https://nysbroadband.ny.gov/about .................. 6

New York City Mayor's Off. of the Chief Tech. Officer,
    *The New York City Internet Master Plan* (2020),
    https://www1.nyc.gov/assets/cto/downloads/internet-
    master-plan/NYC_IMP_1.7.20_FINAL-2.pdf ................................... 7, 8

New York State, *Broadband for All, Ensuring High-Speed
    Internet Access for Every New Yorker*,
    https://www.ny.gov/BroadbandForAll ................................................. 7

Office of the N.Y.C. Comptroller, *Internet Inequality:
    Broadband Access in NYC* (2014),
    https://comptroller.nyc.gov/wp-
    content/uploads/documents/Internet_Inequality.pdf .......................... 7

Office of the N.Y.S. Comptroller, *Availability, Access and
    Affordability: Understanding Broadband Challenges in
    New York State* (2021),
    https://www.osc.state.ny.us/files/reports/pdf/broadband-
    availability.pdf .............................................................................. 6, 7, 8

# PRELIMINARY STATEMENT

In the last quarter-century, broadband internet has graduated from useful curiosity to absolute necessity. The COVID-19 pandemic crystallized this fact: for large segments of the population, a reliable high-speed internet connection became vital to go to work, attend school, connect with friends and family, or obtain medical advice.

For too many New Yorkers, however, preexisting inequalities have made it difficult to afford broadband plans, thus shutting them out of core aspects of daily life that others take for granted. Broadband access thus remains illusory for many low-income consumers, especially in New York City.

In April 2021, the New York Legislature took action to bridge this digital divide by enacting the Affordable Broadband Act (ABA). With certain exceptions, the ABA requires broadband providers in New York State to adhere to statutory price caps when offering broadband plans to low-income consumers in New York.

Before the ABA took effect, a consortium of industry groups representing broadband providers in New York sued to enjoin the law as federally preempted both by the Communications Act of 1934 (as amended

by the Telecommunications Act of 1996)[1] and by an order of the Federal Communications Commission (FCC) issued in 2018 that purported to deregulate the broadband industry. The United States District Court for the Eastern District of New York (Hurley, J.) held that both field and conflict preemption applied to the ABA and enjoined the statute's enforcement. This Court should reverse.

First, the district court's sweeping field-preemption ruling relied on the startling and unjustified proposition that the Communications Act altogether bars States from regulating any aspect of broadband providers, solely because they offer interstate communications services. That conclusion is at odds with multiple provisions of the Communications Act that expressly acknowledge the continued applicability of state regulation of broadband providers, including regulation of their business practices under consumer-protection and similar laws. Disregarding these provisions, the district court instead relied nearly exclusively on the Act's conferral of authority on the FCC to regulate interstate communications

---

[1] *See* 47 U.S.C. § 151 et seq., *as amended by* Pub. L. 104-104, 110 Stat. 56 (1996). This brief will refer to these statutes simply as the "Communications Act" or the "Act."

and providers. But the mere existence of federal authority over a subject does not alone oust the States from all concurrent authority. And here, Congress did not intend for the FCC's jurisdiction over interstate communications providers to be exclusive. Indeed, field preemption here would lead to the untenable conclusion that, unlike any other business operating in a State, broadband providers would be uniquely exempt from traditional state regulation to protect consumers, curb business abuses, and safeguard the integrity of the marketplace.

Second, the district court erred in finding conflict preemption based on a 2018 order of the FCC. That order reclassified broadband service from a Title II "telecommunications service" to a Title I "information service" under the Act, as part of the FCC's effort to free broadband providers from federal regulation. The district court's finding of conflict preemption from this reclassification clashes with the D.C. Circuit's recent holding that neither the 2018 order nor Title I could support preemption of state laws. And contrary to plaintiffs' argument below, no other provision of the Communications Act preempts the ABA.

## JURISDICTIONAL STATEMENT

The district court had original subject matter jurisdiction over this federal-preemption action under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on July 29, 2021, and amended the judgment on August 10, 2021. (*See* Joint Appendix (J.A.) 160-161.) The State of New York filed a timely notice of appeal on August 11, 2021. (J.A. 162.)

## QUESTIONS PRESENTED

1.    Whether the ABA is impliedly preempted on the ground that federal law occupies the entire field of regulation of interstate communications providers.

2.    Whether the ABA is impliedly preempted by the FCC's 2018 decision to reclassify broadband service as an information service under Title I of the Communications Act.

# STATEMENT OF THE CASE

## A. The Necessity of Broadband Internet Access and Its Inaccessibility to Low-Income New Yorkers

Today, most users "connect to the internet through a broadband provider, which delivers high-speed internet access using technologies such as cable modem service, digital subscriber line (DSL) service, and fiber optics." *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 690 (D.C. Cir. 2016). Congress has declared it a national priority "to ensure that all people of the United States have access to broadband capability" and to develop a "strategy for achieving affordability of such service." 47 U.S.C. § 1305(k)(2)(B). The FCC has emphasized broadband internet's role in "changing how we educate children, deliver health care, manage energy, ensure public safety, engage government, and access, organize and disseminate knowledge."[2]

The recent COVID-19 pandemic has confirmed the indispensable nature of high-speed broadband. By April 2021, in New York, over 70% of adults in households with schoolchildren reported that teaching had

---

[2] FCC, *Connecting America: The National Broadband Plan* xi (2010). For authorities available on the internet, URLs appear in the Table of Authorities. All sites were last visited on November 24, 2021.

become at least partially remote, and 41% of working households reported at least one adult telecommuting.[3] These shifts amplified the demand for home high-speed broadband: by the end of 2020, monthly average internet usage had climbed 75% from the start of the pandemic, with multiple family members often needing to be online at once.[4]

As the emergence of broadband has fundamentally changed daily life, the State of New York has been at the forefront of ensuring that this online revolution does not leave behind society's most vulnerable. For example, in 2015, to strengthen broadband infrastructure statewide, New York established a $500 million grant fund for projects to deliver high-speed internet to unserved and underserved locales.[5] New York has since secured high-speed internet upgrades for approximately 2.5 million

---

[3] Office of the N.Y.S. Comptroller, *Availability, Access and Affordability: Understanding Broadband Challenges in New York State* 1 (2021).

[4] *Id.* at 1, 11.

[5] New York Broadband Program Off., *About, The New NY Broadband Program* (website).

customers, resulting in some form of high-speed broadband service being available to greater than 98% of New York's population.[6]

Yet access to this new and essential feature of modern life has remained beyond reach for large numbers of New Yorkers, particularly low-income New Yorkers who cannot afford broadband plans. In 2013, 27% of New York City households lacked broadband internet at home, including more than one-third of households in the Bronx and nearly one-third of households in Brooklyn.[7] (By contrast, only 11% of households in Lower Manhattan lacked broadband.[8]) This state of affairs persists to this day: as of early 2020, nearly one-third (or 29%) of New York City households still lack broadband at home.[9]

---

[6] New York State, *Broadband for All, Ensuring High-Speed Internet Access for Every New Yorker* (website); *see also* N.Y.S. Comptroller, *Availability, Access and Affordability*, *supra*, at 3-8.

[7] Office of the N.Y.C. Comptroller, *Internet Inequality: Broadband Access in NYC* 1 (2014).

[8] *Id.* at 2.

[9] New York City Mayor's Off. of the Chief Tech. Officer, *The New York City Internet Master Plan* 13 (2020).

A map of internet service rates in New York City "bears a striking resemblance" to a map of poverty rates.[10] Nearly half (or 46%) of New York City households below the poverty level lack broadband at home, as do one in five households with schoolchildren.[11] Across the whole State, the statistics improve only somewhat: as of 2019, more than one-third (or 36%) of households earning less than $20,000 annually lacked broadband at home.[12] In a nationwide survey published in June 2021, households without a broadband subscription most frequently cited cost as the reason.[13]

---

[10] *Id.*

[11] *Id.*

[12] N.Y.S. Comptroller, *Availability, Access and Affordability*, *supra*, at 14.

