# 21-1975

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

NEW YORK STATE TELECOMMUNICATIONS ASSOCIATION, INC., CTIA – THE WIRELESS ASSOCIATION, ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, USTELECOM – THE BROADBAND ASSOCIATION, NTCA – THE RURAL BROADBAND ASSOCIATION, SATELLITE BROADCASTING AND COMMUNICATIONS ASSOCIATION, ON BEHALF OF THEIR RESPECTIVE MEMBERS,
*Plaintiffs-Appellees*,

v.

LETITIA A. JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NEW YORK,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of New York

**BRIEF OF THE STATES OF CALIFORNIA, CONNECTICUT DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEBRASKA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA, WASHINGTON, AND WISCONSIN, AND THE DISTRICT OF COLUMBIA, AS AMICI CURIAE IN SUPPORT OF DEFENDANT–APPELLANT**

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
PAUL STEIN
Supervising Deputy Attorney General
SARAH E. KURTZ
JOHN D. ECHEVERRIA
Deputy Attorneys General

P. PATTY LI
Deputy Attorney General
  455 Golden Gate Ave., Suite 11000
  San Francisco, CA 94102
  Telephone: (415) 510-3817
  Fax: (415) 703-1234
  Email: Patty.Li@doj.ca.gov
*Counsel for Amici Curiae*

Dated: December 1, 2021

# TABLE OF CONTENTS

**Page**

Interests of Amici Curiae ................................................................. 1

Argument ......................................................................................... 2

I. States May Exercise Their Historic Police Powers to Regulate Broadband Services Provided to Their Residents ............................................................................. 2

    A. There Is a Presumption Against Preemption of State Consumer Protection Laws .................................... 2

    B. The FCC's 2018 Order Does Not Preempt New York's Statute ................................................................ 3

        1. The FCC Lacks Plenary Authority Over Broadband, Due to Its Status as a Title I Information Service ............................................. 3

        2. There Is No Conflict with the FCC's Reclassification Decision ..................................... 6

        3. There Is No Conflict with the Transparency Rule ........................................................................ 10

    C. There Is No Conflict with Section 153(51) of the Communications Act ................................................... 11

    D. The Communications Act Does Not Preempt the Field of "Interstate Communications" .......................... 16

II. Plaintiffs' Preemption Theories Would Undermine the States' Abilities to Protect Their Residents ............................ 20

    A. Plaintiffs' Theories Cannot Be Squared with the States' Well-Established Practice of Regulating Internet-Based Activity ................................................ 20

    B. Broadband Is an Essential Service that Is Already Subject to State Consumer Protection Laws, Including Laws that Regulate Pricing .......................... 24

Conclusion ..................................................................................... 31

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. City of Rancho Palos Verdes*
354 F.3d 1094 (9th Cir. 2004) .................................................................. 14

*ACA Connects - Am.'s Commc'ns Ass'n v. Frey*
471 F. Supp. 3d 318 (D. Me. 2020) ......................................................... 26

*Am. Library Ass'n v. FCC*
406 F.3d 689 (D.C. Cir. 2005) ................................................................... 4

*Arizona v. United States*
567 U.S. 387 (2012) ................................................................................. 19

*Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*
461 U.S. 375 (1983) ................................................................................. 12

*AT&T Comm'cns of Ill. v. Ill. Bell Tel. Co.*
349 F.3d 402 (7th Cir. 2003) .................................................................. 14

*Cal. Fed. Savs. & Loan Assoc. v. Guerra*
479 U.S. 272 (1987) ................................................................................... 2

*California v. ARC Am. Corp.*
490 U.S. 93 (1989) ..................................................................................... 3

*California v. FCC* (*California I*)
905 F.2d 1217 (9th Cir. 1990) ........................................................... 15, 16

*California v. FCC* (*California III*)
39 F.3d 919 (9th Cir. 1994) ............................................................... 15, 16

*Chamber of Comm. of U.S. v. Whiting*
563 U.S. 582 (2011) ................................................................................. 12

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*
467 U.S. 837 (1984) ............................................................................. 9, 10

# TABLE OF AUTHORITIES
## (continued)

Page

*City of Dallas v. FCC*
    165 F.3d 341 (5th Cir. 1999) ................................................................. 13

*Comcast Corp. v. FCC*
    600 F.3d 642 (D.C. Cir. 2010)........................................................ *passim*

*Comp. & Commc'ns Indus. Ass'n v. FCC* (*CCIA*)
    693 F.2d 198 (D.C. Cir. 1982)....................................................... 15, 16

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*
    458 U.S. 141 (1982)....................................................................................3

*Fla. Lime & Avocado Growers, Inc. v. Paul*
    373 U.S. 132 (1963)....................................................................................3

*Gen. Motors v. Abrams*
    897 F.2d 34 (2d Cir. 1990) .........................................................................3

*Gonzales v. Oregon*
    546 U.S. 243 (2006)....................................................................................1

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*
    742 F.3d 414 (9th Cir. 2014) ................................................................. 19

*Gregory v. Ashcroft*
    501 U.S. 452 (1991)....................................................................................2

*Ivy Broadcasting Co. v. AT&T Co.*
    391 F.2d 486 (2d Cir. 1968) ............................................................. 16, 17

*La. Pub. Serv. Comm'n v. FCC*
    476 U.S. 355 (1986)............................................................................ 3, 17

*MCI Telecomm. Corp. v. AT&T Co.*
    512 U.S. 218 (1994)................................................................................ 10

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Med. Soc'y of State of N.Y. v. Cuomo*
  976 F.2d 812 (2d Cir. 1992) ...................................................................7

*Merck Sharp & Dohme Corp. v. Albrecht*
  139 S. Ct. 1668 (2019)...........................................................................9

*Mozilla Corp. v. FCC*
  940 F.3d 1 (D.C. Cir. 2019)............................................................ *passim*

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*
  533 F.2d 601 (D.C. Cir. 1976)............................................................ 18

*National Cable & Telecommunications Ass'n v. Brand X*
  *Internet Services* (*Brand X*)
  545 U.S. 967 (2005)........................................................................ 5, 20

*Pinney v. Nokia*
  402 F.3d 430 (4th Cir. 2005) ............................................................ 14

*Ray v. Atl. Richfield Co.*
  435 U.S. 151 (1978)...............................................................................7

*State v. CenturyLink, Inc.*
  No. 19-2-32452-0 SEA (King County Super. Ct. Dec. 9,
  2019) ............................................................................................... 29

*State v. Charter Commc'ns*
  No. 20-2-00460-04 (Chelan County Super. Ct. July 27,
  2020) ............................................................................................... 29

*State v. Comcast Cable Commc'ns Mgmt.*
  No. 16-2-18224-1 SEA (King County Super. Ct. June 6,
  2019) ............................................................................................... 29

*State v. Frontier Commc'ns Corp.*
  No. 20-2-01731-34 (Thurston County Super. Ct. July 20,
  2020) ............................................................................................... 29

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*State v. Wave Div. Holdings, LLC*
No. 21-2-03139-7 SEA (King County Super. Ct. Mar. 9, 2021) ................................................................................... 29

*Steel Inst. of N.Y. v. City of New York*
716 F.3d 31 (2d Cir. 2013) ............................................... 14, 19

*United States v. Midwest Video Corp.*
406 U.S. 649 (1972) ........................................................... 6, 18

*United States v. Sw. Cable Co.*
392 U.S. 157 (1968) ................................................................6

*Wis. Pub. Intervenor v. Mortier*
501 U.S. 597 (1991).............................................................. 19

*Wyeth v. Levine*
555 U.S. 555 (2009)........................................................... 2, 31

STATUTES

*Federal*

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115................................................................. 25

