# 21-1975

## United States Court of Appeals
## For the Second Circuit

———————————

NEW YORK STATE TELECOMMUNICATIONS ASSOCIATION, INC., CTIA – THE WIRELESS ASSOCIATION, ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, USTELECOM – THE BROADBAND ASSOCIATION, NTCA – THE RURAL BROADBAND ASSOCIATION, SATELLITE BROADCASTING AND COMMUNICATIONS ASSOCIATION, ON BEHALF OF THEIR RESPECTIVE MEMBERS,

*Plaintiffs-Appellees*,

v.

LETITIA A. JAMES, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NEW YORK,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Eastern District of New York, No. 2:21-cv-2389
Hon. Denis R. Hurley

———————————

**BRIEF OF INTERNET LAW PROFESSORS**
**AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLANT**

———————————

Michael J. Burstein
c/o BENJAMIN N. CARDOZO SCHOOL OF LAW
55 Fifth Avenue
New York, NY 10003
(646)592-6413
mburstei@yu.edu

December 1, 2021

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF AMICI CURIAE ........................................................................ 1

SUMMARY OF ARGUMENT ............................................................................. 2

ARGUMENT ........................................................................................................ 3

I.  The Communications Act Does Not Preempt the Field of Interstate Communications. ........................................................................................ 4

    A. The Communications Act's Grant of Federal Authority to Regulate Interstate Communications Does Not Divest the States of Their Concurrent Authority. ........................................................................... 4

    B. No Court Has Held That the Entire Field of Interstate Communications Is Preempted.. ........................................................ 13

    C. The History of Cable Regulation Demonstrates That the Field of Interstate Communications Is Not Preempted ................................... 18

II.  The Communications Act Does Not Preempt the Field of Interstate Information Services. .................................................................................. 22

CONCLUSION ................................................................................................... 31

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Arizona v. United States*,
  567 U.S. 387 (2012)............................................................. 3, 9, 23

*AT&T Commc'ns of Ill. v. Ill. Bell Tel. Co.*,
  349 F.3d 402 (7th Cir. 2003) ....................................................... 25

*Bond v. United States*,
  572 U.S. 844 (2014)..................................................................... 4

*Capital Cities Cable, Inc. v. Crisp*,
  467 U.S. 691 (1984)................................................................... 8, 9

*Charter Advanced Servs. (MN), LLC v. Lange*,
  903 F.3d 715 (8th Cir. 2018) ....................................................... 27

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992).................................................................... 12

*City of Dallas v. FCC*,
  165 F.3d 341 (5th Cir. 1999) ....................................................... 25

*Comcast Corp. v. FCC*,
  600 F.3d 642 (D.C. Cir. 2010) ......................................... 10, 22, 23

*Crockett Tel. Co. v. FCC*,
  963 F.2d 1564 (D.C. Cir. 1992) ............................................. 15, 16

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658, 664 (1993)............................................................. 4

*Farina v. Nokia, Inc.*,
  625 F.3d 97 (3d Cir. 2010)........................................................... 25

*General Motors Corp. v. Abrams*,
  897 F.2d 34 (2d Cir. 1990)........................................................... 4

*Global NAPs, Inc. v. Verizon New England, Inc.*,
454 F.3d 91 (2d Cir. 2006)............................................................ 16

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
742 F.3d 414 (9th Cir. 2014) ........................................... 16, 29, 30

*GTE Serv. Corp. v. FCC*,
474 F.2d 724 (2d Cir. 1973)........................................................ 15

*Head v. N.M. Bd. of Exam'rs in Optometry*,
374 U.S. 424 (1963) ............................................................. 6, 7, 16

*Hillsborough Cty. v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985) ...................................................................... 6

*In re NOS Commc'ns, MDL No. 1357*,
495 F.3d 1052 (9th Cir. 2007) .................................................... 13

*Ivy Broadcasting Co. v. AT&T*,
391 F.2d 486 (2d Cir. 1968)................................................... 14, 15

*Kansas v. Garcia*,
140 S. Ct. 791 (2020) .................................................. 3, 4, 23, 28

*Kurns v. R.R. Friction Prods. Corp.*,
565 U.S. 625 (2012) ...................................................................... 6

*Louisiana Public Service Commission v. FCC*,
476 U.S. 355 (1986) ................................................................... 7, 8

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ...................................................................... 4

*Minn. Pub. Utils. Comm'n v. FCC*,
483 F.3d 570 (8th Cir. 2007) ................................................ 16, 27

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019) ................................................. passim

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*,
533 F.2d 601 (D.C. Cir. 1976) ....................................... 17, 27, 28

iii

*New York State Department of Social Services v. Dublino*,
    413 U.S. 405 (1973) ................................................................... 13

*O'Brien v. W. Union Tel. Co.*,
    113 F.2d 539 (1st Cir. 1940) ..................................................... 15

*P.R. Dep't of Consumer Aff. v. Isla Petroleum Corp.*,
    485 U.S. 495 (1988) ............................................................ 23, 24

*Pacific Gas & Electric Co. v. State Energy Resource Conservation &*
    *Development Commission*,
    461 U.S. 190, (1983) ................................................................. 11

*Pinney v. Nokia, Inc.*,
    402 F.3d 430 (4th Cir. 2005) ..................................................... 25

*Postal-Tel. Cable Co. v. Warren-Godwin Lumber Co.*,
    251 U.S. 27 (1919) .................................................................... 15

*Quik Payday, Inc. v. Stork*,
    549 F.3d 1302 ..................................................................... 29, 30

*R.J. Reynolds Tobacco Co. v. Durham Cty.*,
    479 U.S. 130, 140 (1986) ....................................................... 3, 23

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ............................................................ 3, 6, 23

*SPGGC, LLC v. Blumenthal*,
    505 F.3d 183 (2d Cir. 2007) ...................................................... 29

*Sprietsma v. Mercury Marine*,
    537 U.S. 51 (2002) .................................................................... 23

