# 21-1975

## United States Court of Appeals for the Second Circuit

---

NEW YORK STATE TELECOMMUNICATIONS ASSOCIATION, INC., CTIA - THE WIRELESS ASSOCIATION, ACA CONNECTS - AMERICA'S COMMUNICATIONS ASSOCIATION, USTELECOM - THE BROADBAND ASSOCIATION, NTCA - THE RURAL BROADBAND ASSOCIATION, SATELLITE BROADCASTING AND COMMUNICATIONS ASSOCIATION, on behalf of their respective members,

*Plaintiffs-Appellees,*

v.

LETITIA A. JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the Eastern District of New York

---

### REPLY BRIEF FOR APPELLANT

---

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
ERIC DEL POZO
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-8019

Dated: March 23, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................ii

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ....................................................................................... 4

FEDERAL COMMUNICATIONS LAW PERMITS NEW YORK'S EFFORT
TO CAP BROADBAND PRICES FOR LOW-INCOME RESIDENTS .................... 4

    A.    The ABA Is Not Preempted by Federal Law as a Matter
            of Field Preemption .................................................................. 4

          1.    The Communications Act does not preempt all state
               regulation of interstate communications providers .......... 4

          2.    Federal law also does not preempt the field of
               broadband pricing regulation. .......................................... 8

    B.    The ABA Does Not Conflict with the FCC's 2018 Order,
            and Is Thus Not Subject to Conflict Preemption. .................. 21

          1.    The FCC lacks a relevant delegation of authority to
               regulate or preempt. ........................................................ 21

          2.    The FCC's 2018 reclassification decision does not
               impliedly preempt the ABA. ............................................ 28

CONCLUSION .......................................................................... 36

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*ACA Connects v. Bonta*,
24 F.4th 1233 (9th Cir. 2022) ..................................................... passim

*Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*,
461 U.S. 375 (1983) ...................................................................... 33, 34

*Bastien v. AT&T Wireless Servs., Inc.*,
205 F.3d 983 (7th Cir. 2000) .............................................................. 13

*Bethlehem Steel Co. v. New York State Labor Relations Bd.*,
330 U.S. 767 (1947) ............................................................................ 34

*Capital Cities Cable, Inc. v. Crisp*,
467 U.S. 691 (1984) ............................................................................ 31

*Cipollone v. Ligett Grp.*,
505 U.S. 504 (1992) ............................................................................ 15

*Comcast Corp. v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) ...................................................... 15, 25

*Day-Brite Lighting Inc. v. Missouri*,
342 U.S. 421 (1952) ............................................................................ 35

*Dunham v. Gould*,
16 Johns. 367 (N.Y. 1819) .................................................................. 20

*English v. General Elec. Co.*,
496 U.S. 72 (1990) .............................................................................. 10

*FCC v. Sanders Bros. Radio Station*,
309 U.S. 470 (1940) ............................................................................ 16

*Federal Power Comm'n v. Southern Cal. Edison Co.*,
376 U.S. 205 (1964) ............................................................................ 19

*Ferguson v. Skrupa*,
372 U.S. 726 (1963) ............................................................................ 35

ii

| Cases | Page(s) |
|---|---|

*Fisher v. NOS Commc'ns,*
495 F.3d 1052 (9th Cir. 2007) ............................................................ 12

*Freeman v. Burlington Broads., Inc.,*
204 F.3d 311 (2d Cir. 2000) ................................................................ 9

*Geier v. American Honda Motor Co.,*
529 U.S. 861 (2000) .......................................................................... 13

*Global NAPs, Inc. v. Verizon New England, Inc.,*
454 F.3d 91 (2d Cir. 2006) ........................................................... 5, 17

*Goldberg v. Sweet,*
488 U.S. 252 (1989) .................................................................... 19, 20

*Head v. New Mexico Bd. of Exam'rs in Optometry,*
374 U.S. 424 (1963) ............................................................ 5, 6, 9, 11

*International Bus. Machs. Corp. v. FCC,*
570 F.2d 452 (2d Cir. 1978) ............................................................. 30

*Interstate Nat. Gas Co. v. Federal Power Comm'n,*
331 U.S. 682 (1947) .......................................................................... 18

*Ivy Broadcasting Co. v. American Telephone & Telegraph Co.,*
391 F.2d 486 (2d Cir. 1968) ................................................... 5, 16, 17

*Jackson v. Federal Express,*
766 F.3d 189 (2d Cir. 2014) ............................................................... 8

*Louisiana Public Service Commission v. FCC,*
476 U.S. 355 (1986) .............................................................. 4, 24, 25

*Marcus v. AT&T Corp.,*
138 F.3d 46 (2d Cir. 1998) ........................................................ 5, 6, 13

*Minnesota Public Utilities Commission v. FCC,*
483 F.3d 570 (8th Cir. 2007) ...................................................... 26, 27

iii

**Cases**                                                          **Page(s)**

*Mozilla Corp. v. FCC,*
    940 F.3d 1 (D.C. Cir. 2019) ........................................................ passim

*Murphy v. NCAA,*
    138 S. Ct. 1461 (2018) ............................................................. 9, 12, 16

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ................................................................. 29, 30, 32

*National Cable & Telecomms. Ass'n v. Gulf Power Co.,*
    534 U.S. 327 (2002) ............................................................................ 29

*Nebbia v. New York,*
    291 U.S. 502 (1934) ............................................................................ 12

*New York SMSA Ltd. P'ship v. Town of Clarkstown,*
    612 F.3d 97 (2d Cir. 2010) ................................................................... 9

*New York State Rest. Ass'n v. New York City Bd. of Health,*
    556 F.3d 114 (2d Cir. 2009) .................................................................. 8

*Nordlicht v. New York Tel. Co.,*
    799 F.2d 859 (2d Cir. 1986) ................................................................ 17

*Oneida Indian Nation of N.Y. v. Madison County,*
    665 F.3d 408 (2d Cir. 2011) .................................................................. 8

*Pacific Gas & Elec. Co. v. State Energy Res.*
    *Conservation & Dev. Comm'n,*
    461 U.S. 190 (1983) ............................................................................ 19

*People v. Charter Commc'ns, Inc.,*
    162 A.D.3d 553 (1st Dep't 2018) ........................................................ 20