[13] *Id.* at 28.

**B.    The Federal Communications Commission's (FCC's) Classification of Broadband Internet Service**

**1.    The distinction between classification as a Title I information service and classification as a Title II telecommunications service**

The Communications Act delegates authority to the FCC to regulate interstate communications by wire or radio and the providers of such communications. 47 U.S.C. § 152(a). The FCC's "authority under the Act includes classifying various services into the appropriate statutory categories." *Mozilla Corp. v. FCC*, 940 F.3d 1, 17 (D.C. Cir. 2019).

Broadband internet service has been subject to "shifting regulatory treatment" on the federal level. *United States Telecom Ass'n*, 825 F.3d at 710; *see id.* at 690-96 (summarizing much of this history). At some times, the FCC has classified broadband as a "telecommunications service" under Title II of the Act, *see* 47 U.S.C. § 153(53), under which the FCC has express authority to impose or enforce common-carrier regulations and to prevent certain state impositions of those regulations. At other times, the FCC has classified broadband as an "information service" under Title I of the Act, *see id.* § 153(24), under which the FCC lacks such authority.

The FCC treats these two classifications "as mutually exclusive." *Mozilla*, 940 F.3d at 19. And these "similar-sounding terms carry consi-

9

derable significance," *id.* at 17, including for the question of federal preemption. If broadband is a telecommunications service under Title II, then it is potentially subject to a unique array of statutory duties and constraints applicable to common carriers. In particular, Title II generally bars a common carrier from levying unreasonable charges, 47 U.S.C. § 201(b), or unjustly discriminating in the provision of services, *id.* § 202(a). At the same time, the FCC is authorized to forbear from applying any of these requirements to a Title II telecommunications service if certain prerequisites are satisfied, including a determination by the FCC that federal common-carrier regulation is not necessary to ensure that charges or practices "are just and reasonable and are not unjustly or unreasonably discriminatory." *Id.* § 160(a)(1). If the FCC exercises its forbearance authority to decline to impose some specific requirement of Title II's common-carrier regime, then a State "may not continue to apply or enforce" that requirement. *Id.* § 160(e). In other words, a federal decision to forbear from enforcement of a specified common-carrier requirement can lead to preemption of state enforcement of the same.

10

"By contrast, 'information services' [under Title I] are exempted from common carriage status and, hence, Title II regulation."[14] *Mozilla*, 940 F.3d at 17. They are subject only to the FCC's "ancillary authority under Title I"—which is "not an independent source of regulatory authority," but rather permits regulation reasonably in furtherance of the FCC's responsibilities under other titles of the Act. *Id.* at 76 (quotation marks omitted). Unlike Title II, Title I contains no express preemption provision that may be applicable here. And as discussed further below, the D.C. Circuit has specifically rejected the FCC's attempt to preempt state regulation of broadband service providers under Title I. *See id.* at 74-81.

---

[14] An analogous set of classifications applies to mobile broadband. *See generally* 47 U.S.C. § 332(c)(1)-(2).

11

## 2. Pre-2018 regulatory classifications of broadband service and related judicial decisions

Starting in 2002, the FCC classified broadband internet over cable, wireline (i.e., DSL or fiber optics), and wireless service as a Title I information service.[15] The Supreme Court upheld this classification in *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005). Broadband was "therefore not subject to mandatory Title II common-carrier regulation." *Id.* at 978.

The FCC's decision to classify broadband as a Title I information service placed serious limitations on its regulatory authority. In particular, the D.C. Circuit held in *Verizon v. FCC* that the FCC lacked statutory power to impose common-carrier requirements on broadband providers because it had classified them under Title I, rather than under Title II. *See* 740 F.3d 623, 650 (D.C. Cir. 2014). As result, the FCC could not subject these entities to common-carrier regulations such as

---

[15] *In re Inquiry Concerning High-Speed Access to Internet Over Cable & Other Facilities*, 17 FCC Rcd. 4798 (2002) (cable); *In re Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 FCC Rcd. 14853 (2005) (wireline); *In re Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd. 5901 (2007) (wireless).

nondiscrimination requirements, *see id.* at 655-59, or rate regulations, *see Comcast Corp. v. FCC*, 600 F.3d 642, 655 (D.C. Cir. 2010). That authority was unavailable because, under the Act, such regulations are permitted "'only to the extent that'" a broadband provider "'is engaged in providing telecommunications services.'" *Verizon*, 740 F.3d at 650 (quoting 47 U.S.C. § 153(51)).

In 2015, the FCC promulgated an order that reclassified broadband as a Title II telecommunications service and invoked the FCC's authority to impose common-carrier regulations under that title to ban several discriminatory network practices. *In re Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015) ("2015 Order"). The FCC also exercised its express authority under 47 U.S.C. § 160(a) to forbear from applying several of Title II's provisions to broadband providers. *Id.* ¶¶ 456-60. In particular, the FCC "expressly eschew[ed]" the use of "industry-wide rate regulation." *Id.* ¶ 5; *see id.* ¶¶ 451-52. And, relying on 47 U.S.C. § 160(e), the FCC announced its "firm intention to exercise [its] preemption authority to preclude" any state efforts to regulate broadband rates, which "would conflict with the federal regulatory framework" the FCC

13

had established under Title II. *Id.* ¶ 433. The D.C. Circuit upheld the 2015 Order. *See United States Telecom Ass'n*, 825 F.3d at 697-98.

### 3. The 2018 order reclassifying broadband service as an information service

In 2018, the FCC "restore[d] broadband Internet access service to its Title I information service classification." *In re Restoring Internet Freedom*, 33 FCC Rcd. 311, ¶ 2 (2018) ("2018 Order"). To justify this reclassification decision, the FCC relied in part on "public policy arguments" against common-carrier regulation of broadband providers, including rate regulation. *Id.* ¶ 86. The 2018 Order acknowledged that the 2015 Order had not imposed such rate regulation, but instead had "announced forbearance from *ex ante* price regulation." *Id.* ¶ 101. Given the reclassification, however, the Title II forbearance decision was "now moot." *Id.* ¶ 174. The FCC nonetheless purported to preempt all state or local economic and other regulation of broadband providers, which the FCC viewed as "inconsistent with the federal deregulatory approach" of the 2018 Order. *Id.* ¶¶ 194-95.

The D.C. Circuit upheld the FCC's reclassification of broadband as a Title I information service. *Mozilla*, 940 F.3d at 23. But the D.C. Circuit

14

rejected the FCC's attempt to preempt state regulation of broadband providers in the 2018 Order. The court found no express statutory authority for such preemption. *Id.* at 75-76. And it held that the FCC's decision to reclassify broadband under Title I—and thus to return to a regime where the FCC's regulatory authority was constrained under *Verizon*—necessarily limited the preemptive effect of the 2018 Order, since "in any area where the Commission lacks the authority to regulate, it equally lacks the power to preempt state law." *Id.* at 75.

Of particular relevance here, the D.C. Circuit specifically rejected the FCC's proffered reliance on Title II's forbearance provision, which prevents state enforcement of common-carrier requirements that the FCC has decided not to impose, *see* 47 U.S.C. § 160(e). "That Title II provision has no work to do here because the 2018 Order took broadband out of Title II." *Mozilla*, 940 F.3d at 79. The FCC "cannot completely disavow Title II with one hand while still clinging to Title II forbearance authority with the other." *Id.* at 80.

15

C.   **New York's Affordable Broadband Act (ABA)**

In April 2021, to help close the State's digital divide, New York passed legislation facilitating "Broadband service for low-income consumers"—commonly called the Affordable Broadband Act, or ABA. *See* Ch. 56, pt. NN, § 1, 2021 N.Y. Laws, pp. 116-18 (codified at General Business Law § 399-zzzzz). (J.A. 55-62 (bill text).)