42 U.S.C.
§ 1983 ................................................................................. 14

47 U.S.C.
§ 152 ................................................................. 13, 17, 18
§ 152 note (§ 601 of Telecommunications Act of 1996) ........... 13, 14, 19
§ 153 ................................................................................ *passim*
§ 163 .................................................................................. 11
§ 201 ....................................................................................5
§ 223 .................................................................................. 19
§ 230 .................................................................................. 19

**TABLE OF AUTHORITIES**
(continued)

Page

§ 253 ...................................................................... 19
§ 253 ...................................................................... 19
§ 257 ...................................................................... 11
§ 257 (1996).............................................................. 11
§ 276 ...................................................................... 19
§ 332 ...................................................................... 19
§ 543 ...................................................................... 19
§ 544 ...................................................................... 19
§ 556 ...................................................................... 19

47 C.F.R.
§ 8.1(a) ................................................................... 10

*State (alphabetical)*

2020 Alaska Laws Ch. 10 § 26 (S.B. 241) ...................... 30

Ark. Code Ann. § 4-88-303(a)(1) ................................. 30

Cal. Bus. & Prof. Code
§§ 17200-17210 ...................................................... 22
§§ 22575-22582 ...................................................... 26

Cal. Civ. Code
§§ 51-52 ................................................................ 22

Cal. Civ. Code
§§ 1798.100-1798.199.100 ....................................... 26

Cal. Pen. Code
§ 288.2(a)(1) .......................................................... 22

Conn. Gen. Stat. § 42-471 ......................................... 26

Del. Code Ann.
tit. 6, §§ 1201C-1206C ............................................ 26

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

tit. 16, §§ 4741-4745 ................................................................... 22

Ga. Code Ann. § 10-1-393.4 ....................................................... 30

Idaho Code Ann. § 48-603(19) .................................................... 30

815 Ill. Comp. Stat. 518/10 ......................................................... 22

Iowa Admin. Code 61-31.1(714) ................................................. 30

Mass. Gen. Laws, Chapter 71, § 94 ............................................. 21

Me. Stat. Title 35-A, § 9301 ........................................................ 26

Nev. Rev. Stat. § 603A.340 ......................................................... 26

N.Y. Gen. Bus. Law § 399-zzzzz ("Affordable Broadband
    Act") ...................................................................... 2, 3, 6, 10, 11

Or. Rev. Stat. § 646.607 .............................................................. 26

Va. Code Ann. §§ 59.1-575 - 59.1-581 ........................................ 26

**ADMINISTRATIVE SOURCES**

*In re Amendment of Section 64.702 of the Commission's Rules
    and Regulations (Second Computer Inquiry)*
    77 F.C.C.2d 384 (1980) ........................................................ 15

*In re Amendment of Sections 64.702 of the Commission's Rules
    and Regulations (Third Computer Inquiry)*, Report and
    Order, 104 F.C.C.2d 958 (1986), on reconsideration, 2
    F.C.C.R. 3035 (1987); 2 F.C.C.R. 3072 (1987) ..................... 15

*In re Amendment of Sections 64.702 of the Commission's Rules
    and Regulations (Third Computer Inquiry)*, Memorandum
    Opinion & Order on Further Reconsideration, 3 F.C.C.R.
    1135 (1988) ......................................................................... 15

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, Memorandum Opinion & Order on Reconsideration, 3 F.C.C.R. 1150 (1988) .................................................................................... 15

*In re Restoring Internet Freedom* 33 F.C.C.R. 311 (2018) ................................................................ *passim*

*Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, 33 F.C.C.R. 12075 (2018) ........................ 20

OTHER AUTHORITIES

Associated Press, *Time Warner Cable to Pay $18.8m in California Internet Case* (Feb. 20, 2020), https://apnews.com/article/ 8e875d8f568d46cb5d117faf059acfe3 .................................................... 28

Cybersecurity & Infrastructure Security Agency, *Guidance on the Essential Critical Infrastructure Workforce*, https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce (last visited Dec. 1, 2021) .............................. 26

H.R. Rep. No. 104-458 (1996) ............................................................. 12, 14

iDevelopment & Econ. Ass'n, *Bill Trackers: Online Gaming and Sports Betting Bills by State, Including Mobile Provisions* (June 2021), https://ideagrowth.org/legislative-tracking ................................................................................................. 21

Lestock, Jake, *Tackling Daily Fantasy Sports in the States*, 26 Legis Brief No. 1 (Nat'l Conf. of State Legs. Jan. 2018), https://www.ncsl.org/research/civil-and-criminal-justice/tackling-daily-fantasy-sports-in-the-states.aspx ......................... 21

# TABLE OF AUTHORITIES
## (continued)

Page

National Conference of State Legislatures, *Price Gouging State Statutes* (May 17, 2021), https://www.ncsl.org/research/ financial-services-and-commerce/price-gouging-state-statutes.aspx ............................................................................... 30

National Conference of State Legislatures, *Security Breach Notification Laws* (April 15, 2021), https://www.ncsl.org/ research/telecommunications-and-information-technology/security-breach-notification-laws.aspx ................................. 27

Malfitano, Nicholas, *AG's Office Settles Shoddy Service Claims with Internet Provider Frontier Communications for $200K*, Penn. Record (Mar. 20, 2020), https://pennrecord.com/ stories/528157350-ag-s-office-settles-shoddy-service-claims-with-internet-provider-frontier-communications-for-200k ........................................................................................... 28

Mayer, Robert, *USTelecom Statement on Updated CISA Guidance on 'Essential Critical Infrastructure Workers' During COVID-19* (Mar. 28, 2020), https://www.ustelecom.org/ustelecom-statement-on-updated-cisa-guidance-on-essential-critical-infrastructure-workers-during-covid-19 .......................................................... 25

Miller, Claire Cain, *Google to Pay $17 Million to Settle Privacy Case*, N.Y. Times (Nov. 18, 2013), https://www.nytimes.com/2013/11/19/technology/google-to-pay-17-million-to-settle-privacy-case.html ............................................. 23

Press Release, Colo. Office of the Att'y Gen., *Attorney General Phil Weiser Announces CenturyLink Will Pay $8,476,000 for Charging Hidden Fees, Overbilling Colorado Customers* (Dec. 19, 2019), https://coag.gov/press-releases/12-19-19 .................... 29

ix

# TABLE OF AUTHORITIES
## (continued)

**Page**

Press Release, Federal Trade Commission, *FTC Sues Frontier Communications for Misrepresenting Internet Speeds* (May 19, 2021), https://www.ftc.gov/news-events/press-releases/2021/05/ftc-sues-frontier-communications-misrepresenting-internet-speeds ............................................................... 29

Press Release, Ill. Office of the Att'y Gen., *Madigan Announces Settlement with VoIP Provider Requiring Improved 911 Disclosures* (Dec. 14, 2006), https://illinoisattorneygeneral.gov/pressroom/2006_12/2006 1214c.html ........................................................................................ 23

Press Release, Mass. Office of the Att'y Gen., *AG Stops Online Auto Title Lender from Collection on Illegal Loans Made to Massachusetts Consumers* (Mar. 18, 2016), https://www.mass.gov/news/ag-stops-online-auto-title-lender-from-collection-on-illegal-loans-made-to-massachusetts ............................................................................. 23

Press Release, Mich. Office of the Att'y Gen., *AG Nessel Announces Significant Settlement with Telecom Carrier Focused on Innovative Robocall Mitigation Measures* (Sept. 11, 2020), https://www.michigan.gov/ag/0,4534,7-359-92297_47203-539389--,00.html ............................................................. 24

Press Release, N.Y. Office of the Att'y Gen., *A.G. Underwood Announces Record $174.2 Million Consumer Fraud Settlement with Charter for Defrauding Internet Subscribers* (Dec. 18, 2018), https://ag.ny.gov/press-release/2018/ag-underwood-announces-record-1742-million-consumer-fraud-settlement-charter .......................................................................... 28

x

# TABLE OF AUTHORITIES
## (continued)

Page

Press Release, N.Y. Office of the Att'y Gen., *A.G. Underwood
Announces Settlements Establishing Industry-Wide
Standards for Marketing Internet Speeds* (Dec. 22, 2018),
https://ag.ny.gov/press-release/2018/ag-underwood-
announces-settlements-establishing-industry-wide-
standards-marketing.................................................................... 28