*Sprint Spectrum, L.P. v. Mills*,
    283 F.3d 404 (2d Cir. 2002) ...................................................... 15

*State Corporate Commission of Kansas v. FCC*,
    787 F.2d 1421 (10th Cir. 1986) ................................................. 16

*Ting v. AT&T*,
    319 F.3d 1126 (9th Cir. 2003) ................................................... 17

*TV Pix, Inc. v. Taylor*,
  304 F. Supp. 459 (D. Nev. 1968) ................................................... 19

*TV Pix, Inc. v. Taylor*,
  396 U.S. 556 (1970) ...................................................................... 19

*U.S. Telecom Ass'n v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016) ..................................................... 26

*United States v. Midwest Video Corp.*,
  406 U.S. 649 (1972) ...................................................................... 10

*United States v. Southwestern Cable Co.*,
  392 U.S. 157 (1968) ................................................................ passim

*Virginia Uranium, Inc. v. Warren*,
  139 S. Ct. 1894 (2019) ................................................................. 11

*Western Union Tel. Co. v. Boegli*,
  251 U.S. 315 (1920) ...................................................................... 15

*Wis. Pub. Intervenor v. Mortier*,
  501 U.S. 597 (1991) ........................................................................ 6

*Worldcom, Inc. v. Graphnet, Inc.*,
  343 F.3d 651 (3d Cir. 2003) ......................................................... 15

*Wyeth v. Levine*,
  555 U.S. 55 (2009) .................................................................... 4, 22

## Administrative Materials

*In re Restoring Internet Freedom*,
  33 FCC Rcd. 311 (2018) ............................................................... 28

*In re Vonage Holdings Corp.*,
  19 FCC Rcd. 22404 (2004) ........................................................... 27

## Statutes

47 U.S.C. § 153 ....................................................................... passim

47 U.S.C. § 223 ........................................................................ 12, 24

v

47 U.S.C. § 276 ......................................................................... 12

47 U.S.C. § 303 ......................................................................... 24

47 U.S.C. § 414 ......................................................................... 13

47 U.S.C. § 543 ................................................................... 12, 20

47 U.S.C. § 544 ......................................................................... 12

47 U.S.C. § 556 ................................................................... 12, 21

47 U.S.C. § 601 ......................................................................... 26

Cable Communications Policy Act of 1984,
    Pub. L. No. 98-549, 98 Stat. 2779 ........................................ 18, 20

Colo. Rev. Stat. § 44-30-1607 ....................................................... 29

Communications Act of 1934,
    47 U.S.C. §§ 151-646 .......................................................... passim

N.Y. Gen. Bus. Law § 399-zzzzz .......................................................... 2

Telecommunications Act of 1996,
    Pub. L. No. 104-104, 110 Stat. 56 ......................................... 24, 25

## **Other Authorities**

H.R. Rep. 98-934 (1984) .............................................................. 21

H.R. Rep. No. 104-458 (1996) .................................................... 24, 25

Letter Agreement Between Zoom and the NYAG (May 7, 2020) (Zoom, an
    online videoconferencing service, committing to complying with New
    York's encryption and routing standards even when some participants
    are not in New York).
    https://perma.cc/7ZCN-XKD5 ..................................................... 30

Philip R. Hochberg, *The States Regulate Cable: A Legislative Analysis of
    Substantive Provisions* (1978),
    https://perma.cc/Z89E-JTHQ ..................................................... 20

*Voice over Internet Protocol (VoIP)*,
     FCC, https://perma.cc/2UZX-P7FQ (last updated Dec. 30, 2019) ............. 27

## INTEREST OF AMICI CURIAE[1]

*Amici* are law professors who write about and teach internet law. *Amici* have an interest in ensuring the proper balance between state and federal internet regulation, which affects state access and consumer protection regulations. Amici submit this brief to articulate their scholarly view of the proper reach of federal preemption of interstate communications. *Amici* are:[2]

**Michael J. Burstein**
Cardozo Law School

**Brett M. Frischmann**
Villanova University

**Chris Jay Hoofnagle**
University of California, Berkeley, School of Law

**Lawrence Lessig**
Harvard Law School

**Pamela Samuelson**
University of California, Berkeley, School of Law

**Jason M. Schultz**
New York University School of Law

**Barbara van Schewick**
Stanford Law School

---

[1] Amici certify that that no counsel for a party authored this brief in whole or in part, and no person other than amici or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. The parties have consented to its filing.

[2] Affiliations are listed for identification purposes only.

1

## SUMMARY OF ARGUMENT

The district court held that New York's Affordable Broadband Act, N.Y. Gen. Bus. Law § 399-zzzzz ("ABA"), is preempted because Congress occupied the entire field of interstate communications, stripping the states of their preexisting police power.

This is a sweeping claim. If affirmed, it would invalidate vital state laws regulating areas of traditional local concern—including consumer protection, public health, and public safety. In many cases, Plaintiffs' and the district court's theory would leave both the FCC and the states without regulatory authority, leaving Americans wholly unprotected from harms by interstate communications providers.

Nothing in the text and structure of the Communications Act of 1934 ("Communications Act" or "Act") or the long history of judicial decisions interpreting the scope of federal preemption under that statute supports this position. Plaintiffs' field preemption claim is also inconsistent with the Act's recognition of a role for states in regulating interstate communications, the long-standing practice of states doing so, and the case law upholding those regulations and practices.

Even if the Plaintiffs' claim were confined to "interstate information services," which it does not appear to be, the limited nature of the FCC's ancillary

authority over these services is impossible to square with the essential requirement for field preemption: "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Instead, the text, structure, and history of the Telecommunications Act of 1996 (which introduced information services), coupled with its explicit prohibition on implied preemption, all demonstrate the contrary: Congress did not intend to create a regulatory void where neither the FCC nor the states could regulate many of the interstate information services that are now so central to modern life.

## ARGUMENT

Field preemption occurs only in those "rare cases" in which "Congress has 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)).