*Pettis Moving Co. v. Roberts,*
    784 F.2d 439 (2d Cir. 1986) .................................................................. 8

*Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.,*
    251 U.S. 27 (1919) .............................................................................. 17

**Cases**                                                       **Page(s)**

*Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*,
    485 U.S. 495 (1988) ........................................................ 16, 25, 33, 34

*Ray v. Atlantic Richfield Co.*,
    435 U.S. 151 (1978) ................................................................ 33, 34

*Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.*,
    474 U.S. 409 (1986) ............................................................. 18

*TV Pix, Inc. v. Taylor*,
    304 F. Supp. 459 (D. Nev. 1968) ................................... 14, 19

*United States v. Southwestern Cable Co.*,
    392 U.S. 157 (1968) ............................................................. 14

*Verizon New England, Inc. v. Maine Pub. Utils. Comm'n*,
    509 F.3d 1 (1st Cir. 2007) ............................................... 22

*Verizon v. FCC*,
    740 F.3d 623 (D.C. Cir. 2014) ......................................... 15

*Wachovia Bank, N.A. v. Burke*,
    414 F.3d 305 (2d Cir. 2005) ............................................. 31

*Western Union Tel. Co. v. Boegli*,
    251 U.S. 315 (1920) ......................................................... 16

*Wyeth v. Levine*,
    555 U.S. 555 (2009) .............................................. 8, 24, 31

**Laws**

*Federal*

15 U.S.C.
    § 717 et seq. ....................................................................... 17
    § 717c ............................................................................... 17

**Laws**         **Page(s)**

*Federal (cont'd)*

16 U.S.C.
§ 791a et seq...................................................................... 17
§ 824 .................................................................................. 17

47 U.S.C.
§ 151 .................................................................................. 29
§ 152 ........................................................................... 10, 26
§ 160 ........................................................................... 22, 23
§ 201 ................................................................ 11, 17, 22, 29
§ 202 ................................................................... 11, 17, 22
§ 203 ................................................................... 11, 17, 22
§ 204 ......................................................................... 11, 22
§ 205 ......................................................................... 11, 22
§ 253 .................................................................................. 15
§ 332 .................................................................................. 14
§ 414 .................................................................................. 12
§ 532 .................................................................................. 12
§ 543 ........................................................................... 12, 14
§ 1302 ................................................................................ 14

*New York*

Executive Law § 63....................................................... 20

General Obligations Law § 5-501................................ 20

**Administrative Materials**

*In re Protecting & Promoting the Open Internet,*
  30 FCC Rcd. 5601 (2015) ......................................... 20, 23

*In re Restoring Internet Freedom,*
  33 FCC Rcd. 311 (2018) .......................................... passim

## PRELIMINARY STATEMENT

New York's opening brief demonstrated that the Affordable Broadband Act, a state law capping prices for certain broadband internet service plans offered to low-income New Yorkers, is not subject to either field or conflict preemption.[1] As New York explained, the FCC's 2018 Order removed broadband services from the comprehensive statutory framework that Title II of the Communications Act imposes on common carriers, thereby withdrawing broadband from the FCC's delegated authority under Title II to set prices for telecommunications services and to preempt States from doing the same. Instead, the FCC placed broadband services into Title I of the Act, a statutory regime under which the FCC's regulatory authority is curtailed, and the agency is barred from setting rates for broadband services. And neither Congress nor the FCC has impliedly preempted the States from taking action to ensure that affordable broadband plans are available to those States' residents, thus expanding their access to this vital element of modern life.

---

[1] Certain abbreviations and acronyms have the meanings given in New York's opening brief, and the titles of amicus curiae briefs have been simplified in citations.

The Court should reject each of plaintiffs' arguments to the contrary. Plaintiffs have abandoned any defense of the district court's sweeping field-preemption reasoning, which would improperly strip the States of authority to regulate any aspect of the business practices of broadband providers simply because they deal in interstate communications. Despite urging that theory below, plaintiffs assert on appeal that the allegedly preempted field instead consists of regulation of the rates charged by interstate communications providers. But this reformulated argument also fails. Congress has not enacted a uniform, let alone a comprehensive, regime of rate regulation for interstate communications services—such as telephone (Title II), radio (Title III), and cable television (Title V-A). Rather, the Act's various titles treat each type of service differently and specifically vest the FCC with differing levels of authority over rates. And critically for this case, the FCC altogether lacks power to set broadband rates under Title I, leaving the field at issue here federally unoccupied.

Plaintiffs are also incorrect in arguing that the FCC's 2018 Order impliedly preempted the ABA. That conclusion is inconsistent with decisions from both the D.C. Circuit and the Ninth Circuit. In *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019), the D.C. Circuit invalidated the part

of the 2018 Order purporting expressly to preempt state economic (and other) regulation of broadband providers. The reason was that an agency has no authority to preempt state regulation unless it also has statutory authority to regulate, and Title I failed to supply the FCC with authority either to regulate broadband providers or to preempt States from doing so. If the FCC has no authority to regulate expressly, it has no authority to do so by implication either.

The Ninth Circuit recently adhered to the D.C. Circuit's reasoning in rejecting similar preemption arguments in a case challenging a California law banning discriminatory network practices. *See ACA Connects v. Bonta*, 24 F.4th 1233 (9th Cir. 2022). Plaintiffs offer no reason to depart from these sound and established preemption principles here.

## ARGUMENT

**FEDERAL COMMUNICATIONS LAW PERMITS NEW YORK'S EFFORT TO CAP BROADBAND PRICES FOR LOW-INCOME RESIDENTS**

### A.   The ABA Is Not Preempted by Federal Law as a Matter of Field Preemption.

#### 1.   The Communications Act does not preempt all state regulation of interstate communications providers.

New York's opening brief demonstrated that the district court erred in concluding that the Communications Act preempts the entire field of regulation of providers of interstate communications services, thus precluding any state regulation of those entities. See Br. for Appellant (NY Br.) 26-44. Appellees appear to agree. *See* Br. for Pls.-Appellees (Opp. Br.) 34-54.