Legislative memoranda highlighted the need for this consumer-protection measure. As the bill's state assembly sponsor commented, the COVID-19 pandemic "made it abundantly clear" that internet access had "become an essential service," without which "no one can successfully participate in 21st Century life." (J.A. 100.) The assembly sponsor observed that "[n]o New Yorker should be without broadband internet service because they cannot afford a robust connection," but that the average cost of a basic high-speed internet plan in New York—i.e., more than $50 per month—was "unaffordable to too many people." (J.A. 100.) The ABA therefore aimed to "expand the reach of broadband service in the State," by facilitating low-income consumers' access. (J.A. 100.) The bill's state senate sponsor elaborated that affordable broadband was

16

necessary for applying to jobs, working and learning remotely, and participating in telehealth sessions. (J.A. 101.)

The ABA defines broadband as "a mass-market retail service that provides the capability to transmit data to and receive data from all or substantially all internet endpoints," whether "by a wireline, fixed wireless or satellite service." General Business Law § 399-zzzzz(1). And the statute requires anyone "providing or seeking to provide" such a "broadband service in New York State," within sixty days of the law's enactment, to "offer high speed broadband service" at statutorily fixed prices to low-income consumers who otherwise qualify for specified governmental benefits.[16] *Id.* § 399-zzzzz(2).

A provider may comply with the statute by charging no more than $15 per month for broadband service of 25 megabits per second, or no more than $20 per month for broadband service of 200 megabits per second, with certain price increases allowable every few years. *Id.*

---

[16] Among the qualifying households are those who are eligible for reduced-price school lunch or supplemental nutrition assistance benefits; who are Medicaid-eligible; who receive rent-increase exemptions based on disability or senior-citizen status; and who receive discounted electric or gas service. *See* General Business Law § 399-zzzzz(2)(a)-(f).

17

§ 399-zzzzz(2)-(4). New York's Public Service Commission (PSC) may grant exceptions to the speed thresholds where "such download speed is not reasonably practicable." *Id.* § 399-zzzzz(2). The PSC may also altogether exempt "any broadband service provider providing service to no more than twenty thousand households, if the [PSC] determines that compliance with such requirements would result in unreasonable or unsustainable financial impact" on the provider. *Id.* § 399-zzzzz(5).

In May 2021, the PSC temporarily exempted dozens of providers from ABA compliance while evaluating the providers' fuller exemption requests.[17] (J.A. 105-113.) The PSC invited any other eligible providers to apply for exemptions (J.A. 110), and invited public comment on the standard for evaluating the financial impact of compliance (J.A. 111).

---

[17] The recipients of temporary exemptions included four of the six providers that submitted declarations in this lawsuit alleging that the ABA's implementation would cause them irreparable harm: Champlain Telephone Company, Delhi Telephone Company, Empire Telephone Corporation, and Heart of the Catskills Communications. (*See* J.A. 112.)

18

**D.    This Lawsuit**

Two weeks after the ABA's passage, a group of organizations whose member companies offer broadband access in New York filed suit in the U.S. District Court for the Eastern District of New York against the New York State Attorney General in her official capacity. (J.A. 80-98.) The lawsuit sought a declaration that federal law preempted the ABA and both preliminary and permanent injunctive relief. (J.A. 95-97.)

In June 2021, before the ABA took effect, the district court preliminarily enjoined enforcement of the statute. (J.A. 121-154 (opinion), 155 (order).) The court recognized that internet access "has transcended beyond mere luxury to modern necessity," playing a pivotal role in how "our nation adapted to—if not survived—the COVID-19 pandemic." (J.A. 122.) And as the court acknowledged, the internet's "promise of access is only as promising as its accessibility—which depends in part on whether individuals can afford it." (J.A. 123.) But the district court held plaintiffs' preemption claims likely to succeed on two theories. (J.A. 133-152.)

*First*, the district court concluded that the ABA conflicts with the FCC's 2018 Order reclassifying broadband service as a Title I information

service under the Communications Act. (J.A. 137-143.) The court viewed that classification not as "an abdication of jurisdiction" over broadband providers, but rather as "an affirmative decision not to treat" them as common carriers under Title II. (J.A. 137-138.)

According to the district court, the 2018 Order confirmed the FCC's "long-standing policy choice" not to subject broadband service to rate regulation, and in doing so did not tender jurisdiction to the States to enact such regulations. (J.A. 139.) The court viewed the ABA's price ceilings as rate regulation and common-carrier treatment. (J.A. 139-140.) The court thus concluded that the ABA "stands as an obstacle" to the FCC's "full purposes and objectives" of freeing broadband service of all common-carrier treatment, including threat of rate regulation. (J.A. 141.) Moreover, the district court reasoned that the D.C. Circuit's holding in *Mozilla*—that the FCC "could not *expressly* preempt" state broadband regulation—did not preclude the 2018 Order from having "implicit preemptive effect." (J.A. 142-143.)

*Second*, and in addition, the district court held that field preemption applied to the ABA. (J.A. 145-152.) The court sweepingly defined the relevant field to include any regulation of "interstate communication

20

services" (J.A. 144), relying on 47 U.S.C. § 152(a)'s grant of "'plenary authority'" to the FCC to regulate providers of interstate communications by wire or radio (J.A. 150 (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986))). And the court held that the ABA was preempted because it extends to broadband providers who transmit "interstate communication[s]" and "connect[] New York State users to internet endpoints well beyond New York's borders." (J.A. 146.) The court rejected a characterization of the ABA as focused principally on intra-state prices charged by New York companies to New York customers. (J.A. 147.)

In so concluding, the court also relied heavily on this Court's *Ivy Broadcasting* decision from 1968, which held that federal common law governed tort and contract claims concerning interstate telephone service. (J.A. 147 (citing *Ivy Broad. Co. v. American Tel. & Tel. Co.*, 391 F.2d 486, 490-91 (2d Cir. 1968)).) Although the State pointed out that this Court has since abrogated that decision's preemption analysis, *see Marcus v. AT&T Corp.*, 138 F.3d 46, 54 (2d Cir. 1998), the district court refused to "disregard" the abrogated reasoning (J.A. 148).

21

The district court then entered a stipulated final judgment, declaring the ABA to be federally preempted and permanently enjoining its enforcement, for the reasons given in the opinion granting the preliminary injunction. (J.A. 156-161.) The State expressly preserved its right to appeal the judgment, declaration, and injunction. (J.A. 157-158.)

## STANDARD OF REVIEW AND SUMMARY OF ARGUMENT

This Court reviews de novo the application of federal preemption principles. *See Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 34 (2d Cir. 2020). Here, the district court erred in concluding that federal communications law preempted the ABA.

**I.A.** The district court erred in holding the ABA subject to field preemption under the Communications Act. To the contrary, Congress included various provisions in the Act that confirm its intent to preserve a role for the States in regulating interstate communications services, including broadband providers. For example, a statutory savings clause announces that the Act's remedies are cumulative of existing state legislative and common-law remedies. A different section of the Act encourages States to promote broadband internet access, including

22

through means such as capping prices. Still other sections expressly authorize the FCC to displace particular kinds of state regulations of *telecommunications* services—but not *information* services, as broadband has been classified by the FCC.

All of these provisions are incompatible with a conclusion that Congress silently intended for States to have *no* authority in this area. And the lack of field preemption is underscored by the fact that the ABA does not purport to regulate interstate communications as such, but rather addresses in-state prices charged by broadband providers. Such traditional state regulation of in-state business practices does not intrude on any field that Congress sought to leave exclusively for federal regulation.