Press Release, N.Y. Office of the Att'y Gen., *Attorney General
James Delivers 1.2 Million Eggs to New Yorkers* (Apr. 1,
2021), https://ag.ny.gov/press-release/2021/attorney-
general-james-delivers-12-million-eggs-new-yorkers ........................... 30

Press Release, N.Y. Office of the Att'y Gen., *Attorney General
James Secures New Protections, Security Safeguards for All
Zoom Users* (May 7, 2020), https://ag.ny.gov/press-
release/2020/attorney-general-james-secures-new-
protections-security-safeguards-all-zoom-users..................................... 23

Press Release, Or. Office of the Att'y Gen., *AG Rosenblum
Announces $4 Million Settlement with CenturyLink* (Dec. 31,
2019), https://www.doj.state.or.us/media-home/news-media-
releases/ag-rosenblum-announces-4-million-settlement-
with-centurylink...................................................................... 29

Press Release, Tex. Office of the Att'y Gen., *AG Paxton Sues
La Quinta BCB for Price Gouging During 2021 Winter
Storm* (Mar. 18, 2021),
https://www.texasattorneygeneral.gov/news/releases/ag-
paxton-sues-la-quinta-bcb-price-gouging-during-2021-
winter-storm........................................................................... 30

Reuters, *AOL Settles with States on Cancellation Complaints*
(July 11, 2007), https://www.reuters.com/article/
idUSN1139872320070711 ..................................................... 27

xi

# TABLE OF AUTHORITIES
## (continued)

Page

Rizo, Chris, *VONAGE Agrees to $3 Million Multistate Settlement*, Legal Newsline (Nov. 16, 2009), https://legalnewsline.com/stories/510521856-vonage-agrees-to-3-million-multistate-settlement ............................................................ 23

Robertson, Adi, *Google Settles Street View Privacy Case with 38 States for $7 Million*, The Verge (Mar. 12, 2013), https://www.theverge.com/2013/3/12/4094522/google-settles-street-view-privacy-case-with-states-for-7-million ..................... 23

Settlement Agreement, *People ex rel. Underwood v. Charter Commc'ns, Inc.* (Dec. 17, 2018), https://ag.ny.gov/sites/default/files/_dec._17_2018_executed__agreement.pdf ........................ 28

*What Are the States Where You Can Play Daily Fantasy Sports*, Legal Sports Report, https://www.legalsportsreport.com/daily-fantasy-sports-blocked-allowed-states ........................................... 21

## INTERESTS OF AMICI CURIAE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the States of California, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin, and the District of Columbia ("Amici States") submit this brief in support of Defendant-Appellant.

Amici States have a strong interest in protecting their residents' health and welfare through the exercise of their traditional police powers, including by promoting and safeguarding access to broadband Internet access, an essential service in the modern world. "[T]he structure and limitations of federalism … allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (cleaned up). Amici therefore seek to defend New York's sovereign right to exercise its police powers against Plaintiffs' unwarranted assertions of federal preemption.

Here, telecommunications industry groups contend that their members are uniquely immunized from state regulatory authority when providing broadband. Plaintiffs ask the federal courts to do what Congress has not: exempt them from the basic federalist principle that interstate businesses must abide by the laws of

each jurisdiction in which they operate.  Amici States regularly exercise their

sovereign authority to enact and enforce numerous laws applicable to broadband

providers and other online businesses—including laws that, like New York's

Affordable Broadband Act,[1] are aimed at securing their residents' access to vital

goods and services.  There is nothing about the Internet that necessitates a

departure from that normal state of affairs, and certainly nothing that warrants it in

the absence of clear direction from Congress.

## ARGUMENT

**I.    STATES MAY EXERCISE THEIR HISTORIC POLICE POWERS TO
REGULATE BROADBAND SERVICES PROVIDED TO THEIR RESIDENTS**

### A.   There Is a Presumption Against Preemption of State Consumer Protection Laws

Any preemption analysis must "start with the assumption that the historic

police powers of the States were not to be superseded by [a] Federal Act unless

that was the clear and manifest purpose of Congress."  *Wyeth v. Levine*, 555 U.S.

555, 565 (2009).  The power to preempt state law is "an extraordinary

power," *Gregory v. Ashcroft,* 501 U.S. 452, 460 (1991), that "is not to be lightly

presumed," *Cal. Fed. Savs. & Loan Assoc. v. Guerra,* 479 U.S. 272, 281 (1987).

And "because consumer protection law is a field traditionally regulated by the

---

[1] N.Y. Gen. Bus. Law § 399-zzzzz.

2

states, compelling evidence of intention to preempt is required in this area." *Gen.*

*Motors v. Abrams,* 897 F.2d 34, 41-42 (2d Cir. 1990).[2]

The presumption against preemption applies here. The Affordable Broadband

Act in an exercise of New York's historic police powers to protect New York

consumers' access to an essential service. Plaintiffs have failed to overcome this

presumption and establish that the "clear and manifest purpose of Congress" was

to prevent the States from protecting its consumers in this manner.

**B.    The FCC's 2018 Order Does Not Preempt New York's Statute**

**1.    The FCC Lacks Plenary Authority Over Broadband, Due to Its Status as a Title I Information Service**

In evaluating whether the Federal Communications Commission (FCC) has

preempted the Affordable Broadband Act, the first step is to ascertain whether the

FCC has the authority to regulate in the manner reflected in the state statute. That

is because, in considering conflict preemption through agency action, courts must

determine "whether that action is within the scope of the [agency's] delegated

authority." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982);

*see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("a federal

---

[2] *See also California v. ARC Am. Corp*., 490 U.S. 93, 101 (1989) ("Given the long history of state common-law and statutory remedies against monopolies and unfair business practices, it is plain that this is an area traditionally regulated by the States."); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963) (prohibition on consumer deception was "well within the scope of [state] police powers").

agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority").

In 2018, the FCC reclassified broadband as an "information service," which the FCC can regulate only in accordance with Title I of the Communications Act. *See In re Restoring Internet Freedom*, 33 F.C.C.R. 311, ¶¶ 26-64, 65-85, 263-283 (2018) ("2018 Order"), *vacated in part by Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019). Although the FCC has "express and expansive" authority to regulate Title II telecommunications services, *Mozilla*, 940 F.3d at 75 (citation omitted), it has far more limited "ancillary authority" over Title I information services, *Comcast Corp. v. FCC*, 600 F.3d 642, 645 (D.C. Cir. 2010). Such authority "empowers the Commission to 'perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions,'" *Mozilla*, 940 F.3d. at 75 (quoting 47 U.S.C. § 154(i)), but extends only to matters "reasonably ancillary to the … effective performance of its statutorily mandated responsibilities," *Am. Library Ass'n v. FCC*, 406 F.3d 689, 692 (D.C. Cir. 2005). Thus, with respect to Title I information services, any regulatory action taken by the FCC must be "reasonably ancillary" to a duty expressly bestowed upon the FCC by other parts of the

4

Communications Act.[3]  Specifically, "it is Title II, III, or VI to which the authority must ultimately be ancillary," because "it is Titles II, III, and VI that do the delegating" of specific statutory responsibilities to the FCC.  *Comcast*, 600 F.3d at 651, 654.