The Communications Act regulates neither the whole of "interstate communications services," JA144, nor even the narrower field of interstate "information service[s]," 47 U.S.C. § 153(24), "so pervasive[ly] . . . that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (second alteration in original) (quoting *Rice*, 331 U.S. at 230). To the contrary,

the Act leaves intact the states' preexisting police powers—their "broad authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854 (2014). New York's ABA is an exercise of that police power. *See Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41-42 (2d Cir. 1990) (holding that "consumer protection law" is one of the "historic police powers of the States") (citation omitted). The preemption analysis in this case therefore proceeds from the assumption that a federal law has not displaced the state statute "unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

## I. The Communications Act Does Not Preempt the Field of Interstate Communications.

### A. The Communications Act's Grant of Federal Authority to Regulate Interstate Communications Does Not Divest the States of Their Concurrent Authority.

An inference of field preemption, "like all preemption arguments, must be grounded 'in the text and structure of the statute at issue,'" *Garcia*, 140 S. Ct. at 804 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)), not in hypothesized "abstract and unenacted legislative desires" that cannot be found in the statute itself, *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019). Nothing in the text, structure, or history of the Communications Act suggests that interstate communications is a preempted field. The ABA is therefore a lawful

4

exercise of New York's police powers regardless of whether it is interstate or intrastate regulation, or both.

      **1.**     Plaintiffs attempt to manufacture field preemption from the grant of jurisdiction to the FCC in section 152 of the Act, 47 U.S.C. § 152. But nothing in that section suggests that the FCC's jurisdiction over interstate communications is *exclusive*, or that Congress intended to eliminate the states' police powers over interstate communications.

      Section 152(a) defines the scope of the Communications Act, stating that its provisions "shall apply to all interstate and foreign communication by wire or radio." 47 U.S.C. § 152(a). This text by its terms addresses only the scope of the "provisions of this chapter," *id.*, and consequently, only the scope of any regulatory authority they may confer on the FCC. It is silent about whether the FCC's jurisdiction over interstate communications is exclusive of or concurrent with state authority.

      Section 152(b) does not help. That section merely limits the FCC's jurisdiction under the statute over intrastate communications, stating: "[N]othing in *this chapter* shall be construed to apply or to give the Commission jurisdiction with respect to" various aspects of intrastate communications, except in limited circumstances. *Id.* § 152(b) (emphasis added). The states' police powers exist independent of the Communications Act. It is implausible that Congress would

5

indicate its desire to displace state powers that exist outside the purview of the statute by delimiting the scope of the FCC's jurisdiction under the Act. "Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 607 (1991) (quoting *Rice*, 331 U.S. at 230).

The Supreme Court, moreover, has consistently held that authority to regulate does not, standing alone, give rise to field preemption. *See, e.g.*, *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985) (holding that FDA authority to regulate does not preempt the field); *see also Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring) (noting that "Congress must do much more to oust all of state law from a field" than "grant[] regulatory authority over that subject matter to a federal agency").

Indeed, the Court has specifically counseled against reading field preemption into "broad statements about the 'comprehensive' nature of federal regulation under the Federal Communications Act," instead requiring "positive evidence of legislative intent" to preempt the field based on a case-by-case analysis of "specific provisions of the statute." *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 429-32 (1963).

None of the cases Plaintiffs or the district court cite for the proposition that section 152 creates exclusive FCC jurisdiction and field preemption over interstate communications sweeps so broadly. Not only are the cited passages taken out of context, they all contain exactly the kind of (and sometimes even the exact) shorthand references to the allocation of regulatory authority that the Supreme Court warned against relying upon in *Head*. *See id*.

In *Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986) (*"Louisiana PSC"*), the Court began its preemption analysis by sketching in admittedly "broad terms" the contours of the FCC's authority. *Id.* at 360 (citing 47 U.S.C. §§ 151, 152(b)). Of course, *Head* precludes a finding of preemption in such "broad statements." 374 U.S. at 429-30. The Court then explained that:

> "[W]hile the Act would seem to divide the world of *domestic telephone service* neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction—in practice, the realities of technology and economics belie such a clean parceling of responsibility." *Louisiana PSC*, 476 U.S. at 360 (emphasis added).

This statement cannot fairly be read as establishing field preemption, let alone field preemption over all of interstate communications. First, the Court uses the term "plenary" to describe the nature of FCC authority over interstate "domestic telephone service," not over "communications services" in general (*contra* JA150). Interstate telephone service is a distinct subset of communications

7

service, and is comprehensively regulated under Title II; interstate information services such as broadband, another subset of communications service, are not. This difference in the pervasiveness of federal regulation is critical to field preemption analysis. *See infra* Part I.A.2. The Court's language, moreover, is precise: States' intrastate jurisdiction is "exclusive," because § 152(b) denies the FCC intrastate jurisdiction, but the FCC's interstate authority over telephone service is "plenary"—not "exclusive." There is no parallel provision divesting the states of their inherent police powers, only a grant of federal authority. *Louisiana PSC*, 476 U.S. at 360. Second, the decision in *Louisiana PSC* has nothing to do with field preemption of *interstate* telephone or communications services; it addresses only express and conflict preemption of certain state regulation of *intrastate* telephony. *See id.* at 369-70.

Similarly, the district court relied on statements about the broad scope of the FCC's authority over interstate communications first made in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 177-78 (1968) and then cited and summarized in *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700 (1984). *See* JA148 n.11. But *Southwestern Cable* is not about preemption at all. These statements are instead part of a holding that "the Commission has [ancillary] authority under the Communications Act to regulate [cable service]," *Southwestern Cable*, 392 U.S. at 177-78, and are cited in support of that same

8

holding in *Capital Cities*, *see* 467 U.S. at 699-700. *Capital Cities* isn't about field preemption either; it only addresses express and conflict preemption arising from the FCC's exercise of that ancillary authority, *see id.* at 700-09.