The district court missed the mark in relying for a holding of field preemption on two prior decisions concerning regulation of Title II tele-phone services, over which the FCC has comprehensive regulatory auth-ority. Those decisions do not address the possible preemptive effect of Title I, which governs information services like broadband. Specifically, the district court relied on: (1) *Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986), which described 47 U.S.C. § 152(a) as granting "'plenary'" authority to the FCC over interstate telephone services

4

(J.A. 150 (quoting 476 U.S. at 357)); and (2) *Ivy Broadcasting Co. v. American Telephone & Telegraph Co.*, 391 F.2d 486 (2d Cir. 1968), which discussed Title II's "'broad scheme for the regulation of interstate service by communications carriers'" (J.A. 147 (quoting 391 F.2d at 490-91)).

As New York's opening brief explained (at 35-44), this field-preemption ruling contravenes settled precedent establishing that the allegedly "'comprehensive' nature of federal regulation under the Federal Communications Act" does not manifest a clear congressional intent to shield providers of interstate communications services from all state regulation. *Head v. New Mexico Bd. of Exam'rs in Optometry*, 374 U.S. 424, 429-30 (1963); *see Marcus v. AT&T Corp.*, 138 F.3d 46, 54 (2d Cir. 1998) (abrogating *Ivy*); *Global NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 100 (2d Cir. 2006) (rejecting argument that "[s]ince federal law generally governs interstate communication" under § 152(a), States lacked all concurrent authority to regulate interstate telephone calls).[2]

---

[2] *Global NAPs* rejected field preemption even though the FCC had viewed the phone calls to dial-up internet providers there "as interstate traffic," 454 F.3d at 100, using the same "end-to-end" analysis the FCC

*(continued on the next page)*

5

The district court's sweeping field-preemption ruling also contradicts multiple provisions of the Act that contemplate state regulation of providers of interstate communications services, including broadband providers. See NY Br. 28-35. Indeed, States have long exercised their police powers to regulate such providers, and even the FCC—when seeking (without authority) to preempt certain state broadband regulations— recognized the "continued applicability" of state laws governing, for example, fraud, taxation, general commercial dealings, and fair business practices. 2018 Order ¶ 196.

Plaintiffs do not meaningfully respond to this authority or attempt to defend the district court's dramatic field-preemption ruling—which would erroneously displace States from having any role in regulating providers that offer interstate communications services falling under any of the Act's titles. *See Head*, 374 U.S. at 431 (state regulation of interstate radio advertising not field-preempted); *Marcus*, 138 F.3d at 54 (state consumer regulation of interstate telephone service not field-preempted). Instead, plaintiffs mischaracterize the scope of the field-preemption deci-

---

applies to broadband traffic (*e.g.*, Chamber Amicus Br. 6, 18; Former Comm'rs Amicus Br. 10-13; Competitive Carriers Amicus Br. 6-19).

sion below, asserting that it concerned the field of "*rate regulation* of inter-state communications services." Opp. Br. 13, 34-36, 41, 45-48 (emphasis added).

But this is not true. The district court's field-preemption ruling turned on its sweeping and incorrect view that "federal law preempts the field of interstate communications services" (J.A. 144; *see also* J.A. 147)—not just state laws that "regulate[] rates" (Opp. Br. 13). Indeed, the district court adopted the same broad field-preemption theory that plaintiffs asserted below, where they argued that "Congress occupied the field of interstate communications services" and purportedly "precluded states from directly regulating any interstate communications service."[3] Mem. in Supp. of Pls.' Mot. for Prelim. Inj. 2-3; *see also* Reply Mem. in Supp. of Pls.' Mot. for Prelim. Inj. 8 (asserting that Congress has "preempted the field of interstate communications services").

Plaintiffs have now abandoned their own field-preemption theory below and, with it, any defense of the district court's field-preemption

---

[3] On appeal, plaintiffs now claim that "Congress occupied the field of *rate regulation of* interstate communications services," which allegedly "preempts New York from regulating *the rates of* interstate broadband service." Opp. Br. 2 (emphasis added).

ruling adopting that theory. *See Jackson v. Federal Express*, 766 F.3d 189, 196 (2d Cir. 2014); *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 441 (2d Cir. 2011). The district court's field-preemption holding is thus plainly incorrect and should be reversed.

## 2. Federal law also does not preempt the field of broadband pricing regulation.

In any event, there is no merit to plaintiffs' new theory that the Communications Act preempts the entire field of rate regulation of interstate communications services. "[I]n all pre-emption cases," courts presume that federal law allows for state supplementation and demand evidence of "clear and manifest" preemptive intent to hold otherwise. *E.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation marks omitted). Contrary to plaintiffs' contention that this presumption does not apply here (Opp. Br. 43), the presumption "is heightened" when States exercise core police powers, *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009), including "their traditional powers of economic regulation," *Pettis Moving Co. v. Roberts*, 784 F.2d 439, 441 (2d Cir. 1986), as New York did in enacting the ABA.

8

In the communications realm, field preemption turns on the "nature of the regulatory power given to" the FCC by "specific provisions of the federal statute."[4] *Head*, 374 U.S. at 430-31. And for such a claim to succeed, those provisions must evince that federal law "occupies [the] field of regulation so comprehensively that it has left no room for supplementary state legislation." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018) (quotation marks omitted). Plaintiffs fail to make that showing for consumer broadband price regulation.

Plaintiffs are incorrect in arguing that 47 U.S.C. § 152 preempts the entire field of pricing regulation for all providers of interstate communications services. *See* Opp. Br. 36-43. This contention echoes the district court's erroneous conclusion that § 152 preempts the field of regulation of interstate communications services writ large, and it fails for essentially the same reasons. Section 152 gives the FCC regulatory jurisdiction over "all interstate and foreign communication by wire or radio" and "all

---

[4] *See, e.g.*, *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 105 (2d Cir. 2010) (federal law occupied field of "regulation of technical and operational aspects of wireless telecommunications technology"); *Freeman v. Burlington Broads., Inc.*, 204 F.3d 311, 321 (2d Cir. 2000) (upholding FCC's "exclusive jurisdiction to regulate RF [i.e., radio frequency] interference phenomena").

persons engaged within the United States in such communication," 47 U.S.C. § 152(a), while denying the FCC's jurisdiction over, among other things, "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio," *id.* § 152(b).