**B.** In holding otherwise, the district court relied almost exclusively on 47 U.S.C. § 152(a)'s conferral of authority on the FCC to regulate interstate communications and providers. But the mere existence of federal authority, however comprehensive, does not alone eliminate the States' concurrent authority in an area. And any claim of field preemption here is particularly weak because the FCC's 2018 Order classified broadband not as a Title II telecommunications service, but instead as a

23

Title I information service—a classification under which the FCC *lacks* statutory power to impose common-carrier-type regulations, including rate regulation. It makes no sense to infer field preemption based on regulatory authority that the FCC does not even possess.

**C.** The district court also mistakenly relied on a 1968 decision of this Court, *Ivy Broadcasting*, which held that federal common law governed judicial claims "concerning the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications service." 391 F.2d at 491. That decision does not support field preemption here. For one thing, *Ivy*'s finding of complete preemption was based on Title II's comprehensive scheme of common-carrier regulation over telecommunications providers. But the FCC has unequivocally disclaimed Title II treatment of broadband internet service. In addition, this Court has since abrogated *Ivy*'s preemption reasoning and concluded that, contrary to *Ivy*'s analysis, a proper reading of the Communications Act leaves room for the application of state laws to interstate communications providers.

**II.A.** The district court erred in additionally holding that the ABA conflicts with the FCC's 2018 Order reclassifying broadband internet

service from a Title II telecommunications service to a Title I information service. Such a conclusion fundamentally misconstrues the nature and effect of the FCC's classification decision. As the D.C. Circuit held in *Mozilla*, the FCC lacked statutory authority under Title I to preempt state laws in the 2018 Order. The place where Congress authorized the FCC to block state rate regulation was in Title II, which allows the FCC to classify broadband as a telecommunications service, forbear from imposing common-carrier requirements (including rate regulation), and then prevent States from imposing the same. But Title I contains no similar mechanism for blocking state authority. As *Mozilla* further held, neither the reclassification itself nor the FCC's expressed policy preference for deregulation could support preemption. There was no reason for the district court here to have deviated from these sound and established principles.

**B.** Although the district court did not analyze this question, there is also no merit to plaintiffs' alternative contention below that 47 U.S.C. § 153(51) impliedly preempts the ABA. This definitional provision says that a "telecommunications carrier shall be treated as a common carrier under [the Act] only to the extent that it is engaged in providing

25

telecommunications services." 47 U.S.C. § 153(51). By its plain terms, this prohibition on providers' "be[ing] treated as a common carrier" applies only to treatment under the Communications Act. It thus affects only the FCC's powers under the Act, not the States' exercise of their independent sovereign authority.

## ARGUMENT

## POINT I

### THE DISTRICT COURT ERRED IN HOLDING THAT THE ABA IS BARRED BY FIELD PREEMPTION

In a sweeping ruling, the district court held that the Communications Act preempts the entire field of regulation of providers of interstate communications services, thus precluding any ability of States to regulate these entities. (J.A. 145-152.) The potential consequences of that ruling are enormous: if affirmed, it could oust States from their longstanding power to protect their residents through state consumer-protection and antifraud laws (among others) against the practices of any provider of an interstate communications service—even when, as here, the practice consists solely of intrastate pricing levied by New York companies on New York customers.

In our federal system, "States have broad authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854 (2014). In contrast to the federal government's few and defined powers, the States' powers "'are numerous and indefinite.'" *United States v. Lopez*, 514 U.S. 549, 552 (1995) (quoting *The Federalist No. 45*, at 292-93 (James Madison) (Clinton Rossiter ed., 1961)). And "because the States are independent sovereigns in our federal system," courts presume in all cases that Congress has intended to preserve state law—a presumption that is overcome only where Congress demonstrates a "clear and manifest" preemptive purpose. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks omitted); *accord Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

"In rare cases," Congress will have "legislated so comprehensively in a particular field" that an intent to preclude all state regulation may be inferred. *Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020) (quotation marks omitted). Here, the district court defined the relevant field as that of "interstate communications services," which 47 U.S.C. § 152(a) grants the FCC jurisdiction to regulate. (J.A. 144, 150.) But Congress has expressly recognized—rather than displaced—concurrent state regula-

27

tion over interstate communications providers. In light of that respect for traditional state authority, and for other reasons discussed below, the district court's field-preemption ruling cannot stand.

## A. Federal Communications Law Expressly Acknowledges a Role for State Regulation of Broadband Providers, Including Their In-State Business Practices.

1. The district court's field-preemption ruling improperly ignored "the Communications Act's vision of dual federal-state authority and cooperation" over providers of interstate communications services. *See Mozilla*, 940 F.3d at 81. Even the FCC's 2018 Order, which went too far in seeking to preempt state regulation, acknowledged the "continued applicability" of state laws "policing such matters as fraud, taxation, and general commercial dealings," as well as those "enforcing fair business practices." 2018 Order ¶ 196 (quotation marks omitted). And this Court has already recognized that various provisions of the Communications Act "evidence[] Congress's intent to allow" state law claims to proceed against interstate communications providers, pointing in particular to

"state law actions prohibiting deceptive business practices, false adver-tisement, or common law fraud." *Marcus*, 138 F.3d at 54.

Several provisions of the Act are relevant here. *First*, the Act's "savings clause" announces that nothing in the Act "shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of [the Act] are in addition to such remedies." 47 U.S.C. § 414. This section is "designed to save state law from being preempted." *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 375 (2002). As a result, this savings clause "is fundamentally incompatible" with field preemption, which would leave "nothing for section 414 to 'save.'" *Fisher v. NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007); *accord Johnson v. American Towers, LLC*, 781 F.3d 693, 703 (4th Cir. 2015); *see also Smith v. GTE Corp.*, 236 F.3d 1292, 1313 (11th Cir. 2001).

*Second*, the Act directs that not only the FCC, but also "each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans"—and identifies "price cap regulation" as one available mechanism. 47 U.S.C. § 1302(a). As used in this section, "advanced telecommunications capability" means

29

high-speed broadband service. *Id.* § 1302(d)(1). This provision generally underscores Congress's intent to preserve at least some aspects of the States' concurrent jurisdiction over broadband providers—a policy objective that is inconsistent with the district court's view of field preemption, which would give the FCC alone authority to act. *See Verizon*, 740 F.3d at 638 (explaining that § 1302(a) could reasonably be read as "grant[ing] both the FCC and state commissions the regulatory authority to encourage the deployment" of broadband service). And § 1302(a) more specifically indicates that Congress did not intend to categorically preclude States from capping prices charged by broadband providers, but instead explicitly endorsed that tactic as a means to promote broadband access for "all Americans." 47 U.S.C. § 1302(a). Since "the purpose of Congress is the ultimate touchstone in every pre-emption case," *Wyeth*, 555 U.S. at 565 (quotation marks omitted), § 1302(a)'s acknowledgment of continued state authority over broadband generally and price-cap regulations specifically cannot be squared with the district court's sweeping finding of field preemption.

*Third*, the Communications Act elsewhere explicitly provides for the preemption of state regulatory authority, particularly over Title II

30

telecommunications services—but contains no similar provision for broadband when classified as a Title I information service. For example, the Act declares that "[n]o State or local statute or regulation . . . may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate *telecommunications* service." 47 U.S.C. § 253(a) (emphasis added).[18] And it obligates the FCC under certain circumstances to "preempt the enforcement" of any measure that does so. *Id.* § 253(d). Similarly, Congress imbued the FCC with express authority to bar state enforcement of some common-carrier requirements, including rate regulation—but only for services that the FCC classifies as telecommunications services under Title II, and even then only if the FCC makes a separate forbearance determination under 47 U.S.C. § 160. See *supra* at 10. The presence of these express preemption provisions means that "Congress has considered the issue of pre-emption" and "that matters beyond [these provisions'] reach are not pre-empted." *Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992); *see Wyeth*, 555 U.S. at 574.