The FCC must identify one of these specific statutory responsibilities as the source of authority for any regulation of a Title I information service.  This means the FCC lacks comprehensive authority over Title I information services, like broadband.  Although the district court relied upon *National Cable & Telecommunications Ass'n v. Brand X Internet Services* (*Brand X*)*,* 545 U.S. 967 (2005) in concluding that the FCC's decision to classify broadband as a Title I service left it with generalized "jurisdiction" over broadband sufficient to preempt state regulation, J.A. 138 [2021 WL 2401338, at *7], the D.C. Circuit has squarely rejected this misreading of *Brand X.*  "By leaping from *Brand X*'s observation that the Commission's ancillary authority may allow it to impose *some* kinds of obligations on cable Internet providers to a claim of plenary authority over such

---

[3] "[T]he various services over which the Commission enjoys express statutory authority" include "Title II authority to set 'just and reasonable' rates for phone service, 47 U.S.C. § 201(b);" "Title III authority to grant broadcasting licenses in the 'public convenience, interest, or necessity,' *id.* § 307(a)"; and "Title VI authority to prohibit 'unfair methods of competition' by cable operators that limit consumer access to certain types of television programming, *id.* § 548(b)." *Comcast*, 600 F.3d at 654.

providers," this theory "runs afoul of" relevant Supreme Court precedent.

*Comcast*, 600 F.3d at 650.[4]

Thus, conflict preemption of a state regulation of a Title I information service like broadband can only result from conflict with a specific regulatory action by the FCC that is "reasonably ancillary" to a statutorily mandated responsibility. As explained below, Plaintiffs have failed to identify any such regulatory action, relying only on amorphous "policy objectives," which do not constitute statutory authority to regulate or preempt. Nor can the FCC's policy goals in adopting the 2018 Order preempt state regulation of broadband provided to their residents, because the Communications Act does not give the FCC the power to use its policy goals in this manner.

### 2. There Is No Conflict with the FCC's Reclassification Decision

Neither the FCC's reclassification decision, nor the agency's policy preferences underlying that decision, preempts the Affordable Broadband Act. The district court viewed the reclassification decision as an instance of "federal officials affirmatively [failing] to exercise their full authority," that "takes on the character of a ruling that no such regulation is appropriate or approved pursuant to

---

[4] Citing *United States v. Sw. Cable Co.*, 392 U.S. 157, 178 (1968), and *United States v. Midwest Video Corp.*, 406 U.S. 649, 670 (1972) (plurality opinion).

6

the policy of the statute." J.A. 138 [2021 WL 2401338 at *7] (quoting *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978)). For several reasons, that is not correct.

As an initial matter, neither *Ray* nor any other Supreme Court case supports the proposition that every decision by a federal agency to refrain from regulation will preempt state regulation. As this Court has noted in evaluating a previous attempt to rely on *Ray* for this point, this argument will "founder upon [the] rocks" when there is no "clear and manifest congressional intent to preempt" or to confer plenary regulatory authority upon the agency. *Med. Soc'y of State of N.Y. v. Cuomo*, 976 F.2d 812, 820 (2d Cir. 1992). In *Ray*, for example, it was undisputed that the Secretary of Transportation had such regulatory authority, including the authority to preempt state law. 435 U.S. at 178 ("Congress . . . anticipated that there would be a single [federal] decisionmaker, rather than a different one in each State."). Here, in contrast, there is no indication that the Communications Act—which sharply limits the FCC's regulatory authority over Title I information services—somehow authorizes the agency to completely immunize broadband from state regulation, simply by deciding to classify broadband as a Title I information service.

It is a service's classification—and not the FCC's policy preferences—that determines the scope of the FCC's power. Congress gave the FCC a choice of two regimes: a Title I regime with minimal federal regulatory authority, and

commensurately minimal authority to preempt; or a Title II regime with more extensive federal regulation, and correspondingly greater preemptive authority. Congress did not give the FCC the choice to unilaterally expand its own power—and thereby preempt all state regulation of a Title I information service—simply by deciding to classify a service under Title I. Rather, as the D.C. Circuit recognized, Congress "created an interpretive statutory fork in the road and gave the Commission the authority to choose the path," but that "power to choose one regulatory destination or another does not carry with it the option to mix and match its favorite parts of both." *Mozilla*, 940 F.3d at 84. To find otherwise would "take[] the discretion to decide which definition best fits a real-world communications service and … turn that subsidiary judgment into a license to reorder the entire statutory scheme to enforce an overarching 'nationwide regime' that enforces the policy preference underlying the definitional choice." *Id*.; *see also Comcast*, 600 F.3d at 659 (rejecting the FCC's effort "to use its ancillary authority to pursue a stand-alone policy objective, rather than to support its exercise of a specifically delegated power").

That the FCC's reclassification decision was motivated in part by the agency's preferred "regulatory environment" for broadband, J.A. 141 [2021 WL 2401338, at *8], does not change the result. It is no doubt true that agencies may base their actions—including the reasonable resolution of ambiguities in statutes

8

they administer, *see Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)—on their policy preferences.  That was the basis for the FCC's reclassification decision.  *See Mozilla*, 940 F.3d at 20.  But in assessing the preemptive effects of agency action on state law, courts must consider what *authority* the agency had—not merely what policy preferences motivated the agency's action.  *Chevron* does not disturb the basic principle that "the only agency actions that can" preempt state law are the agency's exercises of "congressionally delegated authority," because "[t]he Supremacy Clause grants 'supreme' status only to the 'the *Laws* of the United States,'" not to underlying policy preferences that may motivate the agency's exercises of authority.  *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) (citing U.S. Const., art. VI, cl. 2.); *see also Mozilla*, 940 F.3d at 82 ("the Commission's interpretive authority under *Chevron*" cannot "do away with the *sine qua non* for agency preemption: a congressional delegation of authority either to preempt or to *regulate*").

That is especially true here, where the effect of the district court's reasoning would be that neither the federal government nor the States have the authority to regulate broadband.  As the Supreme Court cautioned in a related context, "[i]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially" free from regulation "to agency

9

discretion"—and it is "even more unlikely" that Congress would do so implicitly through a statutory ambiguity. *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994). "The Supreme Court has made very clear that *Chevron* does not have that much muscle." *Mozilla*, 940 F.3d at 84. In contrast, determining which of two statutorily prescribed regulatory regimes should apply to a particular type of service is the kind of choice Congress plausibly would have left to agency discretion. *See id.* at 18-21, 32-35. The upshot of the FCC's classification decision is that the federal government has very limited regulatory authority over broadband. Even if the agency's policy preference is that States not exercise their traditional police powers to fill that void, that is not a choice Congress has authorized the FCC to make.

### 3. There Is No Conflict with the Transparency Rule

The only affirmative regulation of broadband as a Title I information service in the 2018 Order—the Transparency Rule—simply requires broadband providers to make certain disclosures. 47 C.F.R. § 8.1(a). There is not even a hint of conflict between that requirement and the Affordable Broadband Act. Nor does New York's law conflict with the congressionally authorized objectives underlying the Transparency Rule. The statutory basis for the Transparency Rule is the FCC's obligation to report to Congress on "market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications

services and information services." 47 U.S.C. §§ 257(a), (c) (1996).[5] The

Transparency Rule therefore cannot preempt all state regulation of broadband. As

the D.C. Circuit observed in rejecting the FCC's previous reliance on this reporting

requirement as a source of ancillary authority for general conduct rules governing

broadband, "the Commission's attempt to dictate the operation of an otherwise

unregulated service based on nothing more than its obligation to issue a report

defies any plausible notion of 'ancillariness.'" *Comcast*, 600 F.3d at 659-60.

### C. There Is No Conflict with Section 153(51) of the Communications Act

Apart from finding conflict with the 2018 Order, the district court also

appears to have concluded—albeit without explanation—that the Affordable

Broadband Act "conflicts with the implied preemptive effect of … the

Communications Act" itself. J.A. 141 [2021 WL 2104338, at *8]. That theory

finds no support in the statutory text or in precedent.