Finally, references to the FCC's "unified jurisdiction" in *Southwestern Cable* (*see* JA149 n.11) are about the creation of the FCC, not the removal of state police powers. They simply refer to the passage of the Communications Act of 1934, which "centraliz[ed] authority heretofore granted by law to several [federal] agencies"—the Federal Radio Commission for radio and the Interstate Commerce Commission for telephone and telegraph services. 47 U.S.C. § 151.[3]

Nothing in the statutory jurisdictional grant displaces the states' police powers over interstate communications.

**2.**    This reading of the statutory text is supported by the Act's structure. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive … that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399 (citations omitted). The Act does not pervasively regulate *all* aspects of interstate communications, foreclosing an inference of preemption of this entire field.

---

[3] Plaintiffs' reference to § 151 of the Act, *see* Docket Entry ("DE") 16 at 17, is inapposite for the same reasons.

"Interstate communications" comprises a vast range of activities and technologies. Indeed, the Communications Act does not even attempt to limit the scope of "communications."[4] Within this broad field, the Act pervasively regulates *some* aspects of interstate communications—telecommunications services (or "common carrier services") in Title II of the Act, radio transmissions in Title III, and cable services in Title VI—but leaves the rest subject only to light or no express regulation. In areas of interstate communications not covered by those titles of the Act, such as interstate information services, *see infra* Part II, or cable services prior to the enactment of Title VI, *see United States v. Mw. Video Corp.*, 406 U.S. 649 (1972), the FCC is limited to exercising "ancillary authority"—that is, its "authority … is restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities" specified in the Act. *Southwestern Cable*, 392 U.S. at 178; *see Mozilla Corp. v. FCC*, 940 F.3d 1, 75-76 (D.C. Cir. 2019); *Comcast Corp. v. FCC*, 600 F.3d 642, 648-49 (D.C. Cir. 2010) (distinguishing FCC's "subject matter jurisdiction" over interstate communications from its regulatory authority over a subject).

In those areas—and broadband service is one of them—if the FCC is unable to link a desired regulatory action to an express statutory mandate, it has no

---

[4] The Act delimits "interstate communication" only by reference to the location of the communicators, not the scope of their activities. *See* 47 U.S.C. § 153(28).

regulatory authority at all, much less the kind of pervasive authority that gives rise to field preemption. *See Mozilla*, 940 F.3d at 76; *Comcast*, 600 F.3d at 649-61. This lack of regulatory authority over significant parts of the field of interstate communications forecloses an inference of field preemption over the entire field.

Congress's decision to leave some aspects of a field unregulated by the federal government, moreover, does not strip the states of their independent authority to regulate. This general principle was upheld most recently in *Virginia Uranium*. In that case, the Atomic Energy Act gave the Nuclear Regulatory Commission (NRC) broad authority to regulate many aspects of the nuclear power industry. The NRC nevertheless concluded, as the FCC did here for broadband, that it lacked authority over one part of the field—uranium mining on private land. *See* 139 S. Ct. at 1900. The Court declined to find that narrow field preempted, thinking it unlikely that Congress would have left "both state and federal authorities . . . unable to regulate." *Id.* at 1903; *see id.* at 1912 (Ginsburg, J., concurring in the judgment) ("[I]f Congress did not provide for regulation of private conventional mining, it is hard to see how or why state law on the subject would be preempted."); *see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 207-08 (1983) (rejecting field preemption claim because it was "inconceivable that Congress would have left a regulatory vacuum").

11

**3.**      Other aspects of the statute confirm that Congress did not intend to preempt the entire field of interstate communications. The Act contains numerous express preemption provisions. *See, e.g.*, 47 U.S.C. §§ 223(f)(2), 230(e)(3), 253(a), 253(d), 276(c), 543(a)(1), 544(e), 556(c). "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

Some preemption provisions also assume, *contra* Docket Entry ("DE") 16 at 17, that states have the preexisting authority "to regulate directly an interstate communications service." Cable service is a type of interstate communication. *See Southwestern Cable*, 392 U.S. at 168-69. Section 544(e) preempts states from "prohibit[ing], condition[ing], or restrict[ing] a cable system's use of any type of subscriber equipment or any transmission technology," 47 U.S.C. § 544(e). This would not be necessary if the Act already preempted the entire field of interstate communications.[5]

---

[5] This and other cable-related provisions are not limited to preempting states from regulating *intrastate* cable service, as Plaintiffs have claimed in the litigation over California's net neutrality law. Cable service is always interstate communications, even if the television signal originates in the same state in which the cable system operates. See *Southwestern Cable*, 392 U.S. at 168-69. Thus, these express preemption provisions preempt the states from regulating interstate communications.

Finally, an intent to occupy the field of interstate communications is belied by the extensive role the statute gives state authorities in regulating not only the intrastate aspects, but also the interstate aspects of communications by wire and radio. *See Mozilla*, 940 F.3d at 81 (collecting provisions); *see also N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973) ("[T]he case for federal pre-emption" is "less persuasive" when "coordinate state and federal efforts exist within a complementary administrative framework[ ] and in the pursuit of common purposes."); *see also In re NOS Commc'ns, MDL No. 1357*, 495 F.3d 1052, 1058 (9th Cir. 2007) (relying on 47 U.S.C. § 414 in rejecting field preemption); *Metrophones Telecomms., Inc. v. Global Crossings Telecomms., Inc.*, 423 F.3d 1056, 1072 (9th Cir. 2005) (same).

**B.   No Court Has Held That the Entire Field of Interstate Communications Is Preempted.**

The district court's holding that the field of interstate communications is entirely preempted by federal law is without precedent and inconsistent with existing law. No court has ever found field preemption of the whole of interstate communications. Instead, courts have evaluated field preemption claims with respect to much narrower subfields, analyzing the text and structure of the Act's regulation of those subfields. Courts sometimes have found field preemption in narrow subfields pervasively regulated under Title II or III of the Act, but never in the broad remainder of subfields lightly regulated under Title I.