As New York's opening brief explained (at 35-40), "the mere existence" of federal regulatory jurisdiction over providers of interstate communications services does not "imply pre-emption of state remedies" applicable to such providers—or their rates. *English v. General Elec. Co.*, 496 U.S. 72, 87 (1990). And the idea that § 152(a) leaves *no* space for state laws that substantially affect interstate communications "'misrepresents the statutory scheme.'"[5] *ACA Connects*, 24 F.4th at 1248 (quoting *Louisiana PSC*, 476 U.S. at 374) (rejecting field-preemption claim premised on § 152).

Put simply, while § 152 gives the FCC jurisdiction, it does not preempt the field and give the FCC *exclusive* jurisdiction over providers

---

[5] Contrary to plaintiffs' claim (Opp. Br. 55), New York does not contend that the ABA fits within § 152(b)'s carveout for exclusive state regulation of intrastate communications. Nor does the absence of field preemption turn on that question.

10

of interstate communications services—particularly when § 152 does not contain any clear indication that Congress intended to oust the States entirely from their role of protecting against unfair practices or pricing schemes within their respective jurisdictions. Plaintiffs' repeated labeling of the FCC's § 152(a) authority as "exclusive" (Opp. Br. 16, 36, 49, 54) simply begs the field-preemption question at issue. *See Head*, 374 U.S. at 430. And inferring field preemption from § 152 would be especially misguided because that provision strictly *limits* the FCC's jurisdiction to interstate matters. Thus, § 152 does not confer on the FCC exclusive jurisdiction and does not "by itself provide a source of preemption authority." *Mozilla*, 940 F.3d at 78; *see also ACA Connects*, 24 F.4th at 1247-48.

Indeed, far from evidencing clear congressional intent to preempt the field of broadband pricing regulation, § 152(a) says nothing at all about prices or rates, which later titles of the Act separately address. For example, Title II, governing telecommunications services, contains robust ratemaking provisions. *See* 47 U.S.C. §§ 201-205. Title III, governing broadcast television and radio, contains almost no such provisions. And Title V-A, governing cable television, stakes a middle ground, permitting rate regulation in noncompetitive markets and of nonaffiliated stations.

*Id.* §§ 532(c), 543(a). Further, as discussed *infra*, the FCC cannot regulate broadband rates under Title I. Overall, this divergence and in some cases absence of specific authority addressing rates across the Act's various titles negates a claim that § 152(a) silently and "comprehensively" covers that field for all interstate services. *See Murphy*, 138 S. Ct. at 1480 (quotation marks omitted).

Moreover, multiple sections of the Act demonstrate that Congress envisioned that States continue to have concurrent authority to regulate the business practices, including the pricing practices, of interstate communications providers. *See ACA Connects*, 24 F.4th at 1248.

For example, the Act's savings clause declares that nothing in the Act "shall in any way abridge or alter the remedies now existing at common law or by statute," 47 U.S.C. § 414—a broad preservation of state authority "fundamentally incompatible" with field preemption, *Fisher v. NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007); *see also Nebbia v. New York*, 291 U.S. 502, 537 (1934) (confirming States' longstanding authority to regulate "prices to be charged for the products or commodities" sold to in-state consumers).

Plaintiffs and their amici misplace their reliance on decisions holding that a statute's savings clause did not preserve state measures that actually conflicted with an express statutory preemption provision or other specific federal statutes or regulations. *See* Opp. Br. 48; Chamber Amicus Br. 13-14. That result stands to reason, lest a statute be held to "destroy itself" by allowing States to override specific and positive statutory commands. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 872 (2000) (state tort action conflicted with federal regulatory standards for vehicle safety); *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 987 (7th Cir. 2000) (statute announced that no State "'shall have any authority to regulate . . . rates charged by any commercial mobile service'"). But plaintiffs do not point to any such specific and positive statutory command here, and the Act's savings clause plainly negates *field* preemption by preserving States' authority to regulate providers' business practices. *See Marcus*, 138 F.3d at 54.

In addition, the Act expressly contemplates a role for States over the pricing practices of broadband providers. The Act endorses "price cap regulation" as a method that both the FCC and "each State commission with regulatory jurisdiction over telecommunications services" may use

13

to promote high-speed broadband access for "all Americans." 47 U.S.C. § 1302(a). Even if § 1302(a) is hortatory, as plaintiffs contend (*see* Opp. Br. 50), that subsection still eviscerates any notion of field preemption by evincing a congressional policy in favor of States' "setting rates through price cap regulation," as the ABA does for low-income New Yorkers (Former Comm'rs Amicus Br. 8-9).

Indeed, when it wanted to do so, Congress expressly preempted state authority to regulate the practices and rates of certain types of interstate communications providers, such as cable television providers and mobile phone services. For example, the Act declares that "[n]o Federal agency or State may *regulate the rates* for the provision of cable service except" as otherwise provided, 47 U.S.C. § 543(a) (emphasis added),[6] and then provides that the FCC and States share jurisdiction to regulate cable rates in noncompetitive markets. *See also id.* § 332(c)(3)(A) (preempting

---

[6] Prior to this statute's enactment, the Supreme Court held all cable television broadcasting to be "interstate communication," even when the "intercepted signals emanate[d] from stations located within the same State." *United States v. Southwestern Cable Co.*, 392 U.S. 157, 168-69 (1968). Even so, consistent with the Act, States required these then-Title-I services to charge "just and reasonable rates." *TV Pix, Inc. v. Taylor*, 304 F. Supp. 459, 460 (D. Nev. 1968) (three-judge court), *aff'd*, 396 U.S. 556 (1970). *TV Pix* thus "concern[ed] *interstate* rate regulation" (Opp. Br. 45).

States from regulating "the entry of or *the rates charged* by" a mobile phone service (emphasis added)); *id.* § 253(d). These express preemption provisions signal "that matters beyond [their] reach are not pre-empted." *Cipollone v. Ligett Grp.*, 505 U.S. 504, 517 (1992). See NY Br. 30-31.

In their remaining arguments, plaintiffs misplace their reliance on inapposite cases or statutes and improperly ignore the nature of the FCC's regulatory power over broadband service—which the FCC has classified as an information service subject to Title I.