---

[18] *See TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 76-77 (2d Cir. 2002) (holding that municipality violated § 253(a) by passing ordinance allowing the denial of telecommunications carriers' entry into local market based on amorphous criteria).

31

2. The fact that Congress plainly envisioned *some* continued role for state regulation of interstate communications providers is fatal to the district court's field-preemption holding, which would leave States with no such role. This Court need go no further to reverse this aspect of the decision below. But the district court's error is underscored by the fact that the ABA does not purport to regulate interstate communications as such; rather, it addresses the in-state business practices of broadband providers. For such practices, which fall within the core of States' traditional authority to protect their own consumers, the case for field preemption under the Communications Act is particularly weak. *See generally* 47 U.S.C. § 253(b) (recognizing continued vitality of state laws that are necessary to "protect the public safety and welfare" or "safeguard the rights of consumers").

Although the ABA applies to broadband services that permit interstate communications, *see* General Business Law § 399-zzzzz(1), the law is wholly unconcerned with such communications' content or destination. Instead, the ABA's principal feature is to regulate the prices of providers' high-speed broadband offerings to a segment of low-income consumers. *Id.* § 399-zzzzz(2). That price regulation applies only to products offered

32

by companies operating in New York to specified consumers who reside in New York, and it concerns only broadband service to be accessed from computers in New York.[19]

The ABA thus resembles state consumer-protection and tax measures that courts have repeatedly upheld—even when those measures applied to services that involved interstate communications. *See, e.g.*, *Goldberg v. Sweet*, 488 U.S. 252, 263 (1989) (holding that State within which "an interstate telephone call [is] billed" may validly tax the call); *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 114-15 (2d Cir. 2014) (concluding that economic locus of online payday loans from out of state Indian tribes to New York consumers could be New York, notwithstanding "complexities introduced by modern electronic commercial transactions"); *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007) ("The fact that an ordinary commercial transaction happens to occur in cyberspace does not insulate it from otherwise applicable state consumer protection laws.").

---

[19] For these reasons, the ABA does not regulate actual "interstate and foreign communication by wire or radio," but rather only "persons engaged . . . in such communication." 47 U.S.C. § 152(a).

Thus, for example, a New York court has rejected a preemption challenge to the State's authority to regulate deceptive advertising by broadband providers about their broadband services. *See People v. Charter Commc'ns, Inc.*, 162 A.D.3d 553, 554 (1st Dep't 2018). And a federal district court likewise rejected a preemption challenge to a state statute restricting broadband providers from disseminating customers' personal information. *See ACA Connects v. Frey*, 471 F. Supp. 3d 318, 323-26 (D. Me. 2020). These examples are part of a larger pattern of state regulation of internet service providers, for the benefit of in-state consumers, through actions targeting advertising, disclosures, billing practices, or cancellation policies; or promulgation of laws governing privacy and cybersecurity. *See* Br. of California et al. as Amici Curiae in Support of Appellant (describing such state regulation).

The district court's holding that the entire field of providers of interstate communications service is impliedly preempted would preclude such familiar state regulations of in-state business practices because they happen to apply to these types of service providers. (*See* J.A. 144-150.) Such sweeping displacement of state authority would leave a regulatory void that finds no support in the Communications Act or the precedents

interpreting the Act's preemptive scope. *See, e.g.*, *Mozilla*, 940 F.3d at 80-81 (vacating the FCC's "effort to kick the States out of intrastate broadband regulation" through express preemption).

**B.    The Communications Act's Grant of Regulatory Authority to the FCC Over Interstate Communications Services Does Not Impliedly Preempt the Field.**

The district court's field-preemption conclusion was based nearly exclusively on 47 U.S.C. § 152(a)'s declaration that the Communications Act "shall apply to all interstate and foreign communication by wire or radio . . . and to all persons engaged within the United States in such communication"—language that vests the FCC with regulatory jurisdiction over these subjects. (*See* J.A. 144.) The court reasoned that, because the ABA's price caps apply to broadband services that "connect[] New York State users to internet endpoints well beyond New York's borders" (J.A. 146), the ABA regulated in a field—interstate communications services—over which § 152(a) grants the FCC "'plenary'" and therefore exclusive authority (J.A. 150 (quoting *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 357)). This conclusion is mistaken for several reasons.

*First*, the Supreme Court has rejected the idea that field preemption can be inferred from the presence of federal regulatory authority

35

alone. "[T]he mere existence of a federal regulatory or enforcement scheme" does not alone "imply pre-emption of state remedies." *English v. General Elec. Co.*, 496 U.S. 72, 87 (1990). And it makes no difference that the federal scheme may have a "comprehensive character." *New York State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973).

Thus, a claim of field preemption "cannot be judged by reference to broad statements about the 'comprehensive' nature of federal regulation under the Federal Communications Act," but rather must rest on "positive evidence of legislative intent" in "specific provisions of the federal statute." *Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 429-30, 432 (1963). Moreover, the fact that communications may be "interstate does not in itself remove [them] from the jurisdiction of the state." *Global NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 101 (2d Cir. 2006). These conclusions preclude reliance on either the interstate character of internet use or the comprehensiveness of the FCC's authority over interstate communications providers to support field preemption. *See Head*, 374 U.S. at 431-32 (regulation of advertisements over interstate radio not field preempted); *Global NAPs*, 454 F.3d

at 99-101 (regulation of interstate phone calls to internet service providers not field preempted).

The regulatory history of cable television demonstrates the error of the district court's conclusion that the FCC's authority under § 152(a) leads to field preemption. The Supreme Court had held that cable television operators were "engaged in interstate communication" as understood by the Act, even when retransmission occurred "within the same State." *United States v. Southwest Cable Co.*, 392 U.S. 157, 168-69 (1968). But the FCC's authority to regulate cable television under § 152(a) did not mean that the States were automatically ousted from the field. To the contrary, it was by then "settled" that § 152(a) "did not intend absolute preemption of the field [of cable regulation] to the exclusion of all state regulation." *TV Pix, Inc. v. Taylor*, 304 F. Supp. 459, 464 (D. Nev. 1968) (three-judge court), *aff'd*, 396 U.S. 556 (1970). As a result, the FCC pursued "a program of 'deliberately structured dualism'" that reserved to States the oversight of "local incidents of cable operations," while the FCC expressly preempted state authority and "retained exclusive jurisdiction" over only signal carriage and technical standards. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 702 (1984). If § 152(a) had impliedly

37

preempted the entire field of matters subject to the FCC's regulatory jurisdiction, then this express preemption by the FCC would have been unnecessary.

*Second*, when the 2018 Order reclassified broadband as a Title I information service, that decision rendered the Title II common-carrier framework over broadband "moot," 2018 Order ¶ 174. The district court was mistaken in deeming this change immaterial to field preemption. Contrary to the district court's reasoning (J.A. 150), the FCC does not have the same "plenary" authority over Title I services as Title II services. *See Comcast*, 600 F.3d at 650 (rejecting any "claim of plenary authority" over broadband providers under Title I). In particular, Title I does not confer on the FCC any authority to impose common-carrier-type regulations—including rate regulation—on information services. *See Verizon*, 740 F.3d at 650; *Comcast*, 600 F.3d at 655. In other words, by classifying broadband services as information services governed by Title I, the FCC appears to have eliminated its own authority to impose the types of price caps on broadband services that the ABA establishes.

The absence of such federal authority matters for purposes of preemption. There can be "'no federal preemption *in vacuo*.'" *Garcia*,

140 S. Ct. at 801 (quoting *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). And "in any area where the [FCC] lacks the authority to regulate," including as a necessary consequence of its classification decision, "it equally lacks the power to preempt state law." *Mozilla*, 940 F.3d at 75. The district court thus erred in finding field preemption based on § 152(a) alone, without considering the limitations of the actual provisions of the Communications Act—in Title I— that apply here due to the FCC's 2018 Order.