Section 153(51) of the Communications Act defines a "telecommunications

carrier" and provides that a "telecommunications carrier shall be treated as a

---

[5] At the time the notice of proposed rulemaking for the 2018 Order was issued, 47 U.S.C. § 257(c) appeared in Title II of the Communications Act. Section 257(c)'s reporting requirement now appears at 47 U.S.C. § 163. *See Mozilla*, 940 F.3d at 47 ("Section 257(c) was removed from the Communications Act before the 2018 Order became effective," but "was not altered in any material respect for purposes of the Commission's authority."); *see also id*. at 18 (describing § 257 as "located in Title II but written so as to apply to Titles I through VI").

common carrier *under this chapter* only to the extent that it is engaged in providing telecommunications services."  47 U.S.C. § 153(51) (emphasis added).  As the D.C. Circuit has explained, § 153(51) limits only the FCC's authority to treat a telecommunications carrier "as a common carrier under this chapter," that is, *under the Communications Act*.  Section 153(51) is "a definitional provision" that "is a *limitation* on the Commission's authority," not a basis for preempting state law. *Mozilla*, 940 F.3d at 79 (citation omitted); *see also* H.R. Rep. No. 104-458, at 114 (1996) ("Conf. Rep.") ("The definition amends the Communications Act to explicitly provide that a 'telecommunications carrier' shall be treated as a common carrier for purposes of the Communications Act.")  If Congress had meant to limit state authority, it would have said so explicitly, rather than "bur[ying]" the preemption provision in "a definitional section in a non-regulatory part of the statute."  *Mozilla*, 940 F.3d at 84.

Nor, as a general matter, do restrictions on federal regulatory authority necessarily reflect congressional intent to preempt.  *See Chamber of Comm. of U.S. v. Whiting*, 563 U.S. 582, 608 (2011) (state requirement to use federal employment authorization program did not conflict with federal law prohibiting federal agency from requiring participation in program, because federal law "constrain[ing] federal action" simply "limits what the Secretary of Homeland Security may do— nothing more"); *Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375,

383-85 (1983) (congressional denial of agency authority over wholesale rates did not impliedly preempt States from regulating wholesale rates); *City of Dallas v. FCC*, 165 F.3d 341, 348 (5th Cir. 1999) (removal of federal franchising requirement from Communications Act did not impliedly preempt state's franchising requirement).  The district court misapplied this basic principle.

The district court also ignored that *Congress itself* ruled out any inference that § 153(51) impliedly preempts the States' historic police power.  Section 601(c)(1) of the Telecommunications Act of 1996, codified in 47 U.S.C. § 152 note, states: "(1) NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless *expressly* so provided in such Act or amendments."  Pub. L. 104-104 § 601(c)(1) (1996) (emphasis added).  This prohibition on implied preemption squarely applies here, because the Telecommunications Act amended the Communications Act to add § 153(51), as well as the definition of "information services," 47 U.S.C. § 153(24).  Contrary to the district court's decision, § 601(c)(1) precludes any inference that state regulation of "information services" is impliedly preempted, or that § 153(51) impliedly preempts such regulation.

Courts have agreed that, by its plain terms, "§ 601(c)(1) … prohibit[s] implied preemption."  *City of Dallas*, 165 F.3d at 348.  Courts have similarly recognized that the provision "counsel[s] against any broad construction" of other

13

provisions in the Act "that would create an implicit conflict with" state law. *Pinney v. Nokia,* 402 F.3d 430, 458 (4th Cir. 2005); *see also, e.g.*, *AT&T Comm'cns of Ill. v. Ill. Bell Tel. Co.*, 349 F.3d 402, 410 (7th Cir. 2003) (§ 601(c)(1) [erroneously cited as "47 U.S.C. § 609 note"] "precludes a reading that ousts the state legislature by implication"); *cf. Abrams v. City of Rancho Palos Verdes*, 354 F.3d 1094, 1099-1100 (9th Cir. 2004) (§ 601(c)(1) precludes finding that Telecommunications Act forecloses remedies under 42 U.S.C. § 1983 by implication), *rev'd on other grounds*, 544 U.S. 113 (2005). The legislative history of § 601(c)(1) also confirms that there can be no implied preemption here. *See* Conf. Rep. at 201 (§ 601(c)(1) "prevents affected parties from asserting that the bill impliedly preempts other laws"). And this means that neither field preemption nor conflict preemption can result from any provision adopted in the Telecommunications Act. *Steel Inst. of N.Y. v. City of New York*, 716 F.3d 31, 36 (2d Cir. 2013) ("[i]mplied preemption may take the form of field preemption … or conflict preemption").

In seeking the preliminary injunction below, Plaintiffs argued, without explanation, that § 153(51) "codifie[s] decades of FCC decisions exempting information services providers from common-carrier regulation under the Communications Act," thus preventing the States from regulating information

14

services as common carriers.[6]  But this theory has no support in the legislative

history of the Telecommunications Act, or in the case law interpreting the FCC

orders at issue, known as *Computer II*[7] and *Computer III*.[8]

Through these orders, the FCC preempted certain state regulations of

"enhanced services" (the predecessor to Title I information services as codified in

the Telecommunications Act), but these preemptive actions were firmly grounded

in the FCC's ancillary authority.  That is, the specific preemptive actions were tied

to an express statutory responsibility located in Title II.  *See Comp. & Commc'ns*

*Indus. Ass'n v. FCC* (*CCIA*), 693 F.2d 198, 213 (D.C. Cir. 1982) (upholding FCC

regulation of enhanced services as ancillary to FCC's authority over interstate

basic telephone services); *California v. FCC* (*California III*), 39 F.3d 919, 932 (9th

---

[6] Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 14 n.11, Dist. Ct. ECF No. 16; *see also* Reply Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 6, Dist. Ct. ECF No. 23.

[7] *In re Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry),* 77 F.C.C.2d 384 (1980).

[8] Report and Order, *In re Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, 104 F.C.C.2d 958 (1986), on reconsideration, 2 F.C.C.R. 3035 (1987); 2 F.C.C.R. 3072 (1987); Memorandum Opinion & Order on Further Reconsideration, *In re Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, 3 F.C.C.R. 1135 (1988); Memorandum Opinion & Order on Reconsideration, *In re Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, 3 F.C.C.R. 1150 (1988).  These orders were all vacated by *California v. FCC* (*California I*), 905 F.2d 1217 (9th Cir. 1990).

Cir. 1994) (recognizing FCC's ancillary authority, based on previous determination that regulatory authority in question was ancillary to FCC's Title II authority).[9] The idea that § 153(51) somehow "codifies" the FCC's prior preemptive actions assumes a freestanding power to preempt *all* state regulation of enhanced services—or information services—regardless of whether ancillary authority for any specific preemptive action exists. But this is not how the Communications Act structures the FCC's regulatory authority.

### D. The Communications Act Does Not Preempt the Field of "Interstate Communications"

Like its conflict preemption analysis, the district court's field preemption analysis disregards the fundamental limits that the Communications Act places on FCC authority. Relying on *Ivy Broadcasting Co. v. AT&T Co*., 391 F.2d 486 (2d Cir. 1968), the district court concluded that the Communications Act embodies a "broad scheme for the regulation of interstate service by communications carriers," which reflects congressional intent to occupy the field of "interstate communications." J.A. 147 [2021 WL 2401338, at *11] (quoting *Ivy*, 391 F.2d at

---

[9] This previous determination of ancillary authority was made in *California I*, 905 F.2d at 1240 n.35. In addition, in *CCIA*, the D.C. Circuit did not address preemption of "enhanced services," holding only that the FCC validly preempted state tariffing of consumer premises equipment. *See* 693 F.2d at 214. Similarly, in *California III*, the Ninth Circuit considered only certain state structural separation requirements and nonstructural safeguards, not state common carrier regulations. *See* 39 F.3d at 922.