This Court's decision in *Ivy Broadcasting Co. v. AT&T*, 391 F.2d 486 (2d Cir. 1968) ("*Ivy*"), is not to the contrary. The plain language, reasoning, and holding of the case are explicitly limited to what *Ivy* calls "communications carriers"—that is, "common carriers engaged in … telegraph and telephone transmission," which are regulated under Title II of the Act.[6] *Id.* at 490-493. As field preemption doctrine requires, *Ivy* emphasized the "comprehensive [federal] legislation regulating *common carriers engaged in interstate telegraph and telephone transmission*," listing numerous provisions applying to common carriers under Title II. *Id.* at 490 (emphasis added). *Ivy* then concluded, in the sentence that the district court (JA147) and Plaintiffs (DE 16 at 14) cite to support their field preemption argument, that "[t]he Supreme Court has held that the establishment of this broad scheme [i.e. Title II] for the regulation of interstate service *by communications carriers* [i.e. common carriers engaged in interstate telephone transmission] indicates an intent on the part of Congress to occupy the field to the exclusion of state law." *Ivy*, 391 F.2d at 490 (emphasis added).

The two cases that *Ivy* cited to support its limited holding similarly found field preemption of services subject to pervasive common carrier regulation—transmission of interstate telegraph messages under the Mann-Elkins Act. *See*

---

[6] The Act uses "carrier" and "common carrier" interchangeably. 47 U.S.C. § 153(11). Common carriers are regulated under Title II, which is titled "Common Carriers." 47 U.S.C. Chapter 5, Subchapter II.

*Postal-Tel. Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919) ("[The 1910] act *[brought] under federal control the interstate business of telegraph companies* and therefore was an occupation of the field."); *Western Union Tel. Co. v. Boegli*, 251 U.S. 315, 316 (1920) (same).

*Ivy* thus supports, at most, preemption of the pervasively regulated field of "the duties, charges, and liabilities of telegraph or telephone companies with respect to interstate communications service." 391 F.2d at 491.[7] The district court's holding that *Ivy* establishes field preemption of the entire field of interstate communications finds no support in the language and reasoning of the case. Interstate service by communications carriers, a narrow subfield of interstate communications, is pervasively regulated under Title II as *Ivy* describes; the whole of interstate communications service is not.[8] Moreover, the FCC's almost

---

[7] *See also Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651 (3d Cir. 2003) (same for common carrier two-way telex transmission service); *O'Brien v. W. Union Tel. Co.*, 113 F.2d 539, 541 (1st Cir. 1940) (same for transmission of interstate telegraph messages).

[8] Neither the district court (JA147-48) nor the plaintiffs (DE 16 at 15 & n.12) cite any authority to the contrary. *GTE Serv. Corp. v. FCC*, 474 F.2d 724 (2d Cir. 1973) concerns the scope of the FCC's ancillary authority, discussed *infra* p.22-23, not preemption. *Sprint Spectrum, L.P. v. Mills*, 283 F.3d 404 (2d Cir. 2002) observed only that "[f]ederal regulation of interstate and foreign communications plainly preempts *much* of the field of wireless broadcasting," *id.* at 416 (emphasis added), but found no preemption of the regulation at issue in the case. *See id.* at 421. The statement in *Crockett Tel. Co. v. FCC*, 963 F.2d 1564, 1566 (D.C. Cir. 1992), cited by the district court (JA150), is limited to common carrier services,

complete lack of regulatory authority over broadband under Title I is the opposite of the pervasive regulation of common carriers that justifies field preemption in *Ivy* and similar cases, so *Ivy* is simply inapposite in this case.

Courts have rejected field preemption claims in narrower subfields of interstate communications that are less pervasively regulated than common carriers. If federal law does not preempt the narrower subfields in those cases, then *a fortiori* it does not preempt the broader field of interstate communications. In *Head*, the Supreme Court rejected field preemption of radio broadcast—a subset of interstate communications—despite the broad and comprehensive authority granted the FCC to issue broadcast licenses. *See* 374 U.S. at 429-32. More recently, this Court held that the regulation of interstate phone calls to internet service providers is not field preempted. *See Global NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 99-101 (2d Cir. 2006); *accord Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 433 (9th Cir. 2014) (*GLAAD*) (online video closed captioning); *Metrophones*, 423 F.3d at

---

i.e. services regulated under Title II. *See id.* ("exclusive jurisdiction to regulate interstate *common carrier services* including the setting of rates") (emphasis added). *See supra* note 6. The passage of *State Corp. Comm'n of Kan. v. FCC*, 787 F.2d 1421 (10th Cir. 1986), that Plaintiffs cite (DE 16 at 15 n.12) concerns the scope of § 152(b)'s withdrawal of jurisdiction over local matters. *See infra* note 13 for discussion of *Minnesota Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007).

1072 (payphones); *Ting v. AT&T*, 319 F.3d 1126, 1136-37 (9th Cir. 2003) (long-distance telephone contracts).

Finally, no court has found field preemption in subfields of interstate communications where, as here, the FCC only has limited ancillary authority. Many of these cases do not even discuss field preemption claims. Instead, courts have carefully evaluated the scope of the FCC's ancillary authority to determine whether it can preempt state law. *See Mozilla*, 940 F.3d at 75 ("[I]n any area where the Commission lacks the authority to regulate, it equally lacks the power to preempt state law.") In *National Association of Regulatory Utility Commissioners v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) ("*NARUC II*"), for example, the court vacated the FCC's preemption of state regulation of two-way, non-video uses of cable systems, a forerunner of broadband, because the FCC lacked ancillary authority to regulate those services.[9] If the Act actually preempted the field of interstate communications, the court would have upheld the

---

[9] The majority in *NARUC II* held that the entire preemption was invalid because it was not "reasonably ancillary" to the FCC's statutory responsibilities. *Id.* at 612-614, 621-622. Only one judge found that the FCC also lacked authority to preempt because it was preempting state regulation of intrastate services. *See id.* at 621-23 (Lumbard, J., concurring).

preemption—no careful examination of ancillary authority in this and other cases[10] would have been necessary.