*First*, even if the breadth of the FCC's general jurisdiction under § 152 were relevant to field preemption, which it is not, the FCC cannot implement a "comprehensive federal regime[] for regulating broadband" (Chamber Amicus Br. 12). Title I is not a standalone source of regulatory power, and the FCC's regulatory authority over broadband providers is thus limited to actions reasonably ancillary to the effective performance of its responsibilities mandated by other titles of the Act. *Comcast Corp. v. FCC*, 600 F.3d 642, 648 (D.C. Cir. 2010); *see id.* at 650 (FCC lacks "plenary authority" over information services). And critically, the FCC has no power at all to enact pricing schemes for Title I broadband services. *See Verizon v. FCC*, 740 F.3d 623, 650 (D.C. Cir. 2014); *accord Comcast*,

15

600 F.3d at 654-55. Plaintiffs' assertions here thus amount to "federal pre-emption *in vacuo*," without the necessary positive source of regulatory and preemptive power. *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988); *see Murphy*, 138 S. Ct. at 1481 (statute that did not "impose any federal restrictions on private actors" could not preempt state law).

*Second*, plaintiffs miss the mark in relying on *Ivy Broadcasting*, 391 F.2d 486, *abrogated by Marcus*, 138 F.3d 46. See NY Br. 41-44. *Ivy* concerned federal subject matter jurisdiction over state claims removed to federal court under the doctrine of complete preemption—not the separate issue of field preemption. And this Court has since abrogated *Ivy*'s complete-preemption holding. In any event, *Ivy* addressed solely the Act's "comprehensive legislation" for "regulating common carriers" under Title II.[7] 391 F.2d at 490. Indeed, *Ivy* cited Title II's provisions enabling

---

[7] Contrary to plaintiffs' unsupported assertion, New York has never "acknowledge[d]" that *Ivy*'s holding extends beyond Title II (Opp. Br. 39). Moreover, the decisions *Ivy* cited arising under the 1910 Mann-Elkins Act also addressed "the duties, charges and liabilities of telegraph or telephone companies," 391 F.2d at 491—which Title II "recognizes as a common carrier activity and regulates accordingly," *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 474 (1940); *see Western Union Tel. Co. v. Boegli*,

(continued on the next page)

the FCC to conduct prospective ratemaking for telecommunications services, *see* 47 U.S.C. § 203, and ensure that telecommunications charges are just and reasonable, *see id.* §§ 201-202—none of which apply to Title I information services. 391 F.2d at 490; *see Nordlicht v. New York Tel. Co.*, 799 F.2d 859, 862 (2d Cir. 1986) (describing *Ivy* as "concerning *interstate telecommunications service*" (emphasis added)); *see also Global NAPs*, 454 F.3d at 102 n.10 (citing *Ivy* when discussing FCC's power to set rates for interstate telephone service).

*Third*, the Federal Power Act, 16 U.S.C. § 791a et seq., and the Natural Gas Act, 15 U.S.C. § 717 et seq., are similarly inapposite. Plaintiffs note that these statutes give a federal agency broad jurisdiction over interstate electricity and gas sales, respectively, while reserving for States exclusive jurisdiction over intrastate sales. *See* Opp. Br. 41-42. But the parallel fails because these statutes contain detailed provisions authorizing the relevant federal agency to regulate comprehensively the rates of interstate electricity and gas sales. *See* 16 U.S.C. § 824; 15 U.S.C. § 717c.

---

251 U.S. 315, 316 (1920) (telegraph company's delivery of interstate telegram); *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 29-30 (1919) (same). These decisions thus have no bearing on preemption regarding Title I services like broadband.

17

By contrast, Title I of the Communications Act does not give the federal agency similar ratemaking authority. Indeed, the FCC cannot subject Title I information services to any comprehensive regulatory scheme and has specifically eschewed federal "utility-style regulation" of broadband service. 2018 Order ¶ 2. Likewise, plaintiffs misplace their reliance (Opp. Br. 52-53) on case law inferring preemptive effect in deregulatory tweaks to an otherwise "comprehensive regulatory scheme [that] involved 'utility-type ratemaking'" for interstate gas prices, *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409, 420 (1986).

The historical backdrop of the Federal Power Act and the Natural Gas Act further demonstrates that their preemptive effect has no bearing on the field-preemption issue here. Congress enacted the Federal Power Act and the Natural Gas Act after the Supreme Court had held in Commerce Clause decisions that "the regulation of wholesale rates of gas and electrical energy moving in interstate commerce" was "beyond the constitutional powers of the States." *Interstate Nat. Gas Co. v. Federal Power Comm'n*, 331 U.S. 682, 689-90 (1947). Given these "constitutional limitations upon state regulatory power," Congress viewed enacting the federal statutes as "essential if major aspects of interstate transmission and sale

were not to go unregulated." *Federal Power Comm'n v. Southern Cal. Edison Co.*, 376 U.S. 205, 213 (1964).

The Supreme Court has never suggested that a State's regulation of in-state prices for broadband offerings to in-state consumers would violate the Commerce Clause and thus leave broadband rates entirely unregulated absent federal authority. To the contrary, the Supreme Court has affirmed that state regulation of Title I services—including price regulation—"is not proscribed by the Commerce Clause." *TV Pix*, 304 F. Supp. at 463, *aff'd*, 396 U.S. 556; *see also Goldberg v. Sweet*, 488 U.S. 252, 263 (1989) (holding that State where interstate telephone call is "billed or paid" may tax the call consistent with Commerce Clause). Accepting plaintiffs' argument that *nobody* may regulate Title I broadband rates would mean that Congress intended to *create* a regulatory void over these services. But given the "economic considerations" at stake, "[i]t is almost inconceivable that Congress would have left a regulatory vacuum; the only reasonable inference is that Congress intended the states to continue to make these judgments." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 207-08 (1983).