*Third*, construing § 152(a) as a grant of exclusive federal power to regulate interstate communications providers would negate the Act's simultaneous and express reservation of exclusive *state* authority "with respect to . . . charges, classifications, practices, services, facilities, or regulations for or in connection with *intrastate* communication service." 47 U.S.C. § 152(b) (emphasis added). As the Supreme Court has explained, although § 152 relies on a distinction between interstate and intrastate communications services, "in practice, the realities of technology and economics belie such a clean parceling of responsibility." *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 360. State regulation in connection with intrastate communications service often has a substantial effect on

interstate communications because both types of service "are provided by a single integrated system," *id.* at 375, and the same equipment "is used interchangeably to provide both," *id.* at 373.

Nonetheless, in *Louisiana PSC*, the Supreme Court rejected an attempt to oust state authority on the ground that the exercise of such authority might "substantially affect interstate communication." *Id.* at 373 (quotation marks omitted). In other words, the Court refused to allow the FCC's undisputed jurisdiction over interstate communications to displace the States' authority to regulate intrastate matters—authority that Congress had explicitly preserved in § 152(b)—even when the subjects of regulation overlapped and affected one another. But the district court here took the opposite approach, concluding that the "unavoidable overlap" between interstate and intrastate communications service instead *forecloses* "concurrent state regulation." (J.A. 150 n.13.) That reasoning is inconsistent with *Louisiana PSC* and disregards the "system of dual state and federal regulation" that Congress intended in the Act. 476 U.S. at 360.

## C.    The District Court Misplaced Its Reliance on *Ivy Broadcasting*.

The district court also erred in relying on a 1968 decision of this Court—*Ivy Broadcasting Co. v. American Telephone & Telegraph Co.*, 391 F.2d 486—as having held that the Communications Act preempts the field of state regulation of all providers of interstate communications services. (J.A. 148-149.) For one thing, *Ivy*'s holding was limited to Title II services; for another, its preemption analysis has since been abrogated by a decision that reinforces the lack of field preemption here. *See Marcus*, 138 F.3d 46.

*Ivy* held that federal common law governed tort and contract claims that the plaintiffs had brought in federal court "concerning the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications." 391 F.2d at 491. That application of what is known as complete (or jurisdictional) preemption rested on *Ivy*'s characterization of Title II's "comprehensive legislation regulating common carriers engaged in interstate telegraph and telephone trans-

41

mission."[20] *Id.* at 490. *Ivy* thus concluded that Title II's "broad scheme for the regulation of interstate service by communications carriers indicates an intent on the part of Congress to occupy the field to the exclusion of state law." *Id.*; *see also Nordlicht v. New York Tel. Co.*, 799 F.2d 859, 862 (2d Cir. 1986) (extending *Ivy*'s rationale to claims about telephone carriers' billing practices for foreign calls), *abrogated by Marcus*, 138 F.3d 46.

For two reasons, the district court erred in relying on *Ivy* as dictating field preemption of all regulation of providers of interstate communications. *First*, *Ivy*'s finding of complete preemption was expressly based on the applicability of Title II's common-carrier regime to the telecommunications provider at issue there. *See Nordlicht*, 799 F.2d at 862 ("*Ivy* applied federal common law with respect to claims concerning interstate *telecommunications* service." (emphasis added)); *see also Ivy Broad.*, 391 F.2d at 490-91 (surveying Title II's unique duties on common

---

[20] As now formulated, the doctrine of complete preemption applies where a federal statute has such "'extraordinary' preemptive force that state-law claims coming within the scope of the federal statute are transformed, for jurisdictional purposes, into federal claims." *Sullivan v. American Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005).

carriers and related enforcement mechanisms). But here, the FCC's 2018 Order "completely disavow[ed] Title II" treatment of broadband providers and classified them under Title I instead. *Mozilla*, 940 F.3d at 80; *see* 2018 Order ¶ 2. Because the Communications Act's "comprehensive" statutory scheme for "regulating common carriers" under Title II, *Ivy Broad.*, 391 F.2d at 490, thus does not apply to broadband providers, *Ivy*'s finding of complete preemption based on that scheme does not apply to broadband providers either.

*Second*, *Ivy*'s complete-preemption analysis has been superseded by subsequent Supreme Court case law, as this Court has recognized. Unlike ordinary preemption, which acts as "a federal defense to the plaintiff's suit," complete preemption transforms a "state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-65 (1987). But as the Supreme Court made clear in *Metropolitan Life*—decided nearly two decades after *Ivy*—complete preemption occurs only when a federal statute contains "an exclusive federal cause of action for resolution of such disputes." *Id.* at 63; *accord Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). *Ivy*, however, found complete preemption despite

43

acknowledging the *absence* of any provision of the Communications Act that expressly granted a remedy for the plaintiff's tort and contract claims. *See* 391 F.2d at 489-90.

In *Marcus*, this Court concluded that this aspect of *Ivy*'s reasoning (which later cases like *Nordlicht* had carried forward) did not survive *Metropolitan Life* and is "no longer the law." *Marcus*, 138 F.3d at 54-55. *Marcus* thus rejected the key premise of *Ivy*'s preemption analysis, which had been that "*every* state law claim challenging a carrier's rates or billing practices necessarily arises under federal law." *Id.* at 55. To the contrary, as *Marcus* held, the "Communications Act does not manifest a clear Congressional intent to preempt state law actions" to enforce consumer-protection and similar measures relating to interstate telecommunications service. *Id.* at 55. See *supra* at 29-31. In light of these intervening developments, the district court erred in relying on *Ivy* to support field preemption here.

# POINT II

## THE DISTRICT COURT ERRED IN HOLDING THAT THE ABA IS BARRED BY CONFLICT PREEMPTION

In addition to finding field preemption, the district court further concluded that the ABA conflicted with the FCC's "affirmative decision" in the 2018 Order not to treat broadband internet service "as a common carrier." (J.A. 137.) That conclusion both misapplies the 2018 Order and improperly disregards the absence of any conflict with Title I itself—the necessary source of any preemption here. *See Medtronic*, 518 U.S. at 485.

Conflict preemption occurs "in two circumstances: first, when 'compliance with both federal and state regulations is a physical impossibility,' and second, when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 97 (2d Cir. 2013) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). Here, no claim has been made that it would be physically impossible to comply with both the ABA and (nonexistent) federal regulation of broadband prices. Rather, plaintiffs argued, and the district court agreed, that the ABA "stands as an obstacle" to the FCC's deregulatory agenda, as expressed in the 2018 Order. (J.A. 141.)

45

"The burden of establishing obstacle preemption" is a "heavy" one. *In re MTBE*, 725 F.3d at 101. This theory demands more than the "mere fact of tension between federal and state law"; any conflict must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id.* at 101-02 (quotation marks omitted); *see also Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007) ("[T]he conflict between state law and federal policy must be a sharp one." (quotation marks omitted)). Moreover, conflict preemption cannot be established merely by invoking some "brooding federal interest" that state law allegedly offends. *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (opinion of Gorsuch, J., announcing judgment of the Court). Instead, like any preemption claim, conflict preemption must rest on a "constitutional text or a federal statute," *Isla Petroleum*, 485 U.S. at 503, or else "an agency regulation with the force of law," *Wyeth*, 555 U.S. at 576. Plaintiffs failed to satisfy the demanding standards for conflict preemption here.