490-91).  But *Ivy* does not stand for such a proposition, because the quoted language is limited to "communications carriers"—which are common carriers[10] subject to Title II regulation—and because *Ivy* concerned specific types of such common carriers: "telegraph or telephone companies."  391 F.2d at 491.  The district court also relied on language in *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, that described "communications services" as being divided into "two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction."  J.A. 150 [2021 WL 2401338, at *12] (quoting *Louisiana*, 476 U.S. at 357).  But as with *Ivy*, *Louisiana* is about "telephone service," not all interstate communications.  *Louisiana*, 476 U.S. at 357 ("while the Act would seem to divide the world of domestic telephone service neatly into two hemispheres … in practice, the realities of technology and economics belie such a clean parceling of responsibility").

Not only do the primary cases relied upon by the district court address telephone and telegraph service—as opposed to all "interstate communications"—but the very premise of the purported field directly conflicts with the basic structure of the Communications Act.  Section 152(a) of the Communications Act

---

[10] The Communications Act defines "carrier" as "common carrier."  47 U.S.C. § 153(11).

provides that "the provisions of this chapter shall apply to all interstate and foreign communication by wire or radio," and § 152(b) deprives the FCC of "jurisdiction with respect to … charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio." 47 U.S.C. § 152. Nothing in the text of those provisions evinces any congressional desire to create a field of *exclusive* federal regulation of all "interstate communications services," and the district court erred in concluding otherwise. *See* J.A. 144-152 [2021 WL 2014338, at *10-13].

Courts have long rejected the view that § 152 gives the FCC blanket authority to regulate any and all services providing "interstate communications by wire or radio." *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 533 F.2d 601, 612 (D.C. Cir. 1976) ("The language of § 152(a) is quite general and is not unambiguously jurisdictional in character."); *id.* at 612 n.68; *Midwest Video Corp.*, 406 U.S. at 661 (§ 152(a) "does not in and of itself prescribe any objectives for which the Commission's regulatory power … might properly be exercised").

The district court's field preemption analysis also cannot be reconciled with the fundamental principle that the FCC must identify either "express or ancillary authority" when seeking to preempt state law, as made clear most recently in *Mozilla. See* 940 F.3d at 75-76; *see also Comcast*, 600 F.3d at 650-51. The lack of agency power over vast swaths of the purported field cannot be squared with a

regulatory system "so pervasive" that there is "no room for the States to supplement it." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up).

Plaintiffs' field preemption theory also cannot be reconciled with numerous provisions of the Communications Act authorizing express preemption and creating savings clauses to preserve other types of state regulation within the supposedly preempted field of "interstate communications." *See*, *e.g.*, 47 U.S.C. § 253(a) (preemption of regulations affecting both interstate and intrastate telecommunications services). There would be no need to expressly preempt the States from regulating aspects of interstate services, in this provision or others,[11] if Congress had intended to occupy the entire field of "interstate communications services." *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 613 (1991) (express preemption provision "would be pure surplusage if Congress had intended to occupy the entire field").

Finally, as explained above (*supra* at 13), the Communications Act prohibits implied preemption—which includes field preemption, *see Steel Inst. of N.Y.*, 716 F.3d at 36—with respect to information services. *See Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 428 (9th Cir. 2014) (§ 601(c)(1) "signifies that Congress did not intend to occupy the entire legislative

---

[11] *See* 47 U.S.C. §§ 223(f)(2), 230(e)(3), 253(d), 276(c), 332(c)(3), 332(c)(7), 543(a)(1), 544(e), 556(c).

19

field of closed captioning"). This provision therefore forecloses Plaintiffs' field

preemption claim with respect to information services, including broadband.

## II. PLAINTIFFS' PREEMPTION THEORIES WOULD UNDERMINE THE STATES' ABILITIES TO PROTECT THEIR RESIDENTS

### A. Plaintiffs' Theories Cannot Be Squared with the States' Well-Established Practice of Regulating Internet-Based Activity

Under Plaintiffs' conflict preemption theory, any state regulation that "stands

as an obstacle to effectuating" the FCC's policy goals would be preempted,

regardless of whether those policy goals exceed the FCC's statutory authority. J.A.

91, 92 [Compl., ¶¶ 38, 41, 43]. And under Plaintiffs' field preemption theory, if a

service qualifies as an "interstate communications service," then "[S]tates lack the

authority to regulate it." J.A. 94, 95 [Compl., ¶¶ 50, 53]. These theories would

effectively bar the States from regulating any service that could be considered a

Title I information service or that involves the transmission of information over

state lines, potentially encompassing regulation of not just broadband providers,

but also entities such as email providers, text messaging systems, VoIP providers,

video conferencing services, online gambling platforms, websites, and more.[12]

Plaintiffs' nearly unbounded view of federal preemption would threaten to upend

---

[12] *See, e.g.*, *Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, 33 F.C.C.R. 12075 (2018) (classifying text messaging as information service); *Brand X*, 545 U.S. at 998-99 (referring to email service and websites as information services).

the States' long history of exercising their police powers to protect their residents from unfair and harmful practices on and relating to the Internet.

States have passed numerous laws regulating Internet-based companies, directed at practices that could potentially harm consumers or threaten public safety.  For example, approximately twenty States have statutes or regulations governing daily fantasy sports games, which are provided over the Internet.[13] Seven States have legalized online casino gaming through affirmative state regulation.[14]

Many States also have laws regulating other types of electronic practices and online services.  For example, Massachusetts regulates public virtual schools "whose teachers primarily teach from a remote location using the internet or other computer-based methods."[15]  Delaware's Safe Internet Pharmacy Act regulates

---

[13] Jake Lestock, *Tackling Daily Fantasy Sports in the States*, 26 Legis Brief No. 1 (Nat'l Conf. of State Legs. Jan. 2018), https://www.ncsl.org/research/civil-and-criminal-justice/tackling-daily-fantasy-sports-in-the-states.aspx; *see also What Are the States Where You Can Play Daily Fantasy Sports*, Legal Sports Report, https://www.legalsportsreport.com/daily-fantasy-sports-blocked-allowed-states (last visited Dec. 1, 2021).

[14] iDevelopment & Econ. Ass'n, *Bill Trackers: Online Gaming and Sports Betting Bills by State, Including Mobile Provisions* (June 2021), https://ideagrowth.org/legislative-tracking (last visited Dec. 1, 2021).

[15] Mass. Gen. Laws, ch. 71, § 94.

21

Internet sites that dispense prescription drugs to patients within the State.[16]  Illinois requires Internet-based dating, child care, senior care, and home care services to disclose whether they perform criminal background checks on candidates listed on their websites.[17]

Apart from laws specifically regulating online activity, all States have enacted generally applicable civil rights, consumer protection, and criminal laws that govern conduct occurring over the Internet.  For example, California's Unruh Civil Rights Act establishes accessibility and non-discrimination requirements with respect to Internet activity.[18]  California also has laws prohibiting fraudulent or deceptive advertisements or marketing practices over Internet websites or through email,[19] as well as laws prohibiting criminal activity over the Internet.[20]

States also routinely use their general consumer protection statutes to address harmful business practices engaged in by Internet-based companies.  In 2006, Florida, Illinois, Massachusetts, Michigan, North Carolina, and Texas entered into a settlement agreement with Vonage regarding the company's failures to adequately

---

[16] Del. Code Ann. tit. 16, §§ 4741-4745.

[17] 815 Ill. Comp. Stat. 518/10.

[18] Cal. Civ. Code §§ 51-52.

[19] Cal. Bus. & Prof. Code §§ 17200-17210; *id*. § 17529.5.

[20] Cal. Pen. Code § 288.2(a)(1).

22

disclose limitations in its 9-1-1 service provided through VoIP.[21]  In 2009, 32 States reached a $3 million settlement with Vonage that required the company to change its marketing and cancellation policies with respect to VoIP.[22]  In 2013, 37 States and the District of Columbia reached settlements with Google regarding data and privacy abuses.[23]  In 2016, Massachusetts obtained a preliminary injunction against an online auto title lender who had been making and collecting on illegal short-term loans in violation of state usury laws.[24]  In May 2020, New York reached an agreement with Zoom Video Communications to provide security protections for users of its video conference platform.[25]  In September 2020, Michigan reached a

---

[21] Press Release, Ill. Office of the Att'y Gen., *Madigan Announces Settlement with VoIP Provider Requiring Improved 911 Disclosures* (Dec. 14, 2006), https://illinoisattorneygeneral.gov/pressroom/2006_12/20061214c.html.