C.      **The History of Cable Regulation Demonstrates That the Field of Interstate Communications Is Not Preempted.**

Plaintiffs assert that because the Communications Act preempts the field of interstate communications, "[n]o state has ever successfully" "regulate[d] directly an interstate communications service," particularly the "core terms of that service, including its price and speed." DE 16 at 17. Both parts of that statement are incorrect. The history of cable regulation in the United States demonstrates that the states have the power to directly regulate interstate communications services, including their rates. And such regulation has long been held entirely consistent with the federal statutory scheme.

Cable television service is a type of interstate communication. *See Sw. Cable*, 392 U.S. at 168-69. Prior to the enactment of Title VI of the Communications Act in 1984, cable was subject only to light regulation under the FCC's "ancillary authority" in Title I of the Act, just like broadband service since the FCC's 2018 *Restoring Internet Freedom* Order, 33 FCC Rcd. 311 (2018). With no express authority to regulate cable, the FCC's authority was

---

[10] For examples, *see Comcast*, 600 F.3d at 650-58 (discussing examination of ancillary authority in various cases); Brief of Professors of Communications Law as Amici Curiae in Support of Petitioners 6-10, 18-21, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (Nos. 18-1051 et al.) [Mozilla Professors' Br.] (same).

limited. *See id.* at 178. States frequently filled the gaps in federal authority, and courts upheld those state regulations against preemption challenges.

In *TV Pix, Inc. v. Taylor*, 396 U.S. 556 (1970), *aff'g* 305 F. Supp. 459, 465-66 (D. Nev. 1968), the Supreme Court summarily affirmed a lower court judgment that the Communications Act did not preempt state regulation of interstate cable services as public utilities. The Nevada statute at issue imposed traditional duties of public utilities on cable providers—regulating their entry, services, and facilities, and requiring that their rates be "just and reasonable." 305 F. Supp. at 460. Noting that cable service constitutes "interstate communications," *id.* at 461-462, the district court rejected plaintiffs' field preemption claim, holding that "Congress, in enacting the Federal Communications Act of 1934, did not intend absolute preemption of the field to the exclusion of all state regulation," *id.* at 464-465. The court also upheld the statute against express and conflict preemption challenges. *See id.* at 466 & n.4.

Nevada's cable law was not an outlier. By 1978, eleven states had adopted comprehensive regulations governing this interstate service, including regulating it as a public utility (eight states) and creating separate cable regulatory agencies (three states, including New York). Although the specific provisions differed, many states regulated cable television rates and operations, or imposed access and nondiscrimination requirements. *See* Philip R. Hochberg, *The States Regulate*

19

*Cable: A Legislative Analysis of Substantive Provisions*, at Definitions, 23, 29-30, 59-64, 91-97 (1978), https://perma.cc/Z89E-JTHQ. With respect to rate regulation, "[t]he New York statute [was] the most comprehensive." *Id.* at 92. Indeed, New York required administrative approval of rate increases and claimed the authority to change cable providers' rates if they were discriminatory or if service were inadequate. *See id.* at 91-96 (describing various aspects of rate regulation powers in New York and the ten other states with comprehensive cable regulations).

In other words, when cable was subject to the same federal Title I authority as broadband is today, states maintained concurrent jurisdiction to regulate this interstate communications service under their police powers, including by regulating their rates. New York's broadband affordability statute is firmly in that historical tradition.

The light federal regulatory regime for cable came to an end in 1984, when Congress enacted the Cable Communications Policy Act of 1984 ("Cable Act"), Pub. L. No. 98-549, 98 Stat. 2779, which added Title VI to the Communications Act and gave the FCC express authority over cable services. But that enactment itself puts the lie to the Plaintiffs' field preemption claim. For one thing, the Cable Act included several targeted express preemption provisions, *see, e.g.*, 47 U.S.C. § 543(a) (rate regulation), that would have been unnecessary had the field been

entirely preempted already.[11] For another, the Cable Act expressly preserved states' ability to regulate consistently with its terms. *See id.* § 556. The House Report explicitly called out states' continued authority to rate regulate cable service consistent with Title VI. *See* H.R. Rep. 98-934 at 94 (1984) ("Nothing in Title VI is intended to affect a state or local government's authority over matters of public health, safety, or welfare, to the extent that such authority is exercised in a manner consistent with the title. … A state may, for instance, exercise authority over the whole range of cable activities, such as … consumer protection; … rate regulation or deregulation; … and other franchise-related issues—as long as the exercise of that authority is consistent with Title VI. … Nothing in Title VI is intended to overturn state law or regulations in effect on the effective date of [the Cable Act] (including the Massachusetts and California laws on rate deregulation), as long as such regulations or laws are consistent with the title.").

This history demonstrates that even though the Communications Act asserts federal jurisdiction over interstate communications, that jurisdiction is not *exclusive*. Contrary to Plaintiffs' claims, there is a long history of states regulating interstate communications, including in ways that mirror how New York has

---

[11] *See supra* note 5.

chosen to ensure broadband affordability for its citizens.[12] This "historic presence of state law" is compelling evidence that the Communications Act does not preempt the field. *Wyeth*, 555 U.S. at 565 n.3.

## II. The Communications Act Does Not Preempt the Field of Interstate Information Services.

Even if Plaintiffs' field preemption claim were limited to interstate information services—a narrower subfield of interstate communications—the claim would still fail. There is no evidence that the Communications Act preempts the fields of interstate information services or interstate broadband service, and significant evidence to the contrary.