Indeed, as New York's opening brief demonstrated (at 32-35), the ABA fits neatly within the class of regulatory measures that courts have long understood States may apply even to providers of interstate communications services. *See, e.g.*, *Goldberg*, 488 U.S. at 263; *People v. Charter Commc'ns, Inc.*, 162 A.D.3d 553, 553-54 (1st Dep't 2018). The ABA does not address interstate communications' content or destination, but rather caps the price of a product offered by companies operating in New York to qualified low-income consumers residing in New York. In accordance with "great principles of public policy," New York has long taken action to ensure that "distressed" consumers may enter economic transactions "on reasonable terms." *Dunham v. Gould*, 16 Johns. 367, 380 (N.Y. 1819); *see, e.g.*, General Obligations Law § 5-501 (capping interest on consumer loans at legislatively determined rate); Executive Law § 63(12) (authorizing civil remedies for "unconscionable contractual provisions"). By contrast, there is no history of federal broadband price capping, "significant" or otherwise (Opp. Br. 43), when the FCC has either lacked authority to regulate broadband rates under Title I or declined to do so under Title II, *see* 2015 Order ¶¶ 451-52. Nothing in the Act ousts States from this field of traditional state concern.

20

**B.     The ABA Does Not Conflict with the FCC's 2018 Order, and Is Thus Not Subject to Conflict Preemption.**

**1.     The FCC lacks a relevant delegation of authority to regulate or preempt.**

New York's opening brief demonstrated (at 45-55) that the district court erred in viewing the ABA as conflicting with the "implied preemptive effect" of the FCC's 2018 Order reclassifying broadband as a Title I information service (J.A. 141). As New York explained, having reclassified broadband services as Title I services, the FCC lacks statutory authority to regulate the rates of broadband providers or to preempt States from doing so. Plaintiffs contend that through the 2018 Order, the FCC exercised its alleged statutory authority in a way that *both* reclassified broadband services as Title I information services *and* preempted States from regulating broadband providers' prices—the latter of which the FCC could do when broadband had been classified under Title II.[8] *See* Opp. Br. 16-20, 25.

---

[8] On appeal, plaintiffs focus solely on the 2018 Order and have abandoned their claim that 47 U.S.C. § 153(51) also triggers conflict preemption of the ABA. See NY Br. 56-61 (refuting this theory).

But as the D.C. Circuit and the Ninth Circuit have correctly concluded, Congress has not provided the FCC with any such statutory authority to "mix and match its favorite parts of both" Title I and Title II. *Mozilla*, 940 F.3d at 84; *see ACA Connects*, 24 F.4th at 1241-42. Rather, the Act presented the FCC with a "statutory fork in the road and gave the [FCC] the authority to choose the path"—i.e., to classify broadband services as Title II telecommunications services or Title I information services. *Mozilla*, 940 F.3d at 84.

When broadband services were classified as telecommunications services, Title II delegated to the FCC the statutory power both to regulate broadband providers' rates and to preempt conflicting state regulations. Title II enables the FCC to conduct prospective ratemaking proceedings, *see* 47 U.S.C. §§ 203-205, or to engage in "*ex post* rate regulation" by ensuring that telecommunications services' charges are just and reasonable, 2018 Order ¶ 104; *see* 47 U.S.C. §§ 201-202. If the FCC sets Title II rates, then conflicting state rates—even if "lower"—must "give way." *Verizon New England, Inc. v. Maine Pub. Utils. Comm'n*, 509 F.3d 1, 9 (1st Cir. 2007). And Title II further allows the FCC to forbear from its statutory rate-regulation obligation if it makes certain findings, *see* 47 U.S.C.

22

§ 160(a), which the FCC did for broadband under Title II, *see* 2015 Order ¶¶ 451-52. A forbearance decision bars States from "continu[ing] to apply or enforce" that same obligation, 47 U.S.C. § 160(e), and the FCC vowed "to exercise [its] preemption authority to preclude" any state regulation of broadband rates that stood "in conflict with" the Title II forbearance decision, 2015 Order ¶ 433.

In stark contrast, Title I does not give the FCC any authority either to regulate broadband rates or to preempt state regulation thereof. As established (*supra* at 15-16), settled limits on the FCC's Title I authority forbid that agency from capping prices charged for broadband plans. Indeed, as the district court observed (J.A. 141), the FCC's decision to reclassify broadband services as Title I information services ended the "threat" of federal rate regulation by removing the FCC's statutory authority in that regard, *see* 2018 Order ¶¶ 104-06. Without such authority, or a separate delegation of power to preempt state law, the FCC lacks authority to preempt state regulation of broadband rates. *See Mozilla*, 940 F.3d at 80 (holding that FCC "cannot completely disavow Title II with one hand while still clinging to Title II forbearance authority with the other").

As fundamental principles of preemption establish, an agency regulation may preempt state law only "when and if [the agency] is acting within the scope of its congressionally delegated authority." *Louisiana PSC*, 476 U.S. at 374; *see Wyeth*, 555 U.S. at 576-77; *Mozilla*, 940 F.3d at 82 (calling delegated authority either to preempt or to regulate the "*sine qua non* for agency preemption"). Even when trying expressly to preempt future state economic broadband regulation—an effort the D.C. Circuit invalidated—"nowhere in the 2018 Order or its briefing [did the FCC] claim ancillary authority" under Title I for preempting these state laws. *Mozilla*, 940 F.3d at 76. Nor do plaintiffs here.

Instead, plaintiffs reiterate the district court's erroneous reasoning (*see* J.A. 139-141) that the 2018 Order's deregulatory "policy preferences" have their own preemptive force (*see* Opp. Br. 20). At bottom, plaintiffs assert that because the FCC wanted the 2018 Order to remove both the FCC's and the States' authority over broadband rates, the 2018 Order made it so. The detailed and persuasive reasoning of the D.C. Circuit's decision in *Mozilla* disposes of this argument. *See* 940 F.3d at 78-80.

As the D.C. Circuit correctly explained, "both basic agency law and federalism" provide that the power to preempt States' laws "must be

conferred by Congress." *Id.* at 78. "It cannot be a mere byproduct of self-made agency policy." *Id.* Here, Congress did not "statutorily grant the [FCC] freestanding preemption authority to displace state laws even in areas in which it does not otherwise have regulatory power." *Id.* at 76; *see also Comcast*, 600 F.3d at 659 (holding that FCC may not "use its [Title I] ancillary authority to pursue a stand-alone policy objective"). And the FCC's "policy preferences are not a source of the statutory authority required to regulate or to preempt." *ACA Connects*, 24 F.4th at 1243; *see Louisiana PSC*, 476 U.S. at 375; *see also Isla Petroleum*, 485 U.S. at 501.