46

A.     **The FCC's Decision to Classify Broadband Service as an Information Service Lacks Implied Preemptive Effect.**

1. The district court erred in giving preemptive effect to the FCC's allegedly "reasoned decision" in the 2018 Order "to assure interstate broadband providers that no common-carrier rate regulations await them" (J.A. 139). Indeed, the D.C. Circuit in *Mozilla*—a case in which most plaintiffs here participated as intervenors—conclusively rejected the premises on which the district court's decision rested. As the D.C. Circuit held, the FCC lacks any authority to preempt state laws that are inconsistent with the 2018 Order's "deregulatory approach." 940 F.3d at 74. As the D.C. Circuit explained, the Commission lacks both express and ancillary authority under Title I to preempt state broadband laws. *Id.* at 75-76. And *Mozilla* specifically rejected the argument that the FCC's "threshold classification decision"—i.e., reclassifying broadband from a Title II telecommunications service to a Title I information service—gave the 2018 Order the force of a "State-displacing legal command[]." *Id.* at 84. Such reclassification may preclude the FCC from imposing most regulations *of its own* on broadband, but it does not establish "an over-arching 'nationwide regime' that enforces the policy preference underly-

47

ing the definitional choice." *Id.* Plaintiffs offered no ground for deviating from this thoroughly reasoned decision.

In addition to holding the FCC devoid of preemption authority under Title I, *Mozilla* also dispenses with another key premise of plaintiffs' claim and the district court's holding on conflict preemption: that the 2018 Order's announcement of a "federal policy of nonregulation for information services" had preemptive effect on the States. *See id.* at 78. As *Mozilla* explained, that premise conflicts with the well-settled principle that an agency's policy preferences alone cannot sustain preemption. *See Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374 (holding that a "federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority," not merely to "effectuate a federal policy" the agency favors); *see also Isla Petroleum*, 485 U.S. at 501 ("[U]nenacted approvals, beliefs, and desires are not laws."). And this principle has special force under Title I, which does not authorize the FCC "to pursue a stand-alone policy objective." *Comcast*, 600 F.3d at 659. In the absence of any such underlying statutory authority, the 2018 Order's "mere assertion that state law is an obstacle to achieving its statutory objectives" does not control, for "agencies have no special

48

authority to pronounce on pre-emption absent delegation by Congress," *Wyeth*, 555 U.S. at 576-77.

The district court improperly disregarded these principles in finding preemption based on a purported conflict between the ABA and the 2018 Order. Despite *Mozilla*'s holding that the 2018 Order's reclassification of broadband to Title I entailed no preemptive effect, the district court found preemption based on the FCC's "decision not to treat [broadband service] as a common carrier." (J.A. 137.) Similarly, despite *Mozilla*'s holding that the FCC could not affirmatively preempt state laws under Title I, the district court located automatic preemptive effect in the FCC's decision to "bind[] itself to the confines of Title I jurisdiction." (J.A. 139.) And despite the well-settled law denying preemptive effect to an agency's mere policy choices, the district court here held that the ABA was preempted because it conflicted with the FCC's "long-standing policy choice concerning the propriety of imposing common-carrier rate regulation upon broadband internet service." (J.A. 139.) The district court's finding of conflict preemption thus improperly conferred preemptive force on the 2018 Order that does not exist.

2. The district court also erred in assuming that the FCC's "affirmative decision" to reclassify broadband as a Title I information service implemented a federal statutory policy to clear the field of any concurrent state regulation (J.A. 137-138). For that idea, the court relied on decisions holding that an agency's nonregulation decision can accrue preemptive force if equivalent to "a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178 (1978) (quotation marks omitted); *see also Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 774 (1947). But this line of authority does not fit the circumstances here.

There is a "vital difference between [an agency's] refusal to use granted power, and an attempt to prevent regulation by others in an area where no" agency authority exists. *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601, 620 n.113 (D.C. Cir. 1976). In other words, an agency that has power to act may be able to preempt state laws by declining to regulate a discrete subject, because in such a case the agency could be said to be exercising its delegated authority to free that area from regulation altogether. Here, however, as *Verizon* made clear, the

50

FCC *lacks* authority under Title I to impose common-carrier regulations, including rate regulation, on broadband providers. 740 F.3d at 655-59. And the FCC chose to classify broadband as an information service under Title I because it concluded that "the best reading of the relevant definitional provisions" in the Act compelled that outcome, 2018 Order ¶ 26, whereas leaving broadband under Title II would be a statutory "anomaly," *id.* ¶ 161.

Thus, the FCC's decision not to impose rate regulation in the 2018 Order reflected the absence of its own authority, not a choice to exercise delegated authority in a deregulatory manner. And nothing in Title I itself suggests that this absence of federal authority was also meant to displace traditional state authority over in-state business practices. As the D.C. Circuit has observed, "[i]f Congress wanted Title I to vest the Commission with some form of Dormant-Commerce-Clause-like power to negate States' statutory (and sovereign) authority just by washing its hands of its own regulatory authority, Congress could have said so." *Mozilla*, 940 F.3d at 83. But it did not. And without a statutory text that can "plausibly be interpreted as *prescribing* federal pre-emption it is

impossible to find that a free market was mandated by federal law." *Isla Petroleum*, 485 U.S. at 501.

3. To be sure, the D.C. Circuit in *Mozilla* left open the possibility that future parties might "invoke conflict preemption" by "explain[ing] how a state practice actually undermines the 2018 Order." *Mozilla*, 940 F.3d at 85. The district court relied on that passage in identifying conflict preemption here. (J.A. 143.) But the D.C. Circuit's language is best understood as preserving the ability of parties to identify a conflict between a state law and one of the 2018 Order's few affirmative obligations, such as the disclosure requirements imposed by the "transparency rule," ¶¶ 218-31. *See, e.g., Charter Commc'ns*, 162 A.D.3d at 554 (considering but rejecting claim that state false-advertising action conflicted with transparency rule). No such affirmative obligation is present here, since the 2018 Order substantially *withdrew* other federal regulation over broadband—including common-carrier requirements such as rate regulation—leaving no federal regime in its place. *See New York Tel. Co. v. FCC*, 631 F.2d 1059, 1067 (2d Cir. 1980) (doubting that FCC could "invalidate[] state regulation without substituting its own," by creating "a regulatory vacuum"). And consistent with prior law, the FCC's mere preference for

52

a "deregulatory approach" to broadband did not, and could not, preempt state laws. *See Mozilla*, 940 F.3d at 85.

In any event, even a fresh look at the specific claim of conflict here would fail to support preemption. Put simply, there is no conflict between any provision of federal law and the ABA's attempt to increase broadband accessibility by imposing intrastate price caps for certain low-income consumers. And that conclusion is true whether the ABA's price regulation is viewed as an exercise of New York's traditional powers to regulate in-state business practices, or as a form of common-carrier rate regulation.

*First*, as explained above, nothing in the Communications Act generally or in Title I specifically purports to restrain States from regulating the business practices of broadband providers as part of the States' traditional authority to protect consumers, prevent corporate abuses, and more. *See Marcus*, 138 F.3d at 54. Here, the ABA fits squarely within the traditional exercise of state authority that Congress refused to disturb in the Act. Rather than seeking to regulate the actual "transmission . . . of information," 47 U.S.C. § 153(50)—something that would arguably interfere more directly with the FCC's purview over interstate communications—the ABA instead establishes an affordable price regime

53

for certain broadband products sold to low-income consumers in New York. The ABA's price caps may thus be related to broadband service; but that fact alone does not preclude state regulation, just as States are free to regulate broadband providers' advertisements regarding their inter-state communications services. *See Charter Commc'ns*, 162 A.D.3d at 554.

*Second*, even if the ABA were construed as a form of common-carrier rate regulation, as the district court viewed it (J.A. 139-141), there would *still* be no conflict with Title I that would support preemption. That conclusion follows from the fact that Congress expressly provided a statutory mechanism for the FCC to block States from engaging in common-carrier rate regulations—but that mechanism is available *only* when the FCC exercises its Title II powers over telecommunications, and is categorically unavailable under Title I. "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S. at 517.