[22] Chris Rizo, *VONAGE Agrees to $3 Million Multistate Settlement*, Legal Newsline (Nov. 16, 2009), https://legalnewsline.com/stories/510521856-vonage-agrees-to-3-million-multistate-settlement.

[23] Claire Cain Miller, *Google to Pay $17 Million to Settle Privacy Case*, N.Y. Times (Nov. 18, 2013), https://www.nytimes.com/2013/11/19/technology/google-to-pay-17-million-to-settle-privacy-case.html; Adi Robertson, *Google Settles Street View Privacy Case with 38 States for $7 Million*, The Verge (Mar. 12, 2013), https://www.theverge.com/2013/3/12/4094522/google-settles-street-view-privacy-case-with-states-for-7-million.

[24] Press Release, Mass. Office of the Att'y Gen., *AG Stops Online Auto Title Lender from Collection on Illegal Loans Made to Massachusetts Consumers* (Mar. 18, 2016), https://www.mass.gov/news/ag-stops-online-auto-title-lender-from-collection-on-illegal-loans-made-to-massachusetts.

[25] Press Release, N.Y. Office of the Att'y Gen., *Attorney General James Secures New Protections, Security Safeguards for All Zoom Users* (May 7, 2020),

settlement with All Access Telecom, Inc., requiring that the VoIP provider substantially alter its practices with respect to robocalls.[26]

These laws and enforcement efforts all regulate online activity that would be considered Title I information services, as well as interstate communications services. Plaintiffs' conflict and field preemption arguments would thus cast doubt on all of these state actions.

### B. Broadband Is an Essential Service that Is Already Subject to State Consumer Protection Laws, Including Laws that Regulate Pricing

The district court apparently thought it unlikely (or undesirable) that "fifty state sovereigns" might be able to "impose their own public-utility style regulations" on broadband providers. J.A. 141 [2021 WL 2401338, at *8 n.9]. That concern is unfounded and overlooks the reality that broadband—an essential service in the modern world—has long been subject to far-reaching state regulation, including pricing regulation. There is no indication that Congress has sought to alter that status quo, but the district court's (and Plaintiffs') approach to preemption would invite that result.

---

https://ag.ny.gov/press-release/2020/attorney-general-james-secures-new-protections-security-safeguards-all-zoom-users.

[26] Press Release, Mich. Office of the Att'y Gen., *AG Nessel Announces Significant Settlement with Telecom Carrier Focused on Innovative Robocall Mitigation Measures* (Sept. 11, 2020), https://www.michigan.gov/ag/0,4534,7-359-92297_47203-539389--,00.html.

As Congress has recognized, Internet access is fundamental to "consumer welfare, civic participation, public safety and homeland security, community development, health care delivery, energy independence and efficiency, education, worker training, private sector investment, entrepreneurial activity, job creation and economic growth." American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(2)(D), 123 Stat. 115, 516 (2009). And as demonstrated by the paramount importance of online activity during the COVID-19 pandemic, nearly every facet of modern life depends on access to the Internet. For much of 2020 and 2021, millions of Americans have been entirely dependent on broadband to work, study, and obtain food and other essential goods. As a senior official of one of the Plaintiff organizations has observed, "It is unprecedented the degree to which the nation is relying on its communications infrastructure for remote activities like telework, distance learning and telehealth. Americans are also counting on [the communications] sector to keep the lines of news, public safety, daily communication and entertainment open and running smoothly as we collectively cope with the COVID-19 pandemic."[27] The Department of Homeland

---

[27] Robert Mayer, *USTelecom Statement on Updated CISA Guidance on 'Essential Critical Infrastructure Workers' During COVID-19* (Mar. 28, 2020), https://www.ustelecom.org/ustelecom-statement-on-updated-cisa-guidance-on-essential-critical-infrastructure-workers-during-covid-19.

Security recognized as much by including communications workers on the Cybersecurity and Infrastructure Security Agency's list of "Essential Critical Infrastructure Workers."[28]

Because it is indisputably an essential service, broadband and the entities that provide it—Internet service providers ("ISPs")—fall squarely within the scope of the States' historic police powers to protect consumers, as well as public health and safety. And the States have routinely used that authority. For example, many States have privacy, cybersecurity, and security breach notification laws that apply to ISPs. Multiple States, including California, Connecticut, Delaware, Nevada, Oregon, and Virginia, have statutes governing the privacy policies and practices for Internet websites or online services.[29] Similarly, Maine's Internet privacy law prohibits ISPs from using, disclosing, selling, or providing access to certain personal information from consumers without their express affirmative consent.[30] In addition, security breach notification laws—which apply to ISPs—have been

---

[28] Cybersecurity & Infrastructure Security Agency, *Guidance on the Essential Critical Infrastructure Workforce*, https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce (last visited Dec. 1, 2021).

[29] Cal. Bus. & Prof. Code §§ 22575-22582; Cal. Civ. Code §§ 1798.100-1798.199.100; Conn. Gen. Stat. § 42-471; Del. Code Ann. tit. 6, §§ 1201C-1206C; Nev. Rev. Stat. § 603A.340; Or. Rev. Stat. § 646.607; Va. Code Ann. §§ 59.1-575-59.1-581.

[30] Me. Stat. tit. 35-A, § 9301; *see ACA Connects - Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 326 (D. Me. 2020) (rejecting preemption challenge).

adopted by all 50 states, as well as the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands.[31]

State enforcement actions also demonstrate how state regulation is essential to policing unfair, deceptive, or otherwise harmful business practices by ISPs, particularly with respect to pricing and the services advertised for particular prices. For example, in 2007, 48 States and the District of Columbia reached a $3 million settlement agreement with America Online ("AOL") regarding the company's cancellation policies, which had made it extremely challenging for customers to cancel their service. The agreement required AOL to reform its cancellation policies and refund consumers who were charged fees after trying to cancel their services.[32]

Similarly, in 2018, New York's lawsuit against Charter Communications regarding the company's misrepresentations about the speed and reliability of their Internet service resulted in a $174 million settlement agreement that included significant marketing and business reforms to address the conduct that New York

---

[31] National Conference of State Legislatures, *Security Breach Notification Laws* (April 15, 2021), https://www.ncsl.org/research/telecommunications-and-information-technology/security-breach-notification-laws.aspx.

[32] Reuters, *AOL Settles with States on Cancellation Complaints* (July 11, 2007), https://www.reuters.com/article/idUSN1139872320070711.

had uncovered in its investigation.[33] New York then reached agreements with four other broadband providers—Altice, Frontier Communications, RCN, and Verizon—to reform their marketing and business practices regarding Internet speed claims.[34]

Other States have also brought enforcement actions directed at ISPs. In March 2020, Pennsylvania reached a settlement agreement with Frontier also involving allegations of false and deceptive speed claims.[35] Washington State has likewise brought numerous enforcement actions against major broadband providers, including Charter, Comcast, CenturyLink, and Frontier, involving

---

[33] Press Release, N.Y. Office of the Att'y Gen., *A.G. Underwood Announces Record $174.2 Million Consumer Fraud Settlement with Charter for Defrauding Internet Subscribers* (Dec. 18, 2018), https://ag.ny.gov/press-release/2018/ag-underwood-announces-record-1742-million-consumer-fraud-settlement-charter; Settlement Agreement, *People ex rel. Underwood v. Charter Commc'ns, Inc.* (Dec. 17, 2018), https://ag.ny.gov/sites/default/files/charter_dec._17_2018_executed_settlement_agreement.pdf.