Information services, "offering[s] of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications," 47 U.S.C. § 153(24), are subject to regulation only under Title I. *See Comcast*, 600 F.3d at 645-46. This category includes online content, and many applications and services, such as email, websites, social media, online gaming, various online video services, and, since 2018, broadband service. For many information services, including broadband service, the FCC's authority under Title I is sharply limited because their

---

[12] For this reason, it does not matter whether one characterizes the ABA as "direct" regulation of interstate communications, *see* DE 16 at 17, or not, *see* Appellants Br. 32.

regulation is not reasonably ancillary to the FCC's statutorily mandated responsibilities. *See id.* at 645-46, 649-51. The FCC's limited ancillary authority under Title I is hardly the kind of "comprehensive[]," *Garcia*, 140 S. Ct. at 804 (quoting *R.J. Reynolds*, 479 U.S. at 140), or "pervasive," *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230), regulation that ordinarily gives rise to an inference that Congress has intended wholly to occupy the field. It is, in fact, the opposite—a congressional abdication of regulatory authority.

To believe that Congress preempted the field of interstate information services, then, one must believe that Congress intended *neither* the federal government *nor* the states to have authority to regulate them. Although "congressional creation of such a regime" may be possible, "to say that it can be created is not to say it can be created subtly." *Puerto Rico Dep't of Consumer Aff. v. Isla Petroleum Corp.*, 485 U.S. 495, 500 (1988). Courts will not lightly infer congressional intent to leave a field unregulated by anyone. *See id.* at 503-04 (concluding that congressional repeal of federal regulation did not preclude states from filling regulatory void); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 68-70 (2002) (finding no field preemption in federally unregulated field absent "clear and manifest" evidence of congressional purpose). Plaintiffs can point to no convincing evidence—subtle or otherwise—that Congress intended to leave interstate information services completely free from state or federal regulation,

leaving behind "a pre-emptive grin without a statutory cat." *Isla Petroleum*, 485 U.S. at 504.

The text, structure, and history of the Telecommunications Act of 1996 ("1996 Act"), Pub. L. No. 104-104, 110 Stat. 56, do not support field preemption. The 1996 Act defined "information services" for the first time in federal law, *see* 47 U.S.C. § 153(24), but does not directly regulate them or give the FCC any direct authority over them. Nothing in the text or legislative history of the 1996 Act says anything about preemption with respect to information services.

This statutory silence speaks volumes when compared to the range of express preemption provisions elsewhere in the 1996 Act, which carefully calibrate federal-state responsibilities, often striking different balances. Some provisions give the FCC "exclusive jurisdiction," *e.g.*, 47 U.S.C. § 303(v). Others couple an express preemption provision with multiple savings clauses, *e.g.*, *id.* §§ 223(f)(2), 253(a)-(d). Some directly preempt state law, *e.g.*, *id.* § 303(v), while others authorize the FCC to do so case by case after notice and comment, *e.g.*, *id.* § 253(d). Legislative history suggests that these provisions were extensively negotiated. *See, e.g.,* H.R. Rep. No. 104-458, at 191, 197-98, 210 (1996). Against this statutory backdrop, Congress's silence on preemption of state regulation of information services forecloses any inference that Congress meant to preclude the states from exercising their preexisting police powers to regulate them.

Indeed, the 1996 Act went even further, specifically forbidding courts and agencies from implying preemption by anything in the 1996 Act other than its express preemption provisions. A section entitled "No implied effect" states: "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless *expressly* so provided in such Act or amendments." Pub. L. No. 104-104 § 601(c)(1), 110 Stat. 56, 143 (codified at 47 U.S.C. § 152 note) (emphasis added). As the conference report explains, § 601(c)(1) "prevents affected parties from asserting that the bill impliedly preempts other laws." H.R. Rep. No. 104-458, at 201.

Consistent with the statutory text and legislative history, courts have held that § 601(c)(1) prohibits implied preemption, of which field preemption is one variety. In *GLAAD*, for example, the Ninth Circuit held that even though the 1996 Act enacted several requirements related to closed captioning of video, § 601(c)(1) "signifies that Congress did not intend to occupy the entire legislative field of closed captioning." 742 F.3d at 428. Other courts are in accord. *See, e.g.*, *Farina v. Nokia, Inc.*, 625 F.3d 97, 121 (3d Cir. 2010); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 458-59 (4th Cir. 2005); *AT&T Commc'ns of Ill. v. Ill. Bell Tel. Co.*, 349 F.3d 402, 410 (7th Cir. 2003); *City of Dallas v. FCC*, 165 F.3d 341, 348 (5th Cir. 1999).

25

In this case, any preemption of information services must arise solely from the 1996 Act that added the term and its accompanying regulatory scheme. But that statute precludes implied field preemption.

Neither can an indication of Congress's preemptive intent in the 1996 Act be found in policy statements that are unmoored from specific authority. Section 601(c)(1) applies *a fortiori* to bar such preemption. But even on their own terms, those policy statements do not give rise to any inference of preemption. Section 230(b)(2) states that it is "the policy of the United States" "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). That statement of policy says nothing about preemption. It is found, moreover, in the Communications Decency Act, a portion of the 1996 Act, in a provision focused on blocking and screening of offensive material by providers of "interactive computer services," *id.* § 230(f)(2). It is implausible that Congress would choose a provision about regulations on blocking and screening of offensive material by providers of one service—interactive computer services—to express an intent categorically to preempt any state regulation of a different service—information services. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 702-03 (D.C. Cir. 2016) (noting that Congress would not have used an ancillary provision like § 230 to "oblique[ly]" and "indirect[ly]" resolve

26

important policy questions about the "regulatory status of broadband Internet access services").