To be sure, as plaintiffs note (Opp. Br. 27-28), *Mozilla* did not specifically pass on whether any "remaining portions of the 2018 Order" could conflict-preempt a state law. 940 F.3d at 85. The D.C. Circuit called that analysis "premature" since "no particular state law [wa]s at issue." *Id.* at 86. The *Mozilla* majority refused to speculate, as the dissent did, that any state policy would trump "'*all* else'" in the 2018 Order—but stressed that only the FCC's "regulatory choices . . . that are within its authority" can have preemptive effect. *Id.* at 85 (emphasis added). As plaintiffs do not dispute, it is not within the FCC's authority under Title I to regulate broadband rates or preempt States from doing so. The core of *Mozilla*'s

reasoning thus applies here, and this Court should follow it—as the Ninth Circuit did in rejecting similar conflict-preemption arguments against a California ban on broadband network practices that the FCC could not regulate under Title I. *See ACA Connects*, 24 F.4th at 1241-42 (describing this result as compelled by "a straightforward application of federal preemption principles").

Nor can plaintiffs distinguish *Mozilla*'s reasoning as addressing an express preemption clause that went so far as to foreclose States' "*intrastate* broadband regulation*" (Opp. Br. 40)—an area over which the FCC lacks jurisdiction. That the FCC's express preemption clause made no effort to respect States' exclusive authority over intrastate communications, *see* 47 U.S.C. § 152(b), added yet another fact that made it "[d]oubly" invalid, *Mozilla*, 940 F.3d at 78, or "all-the-more-so *ultra vires*" (J.A. 142). In any event, the same type of aggravating circumstance that *Mozilla* noted also exists here, given that the FCC similarly lacks delegated authority to regulate the rates of Title I broadband services.

*Minnesota Public Utilities Commission v. FCC*, 483 F.3d 570 (8th Cir. 2007), on which plaintiffs rely (Opp. Br. 32), warrants no different result. There, the Eighth Circuit upheld an FCC order expressly preemp-

ting state regulation of Voice over Internet Protocol (VoIP)—which allows users "to transmit a voice communication over a broadband internet connection" instead of making "traditional landline telephone calls." *Minnesota PUC*, 483 F.3d at 574. The FCC had deferred classifying VoIP service under either Title I or Title II and instead invoked the so-called "impossibility exception" to § 152(b), which permits the FCC to preempt state measures that cover functionally inseparable intrastate and interstate matters if necessary to preserve federal regulations' efficacy.[9] *Id.* at 576.

But plaintiffs do not invoke the impossibility exception here. And as the D.C. Circuit—authoritative in communications law—has since made clear, the impossibility exception "presupposes the existence of statutory authority to regulate" and cannot "create preemption authority out of thin air." *Mozilla*, 940 F.3d at 78. Moreover, in refusing to classify VoIP, the FCC's order in *Minnesota PUC* did not present, nor did the Eighth Circuit "purport[] to answer," the question of "whether Congress

---

[9] This separate preemption doctrine for a state regulation that "involves interstate communications," *Mozilla*, 940 F.3d at 77, only underscores § 152(a)'s lack of field-preemptive effect (see *supra* at 9-12).

27

delegated to the [FCC] the authority to preempt" state regulation of a Title I service. *Id.* at 85 (distinguishing *Minnesota PUC* on this basis). Indeed, whereas the parties to *Minnesota PUC* assumed that the FCC could regulate VoIP under Title I as ancillary to Title II telephone service, the FCC's *lack* of authority to regulate broadband prices under Title I is uncontested here. And "[w]ithout the underlying authority to regulate [broadband] under Title I, the FCC is without the authority to preempt [States] from doing so." *ACA Connects*, 24 F.4th at 1244.

### 2. The FCC's 2018 reclassification decision does not impliedly preempt the ABA.

In purporting to identify an aspect of the 2018 Order with which the ABA conflicts, plaintiffs shift focus from how the FCC may regulate broadband under Title I to how broadband got there in the first place. Specifically, they maintain that the ABA conflicts with the FCC's "affirmative exercise of statutory authority" in reclassifying broadband from Title II to Title I. Opp. Br. 23, 25. But the D.C. Circuit squarely—and correctly—rejected this exact argument, which "invents a brand new source of preemptive power that not even the [FCC] claims." *Mozilla*, 940 F.3d at 82.

As the Supreme Court has held, the FCC's authority to classify communications services flows from two general delegations of authority: the mandate to "execute and enforce" the Act, 47 U.S.C. § 151, and the power to "prescribe such rules and regulations as may be necessary in the public interest to carry out the [Act's] provisions," *id.* § 201(b). *See National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980-81 (2005). A classification dictates the regulatory regime that will apply to the service at issue.

But after making this threshold classification decision, "[t]he FCC ha[s] to go a step further" to regulate within the regime it has chosen. *National Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 336-37 (2002). It must then properly implement the statutory provisions of the title to which the service belongs, to enforce and carry out the Act. *See id.* at 337 ("[O]nce it decided that it had jurisdiction over attachments providing commingled services, [the FCC] then had to set a just and reasonable rate."). The FCC's classification of a service is thus a means to determining which regulatory powers the agency has been delegated for that service; it is not a regulation of the service itself, and the classification decision's limited nature cabins its preemptive effect. As in *Moz-*

29

*illa*, plaintiffs' argument "makes the mistake of collapsing" the FCC's "authority to make a threshold classification decision" with its "authority to issue affirmative and State-displacing legal commands within the bounds of the classification scheme the [FCC] has selected (here, Title I)." 940 F.3d at 84. "The agency's power to do the former says nothing about its authority to do the latter." *Id.*

Nor does the application of *Chevron* deference to the FCC's threshold classification decision allow the FCC's policy reasons for a classification to alter the scope of the statutorily delegated authority it receives under the selected title. *See* Opp. Br. 22-23. *Chevron* simply instructs that "where a statute's plain terms admit of two or more reasonable" interpretations, "the [FCC's] choice of one of them is entitled to deference." *Brand X*, 545 U.S. at 989. Given that deference, a court generally should not "second-guess" the "FCC's classification" if it is reasonable. *International Bus. Machs. Corp. v. FCC*, 570 F.2d 452, 455 (2d Cir. 1978).