Specifically, under Title II, the FCC has authority to forbear from applying any of Title II's common-carrier requirements—including rate regulation—if it determines that certain statutory criteria are satisfied. *See* 47 U.S.C. § 160(a) (listing forbearance criteria). Congress then

expressly provided that States "may not continue to apply or enforce any provision" of the Act that is subject to FCC forbearance. *Id.* § 160(e). And although forbearance alone does not "prevent states from adopting similar provisions to the extent they have authority under state law," *Irregulators v. FCC*, 953 F.3d 78, 83 (D.C. Cir. 2020) (quotation marks omitted), the FCC's 2015 Order relied on its forbearance from rate regulation of broadband providers to threaten to preempt any state regulation of broadband rates that stood "in conflict with" the FCC's choice, ¶ 433.

Title I contains no similar statutory mechanism authorizing the FCC to preclude States from regulating broadband prices charged to consumers. But the district court's decision here to give preemptive effect to the 2018 Order's objective to free broadband from all rate regulation (J.A. 139) would essentially import Title II's forbearance regime into Title I. There is no basis to disregard Congress's considered choice to limit any preemption of state rate regulation to circumstances where the FCC is exercising its Title II authority. As the D.C. Circuit has explained, the FCC "cannot completely disavow Title II with one hand while still clinging to Title II forbearance authority with the other." *Mozilla*, 940 F.3d at 80.

55

**B.  The ABA Does Not Conflict with the Statutory Definition of "Telecommunications Carrier."**

Besides relying on the FCC's 2018 Order, plaintiffs argued below that the ABA also conflicted with 47 U.S.C. § 153(51). *See* Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 11-14, Dist. Ct. ECF No. 16. That subsection, which was added as part of the 1996 amendments to the Act, defines a "telecommunications carrier" as a "provider of telecommunications services." 47 U.S.C. § 153(51). And it says that a "telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services." *Id.* According to plaintiffs, this definition's prohibition on a provider's "be[ing] treated as a common carrier" applies not just to the FCC, but also to the States—thus precluding state common-carrier-type regulations under the same circumstances.

The district court noted this argument (J.A. 137), but did not further address or analyze this subsection. To the extent that plaintiffs raise their § 153(51) argument as an alternative basis to affirm the judgment below, this Court should reject it.

Section 153(51)'s definition of "telecommunications carrier" does not have the preemptive effect that plaintiffs assert because the defini-

tion concerns only the FCC's administration of Title II, not the States' authority to promulgate state law. Specifically, the definition identifies the circumstances under which a "telecommunications carrier shall be treated as a common carrier *under this chapter*." 47 U.S.C. § 153(51) (emphasis added).[21] The referenced chapter is the Communications Act itself, *see Verizon*, 740 F.3d at 650, the provisions of which the FCC "shall execute and enforce," 47 U.S.C. § 151. But New York here did not purport to "execute" or "enforce" any duties under the Communications Act when enacting the ABA. Thus, even if the ABA's pricing scheme for broadband offerings to low-income consumers could be likened to common-carrier treatment, as the district court thought, § 153(51) would pose no impediment to this state statute.

The Supreme Court rejected an analogous preemption claim in *Chamber of Commerce v. Whiting*, 563 U.S. 582 (2010). There, a business group argued that Arizona could not require in-state employers to use an electronic employment verification system, when a federal statute barred

---

[21] When quoting this sentence, the district court omitted the crucial phrase "under this chapter," writing that § 153(51) "permit[s] treatment 'as a common carrier . . . only to the extent that [an entity] is engaged in providing telecommunications services.'" (J.A. 135.)

the Department of Homeland Security from requiring anyone to use the same program. The Supreme Court rejected that argument, emphasizing that the cited federal law "constrain[ed] federal action" alone, "contain[ed] no language circumscribing state action," and thus "limit[ed] what the Secretary of Homeland Security may do—nothing more." *Id.* at 608. So too here. The pertinent sentence in § 153(51) is "a *limitation* on the [FCC's] authority," not a constraint on state authority. *Mozilla*, 940 F.3d at 79; *see id.* (holding that FCC could not base express preemption of state broadband regulation on § 153(51)). And it makes "obvious that the *Commission* would violate the Communications Act were it to regulate broadband providers as common carriers," *Verizon*, 740 F.3d at 650 (emphasis added), if those entities are not "'engaged in providing telecommunications services,'" *id.* (quoting 47 U.S.C. § 153(51)).

Reinforcing § 153(51)'s lack of implied preemptive effect, the 1996 Telecommunications Act—which added § 153(51)—declares that its provisions shall have "NO IMPLIED EFFECT." Pub. L. 104-104, § 601(c)(1), 110 Stat. at 143, codified at 47 U.S.C. § 152 note ("This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so

58

provided . . . ."). This "anti-preemption clause" precludes any interpretation of § 153(51) that would "oust[] the state legislature by implication." *AT&T Commc'ns of Ill., Inc. v. Illinois Bell Tel. Co.*, 349 F.3d 402, 410 (7th Cir. 2003); *see, e.g.*, *City of Dallas v. FCC*, 165 F.3d 341, 347-48 (5th Cir. 1999) (citing § 601(c)(1) in holding that federal statute exempting video services from needing franchise agreements did not impliedly preempt States from requiring such agreements); *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 428 (9th Cir. 2014) (citing § 601(c)(1) in holding that federal statutory rules for television closed-captioning did not impliedly extend to online closed-captioning).

Plaintiffs made two arguments below to resist § 601(c)(1), but neither is persuasive. *See* Reply Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. ("PI Reply") at 6, Dist. Ct. ECF No. 23. *First*, plaintiffs observed that some courts have held § 601(c)(1) not to "permit actual conflicts between state and federal law." *Farina v. Nokia Inc.*, 625 F.3d 97, 131 (3d Cir. 2010); *see also Qwest Corp. v. Minnesota Pub. Utils. Comm'n*, 684 F.3d 721, 731 (8th Cir. 2012). But even if it were correct, that reading of § 601(c)(1) would not avail plaintiffs here. The ABA does

59

not actually conflict with § 153(51)'s limitation on the FCC's (or anyone's) treatment of telecommunications carriers under the Communications Act. See *supra* at 56-58.

*Second*, plaintiffs posited below that § 153(51) silently "continued" preexisting preemption of state common-carrier-like treatment of Title I information services. PI Reply at 6. This argument simply ignores the Telecommunications Act's announcement that § 153(51) has "NO IMPLIED EFFECT." 47 U.S.C. § 152 note. In any event, in 1970, the Supreme Court affirmed that "state public utility regulation" (including rate regulation) of interstate cable television (then a Title I service) was *not* federally preempted where, as here, the FCC had "sought to eschew legislative authority in this area." *TV Pix*, 304 F. Supp. at 464-66, *aff'd*, 396 U.S. 556.

Moreover, the 1996 amendments further limited the preemptive scope of the Communications Act by including a new provision that exhorted States in "the public interest" to "encourage the deployment on a reasonable and timely basis of" broadband service, including via "price cap regulation." 47 U.S.C. § 1302(a). See *supra* at 29-30. Assessing obstacle preemption requires "examining the federal statute as a whole"

60

to identify Congress's purpose. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000). Section 1302(a) thus reinforces that the ABA and the Communications Act as a whole are not so directly repugnant that the "two acts cannot be reconciled." *See In re MTBE*, 725 F.3d at 102 (quotation marks omitted).

## CONCLUSION

The district court's judgment should be reversed.

Dated:  New York, New York
        November 24, 2021

                                Respectfully submitted,

                                LETITIA JAMES
                                  *Attorney General*
                                  *State of New York*
                                Attorney for Appellant


                        By:  */s/ Eric Del Pozo*
                             ERIC DEL POZO
                             Assistant Solicitor General

BARBARA D. UNDERWOOD              28 Liberty Street
  *Solicitor General*             New York, NY 10005
STEVEN C. WU                      (212) 416-8019
  *Deputy Solicitor General*
ERIC DEL POZO
  *Assistant Solicitor General*
      *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,297 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ *Kelly Cheung*