[34] Press Release, N.Y. Office of the Att'y Gen., *A.G. Underwood Announces Settlements Establishing Industry-Wide Standards for Marketing Internet Speeds* (Dec. 22, 2018), https://ag.ny.gov/press-release/2018/ag-underwood-announces-settlements-establishing-industry-wide-standards-marketing.

[35] Nicholas Malfitano, *AG's Office Settles Shoddy Service Claims with Internet Provider Frontier Communications for $200K*, Penn. Record (Mar. 20, 2020), https://pennrecord.com/stories/528157350-ag-s-office-settles-shoddy-service-claims-with-internet-provider-frontier-communications-for-200k. In February 2020, several California district attorneys resolved similar claims against Time Warner Cable (now owned by Charter). *See* Associated Press, *Time Warner Cable to Pay $18.8m in California Internet Case*, (Feb. 20, 2020), https://apnews.com/article/8e875d8f568d46cb5d117faf059acfe3.

claims of hidden or misleading fees.[36]  In December 2019, Colorado and Oregon
reached separate settlements with CenturyLink regarding abusive marketing
practices, including hidden fees and failure to provide promised discounts and
refunds.[37]  And in May 2021, law enforcement agencies from six States, along with
the Federal Trade Commission, sued Frontier, alleging that Frontier failed to
provide Internet service at the promised speed, and charged for higher-speed
service than was actually provided.[38]

These state enforcement efforts regarding broadband pricing are part of the
States' general practice of policing the pricing of goods and services provided to

---

[36] *State v. Wave Div. Holdings, LLC*, No. 21-2-03139-7 SEA (King County
Super. Ct. Mar. 9, 2021); *State v. Frontier Commc'ns Corp.*, No. 20-2-01731-34
(Thurston County Super. Ct. July 20, 2020); *State v. Charter Commc'ns*, No. 20-2-
00460-04 (Chelan County Super. Ct. July 27, 2020); *State v. CenturyLink, Inc.*,
No. 19-2-32452-0 SEA (King County Super. Ct. Dec. 9, 2019); *State v. Comcast
Cable Commc'ns Mgmt.,* No. 16-2-18224-1 SEA (King County Super. Ct. June 6,
2019).

[37] Press Release, Colo. Office of the Att'y Gen., *Attorney General Phil
Weiser Announces CenturyLink Will Pay $8,476,000 for Charging Hidden Fees,
Overbilling Colorado Customers* (Dec. 19, 2019), https://coag.gov/press-
releases/12-19-19; Press Release, Or. Office of the Att'y Gen., *AG Rosenblum
Announces $4 Million Settlement with CenturyLink* (Dec. 31, 2019),
https://www.doj.state.or.us/media-home/news-media-releases/ag-rosenblum-
announces-4-million-settlement-with-centurylink.

[38] Press Release, Federal Trade Commission, *FTC Sues Frontier
Communications for Misrepresenting Internet Speeds* (May 19, 2021),
https://www.ftc.gov/news-events/press-releases/2021/05/ftc-sues-frontier-
communications-misrepresenting-internet-speeds.

their residents. Thirty-nine states have price-gouging statutes,[39] prohibiting sellers from charging exorbitant prices for essential goods or services, which can include food, medicine, fuel, water, housing, and utilities.[40] States that have filed recent enforcement actions concerning price-gouging include New York (price gouging of eggs during COVID-19 pandemic)[41] and Texas (price gouging of hotel rooms during 2021 winter storm emergency).[42] Given the importance of broadband in daily life and times of crisis, States must have the means to safeguard their

---

[39] National Conference of State Legislatures, *Price Gouging State Statutes* (May 17, 2021), https://www.ncsl.org/research/financial-services-and-commerce/price-gouging-state-statutes.aspx.

[40] *See*, *e.g.*, 2020 Alaska Laws Ch. 10 § 26 (S.B. 241) ("food; medicine; medical equipment; fuel; sanitation products; hygiene products; essential household supplies; and other essential goods"); Ark. Code Ann. § 4-88-303(a)(1) ("consumer food items or goods, goods or services used for emergency cleanup, emergency supplies, medical supplies, home heating oil, building materials, housing, transportation, freight, and storage services, or gasoline or other motor fuels"); Ga. Code Ann. § 10-1-393.4 ("any goods or services identified by the Governor in the declaration of the state of emergency necessary to preserve, protect, or sustain the life, health, or safety of persons or their property"); Idaho Code Ann. § 48-603(19) ("fuel or food, pharmaceuticals, or water"); Iowa Admin. Code 61-31.1(714) ("water, food, medicines, sanitation supplies, utilities, building materials, and materials, goods, or services for cleanup or repair").

[41] Press Release, N.Y. Office of the Att'y Gen., *Attorney General James Delivers 1.2 Million Eggs to New Yorkers* (Apr. 1, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-delivers-12-million-eggs-new-yorkers.

[42] Press Release, Tex. Office of the Att'y Gen., *AG Paxton Sues La Quinta BCB for Price Gouging During 2021 Winter Storm* (Mar. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-sues-la-quinta-bcb-price-gouging-during-2021-winter-storm.

residents' access to broadband, just as they do for many other essential goods and services through their price-gouging statutes.

The state regulatory and enforcement actions described above are just some of the exercises of state police powers that Plaintiffs' sweeping preemption theories would call into question. Indeed, Plaintiffs' approach would seemingly preclude the States from regulating any online activity or services, whether through privacy laws, generally applicable consumer protection laws, or laws regulating the prices of essential goods and services. That would represent an unprecedented and dramatic change in the balance of regulatory authority between the federal government and the States. There is no sign of any congressional intent—let alone "clear and manifest" intent, *Wyeth*, 555 U.S. at 565—to prevent the States from exercising their historic police powers in that manner.

## CONCLUSION

The district court's judgment should be reversed.

Dated: December 1, 2021       Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
PAUL STEIN
Supervising Deputy Attorney General

<u>/s/ *P. Patty Li*</u>
P. PATTY LI
SARAH E. KURTZ
JOHN D. ECHEVERRIA
Deputy Attorneys General
*Counsel for Amici Curiae*

*(State Attorneys General listing continued on following pages)*

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106


KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

CLARE E. CONNORS
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813


KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 W. Randolph Street
Chicago, IL 60601


AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333


BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Place
Boston, MA 02108


DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin
Luther King Jr. Blvd
Saint Paul, MN 55155


DOUGLAS J. PETERSON
  *Attorney General*
  *State of Nebraska*
2115 State Capitol
Lincoln, NE 68509


AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701


ANDREW J. BRUCK
  *Acting Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504


JOSH STEIN
  *Attorney General*
  *State of North Carolina*
114 West Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301


JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of*
  *Pennsylvania*
Strawberry Square
Harrisburg, PA 17120


PETER F. NERONHA
  *Attorney General*
  *Rhode Island*
150 South Main Street
Providence, RI 02903


THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
*Attorney General*
*Commonwealth of*
*Virginia*
202 North 9th Street
Richmond, VA 23219

KARL A. RACINE
*Attorney General*
*District of Columbia*
400 6th Street, NW
Suite 8100
Washington, DC 20001

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
P.O. Box 7857
Madison, WI 53707

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the requirements of Federal Rule

of Appellate Procedure 29(a)(5), because it contains 6,999 words, according to the

word count of Microsoft Word.  I further certify that this brief complies with

typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1

because it has been prepared in 14-point Times New Roman font.


December 1, 2021                              */s/ P. Patty Li*

**CERTIFICATE OF SERVICE**

I certify that on December 1, 2021, the foregoing Brief of the States of

California, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland,

Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New

Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia,

Washington, and Wisconsin, and the District of Columbia, as Amici Curiae in

Support of Defendant-Appellant was served electronically via the Court's CM/ECF

system upon all counsel of record.

December 1, 2021                              */s/ P. Patty Li*