Finally, field preemption of interstate information services is inconsistent with the long line of cases limiting the scope of the FCC's preemption authority for both "information services" and "enhanced services" (the non-statutory forerunner to "information services") to instances in which the FCC had ancillary authority to regulate these services. *See, e.g.*, *NARUC II*, 533 F.2d at 615-17; *Mozilla*, 940 F.3d at 75-86; *see also* Mozilla Professors' Br. 6-10, 18-21.[13] If the

---

[13] The Eighth Circuit cases upholding preemption of interconnected voice-over-IP (VoIP), which the FCC has declined to classify, are not to the contrary. Unlike with most information services, the FCC has broad statutory authority (under Title II) or ancillary authority (under Title I) over the service, since interconnected VoIP competes with traditional telephony. The FCC has used that authority to impose extensive regulations. *See, e.g.*, *Voice over Internet Protocol (VoIP)*, FCC, https://perma.cc/2UZX-P7FQ (last updated Dec. 30, 2019). In *Minnesota Public Utilities Commission v. FCC*, 483 F.3d 570 (8th Cir. 2007), which upheld the FCC's express preemption of certain state VoIP regulations, no party contested the FCC's assertion of authority over the interstate aspects of the service. *See In re Vonage Holdings Corp.*, 19 F.C.C. Rcd. 22404, 22411 n.46, 22425 n.118 (2004). The holding itself addressed the other requirements of the impossibility exception, 47 U.S.C. § 152(b), with respect to that service. *See Minnesota Pub. Utils. Comm'n*, 483 F.3d at 577-581. Based on a misreading of this precedent, *Charter Advanced Servs. (MN), LLC v. Lange*, 903 F.3d 715 (8th Cir. 2018), concluded that state regulation of interconnected VoIP was preempted, and observed, without further analysis, that "state regulation of an information service conflicts with the federal policy of nonregulation." *Id.* at 719 (quoting *Minnesota Pub. Utils. Comm'n*, 483 F.3d at 580). Despite the sweep of that dictum, the holding of the case is specific to conflict preemption of interconnected voice-over-IP. Neither case suggests field preemption of *all* information services.

27

1996 Act had impliedly preempted the field of interstate information services, the FCC would not have needed ancillary authority to preempt state regulation of the interstate aspects of broadband service.[14]

Similarly unpersuasive is any claim that Congress could not have intended to subject information services—or even broadband service, specifically—to a patchwork of state regulations. That argument can be made in nearly every field of interstate commerce, and yet courts find field preemption only "rare[ly]." *Garcia*, 140 S. Ct. at 804. Courts routinely refuse to imply field preemption simply from the fact that some may perceive uniformity to be preferable. *See, e.g.*, *NARUC II*, 533 F.2d at 619 ("It matters not whether we or the FCC believe that one national laboratory would be better than 50 separate schemes of regulation.").

States commonly regulate information services provided to customers in their state that are both interstate and intrastate in nature, as state amici explain, and courts have consistently upheld those laws against various preemption

---

[14] Contrary to Plaintiffs' claims, neither *Mozilla*'s holding nor its reasoning was limited to intrastate services. *Mozilla* vacated the FCC's entire preemption order—including its preemption of "'any state or local requirements that are inconsistent with [its] deregulatory approach'"—because the FCC "fail[ed] to ground" the order "in a lawful source of statutory authority." 940 F.3d at 74 (alteration in original) (quoting *In re Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018)). The lack of statutory authority was "fatal" to the order's express preemption of state regulations, whether those state laws applied to interstate or intrastate services. *Id.* That the FCC also preempted state regulation of intrastate broadband service in violation of § 152(b) was an *additional* problem with its preemption order, not the only or dispositive problem.

challenges. These practices put the lie to Plaintiffs' claim, DE 16 at 3, 17, that states have not successfully regulated interstate communications, of which information services are a subfield. Kansas, for example, directly regulates the provision of online payday loans, an information service, to customers in Kansas, including by regulating maximum interest rates, maximum annual charges, and installments. The law applies regardless of the online payday lender's location, thus regulating both interstate and intrastate information services. *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1304-05, 1308-09 (10th Cir. 2008), upheld the application of the law to a lender with no physical presence in Kansas—that is, to an interstate information service. *See also GLAAD*, 742 F.3d at 428 (upholding state law that directly regulated interstate and intrastate information services by requiring websites, i.e. an information service, to caption posted videos accessed by customers in California, regardless of the location of the website); *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007) (upholding state law regulating an information service—the sale of gift cards online to Connecticut customers, regardless of the seller's location, including regulating aspects of the price).[15]

---

[15] These statutes often directly regulate technical aspects of interstate information services. *Contra* DE 16 at 17. *See, e.g.,* Colo. Rev. Stat. § 44-30-1607(1)(h), (i), (k) (setting technical standards for online fantasy sports leagues serving in-state customers, regardless of the provider's location). *See also* Letter Agreement

The statutes upheld in *Quik Payday* and *GLAAD* and many others like those cited above—all interstate applications of important state consumer protection laws—would fall under the district court's field preemption holding.[16] Indeed, the district court's holding is flatly inconsistent with the body of precedent that includes *Quik Payday*, *GLAAD*, and others. The FCC, moreover, often lacks ancillary authority to engage in such regulation—rules like those in *Quik Payday* and *GLAAD* are not sufficiently related to one of the FCC's express statutory responsibilities. The district court's and Plaintiffs' field preemption theory would therefore leave consumers wholly unprotected.

---

Between Zoom and the NYAG at 3, 4, 6 (May 7, 2020), https://perma.cc/7ZCN-XKD5.

[16] To the extent these statutes raise constitutional questions about the extraterritorial application of state law, challenge remains available under the Dormant Commerce Clause. *See, e.g.*, *GLAAD*, 742 F.3d at 432-33; *Quik Payday*, 549 F.3d at 1308-09.

# CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order.

Respectfully submitted,

/s/ Michael J. Burstein
Michael J. Burstein
c/o BENJAMIN N. CARDOZO SCHOOL
OF LAW
55 Fifth Avenue
New York, NY 10003
(646)592-6413
mburstei@yu.edu

December 1, 2021                    *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit as set out in Circuit Rules 29.1(c) and 32.1(a)(4) because it contains 6993 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman Font.


/s/ Michael J. Burstein
Michael J. Burstein

December 1, 2021                    *Counsel for Amici Curiae*