But *Chevron* does *not* transform the FCC's "discretion to decide" which classification "best fits a real-world communications service" into "an overarching 'nationwide regime' that enforces the policy preference underlying" the classification decision—supplanting the actual statutory

regime that Congress enacted and the FCC selected. *Mozilla*, 940 F.3d at 84; *accord ACA Connects*, 24 F.4th at 1243. Here, for example, plaintiffs assert that the 2018 Order's decision to classify broadband services as Title I information services impliedly preempted all state regulation of broadband rates, even though the FCC's selected statutory regime (Title I) forbids the FCC from regulating broadband rates and does not give the FCC any standalone preemption authority. But "it is Congress to which the Constitution assigned the power to set the metes and bounds of agency authority." *Mozilla*, 940 F.3d at 83. And preemption derives from agency regulations rooted in delegated statutory power—not from an agency's ad hoc explanations or views.[10] *See Wyeth*, 555 U.S. at 577 (refusing to defer to "sweeping position" on preemption contained in regulatory preamble). The FCC's policy preferences thus cannot alter its lack of statutory authority to implement those policies under Title I.

---

[10] *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005), and *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984), relied on by plaintiffs (Opp. Br. 23, 30), each upheld a regulation that explicitly and "unambiguously" preempted state law, 467 U.S. at 701; *see* 414 F.3d at 309. Neither decision relied on implied preemption stemming from policy justifications offered to support the agency's statutory interpretation.

31

In any event, the FCC's classification decision in the 2018 Order was foremost a matter of objective statutory interpretation, not a raw policy choice. The FCC insisted "that the best reading of the relevant definitional provisions of the Act supports classifying broadband Internet access service as an information service" subject to Title I. 2018 Order ¶¶ 20, 26. More specifically, the FCC concluded that Domain Name Service (DNS) and caching functionalities were integral to internet service, making it an information service under the applicable definition, *id.* ¶¶ 33, 42—echoing the reasons for the FCC's pre-2015 classification of broadband as an information service, which the Supreme Court had upheld as reasonable, *see Mozilla*, 940 F.3d at 44-45 (citing *Brand X*, 545 U.S. at 999-1000).

The FCC called its own statutory analysis "sufficient grounds alone on which to base [its] classification decision," 2018 Order ¶ 86, and urged the D.C. Circuit to "uphold its entire rulemaking on the weight of its statutory interpretation," *Mozilla*, 940 F.3d at 49. Although plaintiffs may not view these issues as "hyper-technical" (Opp. Br. 19), the Supreme Court has called them "technical and complex," *Brand X*, 545 U.S. at 992. And these technical classifications "deep within a list of fifty-nine definitions

in a non-regulatory portion of the statute" do not plausibly conceal "enormously far-reaching" preemption authority. *Mozilla*, 940 F.3d at 79.

As New York has explained (NY Br. 50-52), plaintiffs miss the mark in observing that "a federal decision to forgo regulation in a given area" may accrue "as much pre-emptive force as a decision *to* regulate," *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983) (quoted in Opp. Br. 25). The Supreme Court has since cautioned not to "draw exaggerated inferences from [that] statement," which applies only "[w]here a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls." *Isla Petroleum*, 485 U.S. at 503. The principle thus applies where a federal agency has unquestioned delegated authority on an entire subject but exercises it partway. In doing so, the agency may be described as exercising its delegated power to keep the omitted area clear of any regulation, just as if it had said so explicitly, by engaging in "inaction joined with action" in fulfilling its regulatory duties. *Id.* In *Ray v. Atlantic Richfield Co.*, for example, an agency implementing its "statutory directives" promulgated a detailed vessel-traffic-control plan for Puget Sound, with "only a narrow limitation on the operation of supertankers." 435 U.S. 151, 178 (1978). The agency's choice not

to ban tankers above a certain size was held equal to a finding that such a restriction would be inappropriate—foreclosing a conflicting state ban. *Id.*

"What happened in *Ray*, however, is not what happened here," where the FCC effectively "gave up its authority to regulate broadband services" by classifying them as Title I information services. *ACA Connects*, 24 F.4th at 1242. The idea that partial exercise of statutorily delegated authority may entail preemption does not extend to an "administrative concession" that certain entities lie "beyond reach of federal authority." *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 774-75 (1947). Nor does it apply to an agency's determination that it cannot regulate rates "as a jurisdictional matter," *Arkansas Elec.*, 461 U.S. at 384, or when the federal government "has withdrawn from all substantial involvement in . . . price regulation," *Isla Petroleum*, 485 U.S. at 503-04. Each of those descriptions fits the situation here, where the FCC has chosen to apply a statutory regime that does not authorize it to regulate broadband rates. Accordingly, the FCC's mere classification of broadband as a Title I information service does not have the incidental effect of "demolishing

state laws across the Nation" that apply to broadband services, including the ABA. *Mozilla*, 940 F.3d at 84.

The opinions of plaintiffs' amici on broadband deregulation or the ABA's effectiveness are immaterial to this appeal. In our Constitution's system, "it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963). State legislatures thus "have constitutional authority to experiment with new techniques," as "long as conflicts with valid and controlling federal laws are avoided." *Day-Brite Lighting Inc. v. Missouri*, 342 U.S. 421, 423 (1952). As established, no such conflict exists here.

## CONCLUSION

The district court's judgment should be reversed.

Dated:  New York, New York
        March 23, 2022

                              Respectfully submitted,

                              LETITIA JAMES
                                *Attorney General*
                                *State of New York*
                              Attorney for Appellant


                         By:  */s/ Eric Del Pozo*
                              ERIC DEL POZO
                              Assistant Solicitor General

BARBARA D. UNDERWOOD                  28 Liberty Street
  *Solicitor General*                 New York, NY 10005
JUDITH N. VALE                        (212) 416-8019
  *Deputy Solicitor General*
ERIC DEL POZO
  *Assistant Solicitor General*
      *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,962 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Kelly Cheung*