RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

I respectfully dissent from the majority's opinion for two reasons.  First, I believe that we lack jurisdiction to even hear this appeal.  Second, even if we had jurisdiction to reach the merits of the parties' preemption arguments, I am persuaded that New York's Affordable Broadband Act (the "ABA") is preempted by federal law.

## I.  We Lack Appellate Jurisdiction To Review The Stipulated Judgment.

This appeal comes to us in an "unusual posture."  *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 88 (2d Cir. 2013).  After New York was preliminarily enjoined from enforcing the ABA, it *stipulated* to judgment against it, and then appealed that stipulated judgment.  This was a strategic move.  In the district court's preliminary injunction order, it stated that the ABA "is conflict-preempted" by federal law, and thus concluded that the challengers were likely to succeed in showing preemption on the merits, as required to obtain a preliminary injunction.  *N.Y. State Telecomms. Ass'n, Inc. v. James*, 544 F. Supp. 3d 269, 282 (E.D.N.Y. 2021) ("*NYSTA*").  At that point, New York could have appealed the injunction directly under 28 U.S.C. § 1292(a)(1) (in fact, New York initially filed such an appeal, only to later withdraw it).  That interlocutory appeal, however, would have been a narrow challenge *only*

to whether the district court "abused its discretion" in granting the injunction, as opposed to a challenge that would produce "a final resolution of the merits" of preemption. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 393 (1981). In other words, in appealing the preliminary injunction, New York could not have asked us for judgment on the merits of preemption in its favor – it could have asked us only to dissolve the injunction while it continued to litigate the merits before the district court.

Rather than pursue that limited appeal, New York instead consented to a stipulated judgment in order to take a full appeal on the merits of preemption. That is, it stipulated to a judgment against it and asked the district court to enter a permanent injunction forbidding it from enforcing the ABA as preempted. *See* J. App'x at 157. The district court obliged, and New York has now appealed the resulting judgment, asking us to award it judgment on the merits with a finding that the ABA is not preempted by federal law.

But this tactic – which I will refer to as a "stipulated judgment appeal" – is generally not permitted as a shortcut to appellate review. Because these appeals are attempts to "evade the final judgment rule," we allow them in only limited

2

circumstances.  *Palmieri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996).[1]  In the majority's

view, an appellant can appeal from a stipulated judgment when (1) the district

court "plainly rejected the legal basis" for the appellant's case (either a claim or

defense), (2) all claims are disposed of with prejudice, (3) the stipulated judgment

is "designed solely to obtain immediate appeal of the prior adverse decision,

without pursuing piecemeal appellate review," and (4) the appellant has

"expressly preserved" the right to appeal.  Maj. Op. at 13–14 (internal quotation

marks omitted).

   Though I agree that all of these elements are prerequisites, our precedent

requires two more conditions before a party may appeal a stipulated judgment.

First, in order to "plainly reject[]" the legal basis for the appellant's case, *id.* at 13,

the district court's decision must be a "*final* ruling" on an issue, as opposed to a

---

[1] Over the years, we have confronted stipulated judgment appeals by both plaintiffs and defendants.  For plaintiffs, such appeals usually follow an adverse interlocutory decision in the district court and a voluntary dismissal of all claims under Federal Rule of Civil Procedure 41(a)(2).  *See, e.g.*, *Palmieri*, 88 F.3d at 140.  For defendants, stipulated judgment appeals typically involve situations like the one here, in which the appellant received an adverse interlocutory decision below, followed by entry of a judgment by consent – effectively a court-approved settlement.  *See, e.g.*, *LaForest v. Honeywell Int'l Inc.*, 569 F.3d 69, 73 (2d Cir. 2009).  Though there are subtle distinctions between these two scenarios, they are not relevant to this discussion, and I collectively refer to both types as "stipulated judgment appeals."  *See generally* Bryan Lammon, *Manufactured Finality*, 69 Vill. L. Rev. (forthcoming 2024) (manuscript at 23–37) (discussing various attempts to "manufacture[] finality" through voluntary dismissals and stipulated judgments), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4572017 [https://perma.cc/86QK-WMVE].

tentative finding or dicta, *Palmieri*, 88 F.3d at 139 (emphasis added). In other words, a decision cannot "effectively dismiss[]" a claim when it is only a provisional finding that is "subject to change when the case unfolds." *Id.* (quoting *Luce v. United States*, 469 U.S. 38, 41–42 (1984)). Second, the stipulated judgment appeal cannot be an attempt to circumvent the interlocutory appellate rules already in place. As the Supreme Court has held, if the interlocutory appellate rules preauthorize a narrow right to appeal certain issues, then a litigant cannot use a stipulated judgment to claim the right to appeal *additional* issues beyond those preauthorized. *See Microsoft Corp. v. Baker*, 582 U.S. 23, 31–32 (2017) (holding that a litigant cannot use a stipulated judgment to appeal a class certification denial "as a matter of right" (internal quotation marks omitted)).

To invoke our appellate jurisdiction, both conditions must be met. Because neither is present here, I would dismiss the appeal for lack of appellate jurisdiction.

**A. The Adverse "Decision" Was Provisional Dicta.**

Our precedents make clear that an appellant cannot appeal a stipulated judgment when it suffered only a *tentative* setback in the district court. In other words, if a district court issues a provisional finding subject to change – such as one that casts doubt on a litigant's claims only in dicta – then that cannot be an "effective dismissal" of the claims, and no appeal can be taken from a stipulated

4

judgment thereafter.  We said as much in *Palmieri v. Defaria*, where we held that a litigant could not appeal a stipulated judgment when he suffered a tentative evidentiary loss before the district court that was "subject to change at trial."  88 F.3d at 140.

In *Palmeiri*, the plaintiff brought copyright claims accusing the defendant of copying his song and sought to prove up that allegation with evidence that the defendant had had access to the disputed song prior to the alleged infringement. *See id.* at 137.  After the defendant moved *in limine* to exclude that evidence, the district court granted the motion in part, finding that some of the evidence concerning the defendant's access to the song was inadmissible and reserving for trial whether the rest could be introduced.  *See id.*  Disappointed with that ruling, the plaintiff invited the district court to enter final judgment against him so that he could appeal the *in limine* ruling right away.  *See id.* at 138.  The district court did so, and the plaintiff appealed the resulting judgment, challenging the district court's *in limine* findings.

Emphasizing that the *in limine* ruling was merely tentative, we held that the stipulated judgment was not appealable.  Though we acknowledged the rule that stipulated judgment appeals are occasionally permitted when the district court

5

had "effectively dismissed [the] case," *id.* at 139, we nonetheless held that the *in limine* ruling was not an "effective dismissal" because it lacked two features: (1) the district court had not "take[n] the position" that the plaintiff's proof was insufficient as a matter of law, and (2) the *in limine* ruling was merely tentative and "subject to change at trial in the district court's discretion." *Id.* at 140. In other words, we recognized an additional limit on the "effective dismissal" rule – namely, that the adverse decision below must be a "final ruling" as opposed to one that is merely tentative or conditional. *Id.* at 139 ("An *in limine* evidentiary ruling does not constitute a final ruling on admissibility." (italics added)).[2]

Indeed, we emphasized the provisional nature of the *in limine* ruling throughout our opinion, and even distinguished earlier "effective dismissal" cases because those involved district court orders that "could not be examined again at trial." *Id.* at 141 (distinguishing *Allied Air Freight v. Pan Am. World Airways*, 393 F.2d 441 (2d Cir. 1968)). As we went on to explain, this rule – that a stipulated judgment cannot be appealed when the adverse finding is only tentative – makes

---

[2] Though we have characterized our rule against stipulated judgment appeals as "jurisdiction[al]," *Ali*, 719 F.3d at 88, we have not explained whether the rule is constitutional or statutory in nature. *But see* Bryan Lammon, *Voluntary Dismissals, Jurisdiction & Waiving Appellate Review*, 92 U. Cin. L. Rev. 394, 406 (2023) (arguing that this rule is best understood as a waiver doctrine and warning that treating it as an Article III issue could mean conditional guilty pleas are unconstitutional). Whatever the rule's origins, it bars New York's appeal here.

good sense. Though we can take appeals from stipulated judgments following *conclusive* holdings, "[t]here is no reason to spend scarce judicial resources reviewing a decision that may be changed due to [later] developments." *Id.* at 139. We therefore allow a party to proceed to appeal through a stipulated judgment only when the case is effectively dismissed by a "final ruling" on the appealed issue. *Id.* To hold otherwise would only encourage "piecemeal appeals," *id.* at 141, with litigants leapfrogging the district court at the first sign of trouble. The fact that litigants might prefer such shortcuts is of no moment. One can surely imagine situations in which litigants might be discouraged by negative comments from a district judge during an early hearing on a purely legal question, or even where a litigant might dislike the initial district court draw based on unfavorable decisions issued by the assigned judge in other related cases. But those sorts of tentative setbacks are not enough to bypass the district court and the adjudicative process. By first requiring a "final" ruling on an issue, the *Palmieri* rule prevents attempts to "evade the final judgment rule." *Id.* at 139.

For that same reason, New York cannot appeal the provisional findings in the district court's order granting a preliminary injunction against it. As a threshold matter, there is little dispute that the district court's preliminary

injunction was not a "final ruling" on the merits of preemption. Quite the opposite, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Tex.*, 451 U.S. at 395. Indeed, we have long recognized that, with respect to preliminary injunction rulings, "[t]he judge's legal conclusions, like his fact-findings, *are subject to change* after a full hearing and the opportunity for more deliberation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1953) (emphasis added); *see id.* ("For a preliminary injunction . . . is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness."). If anything, "[a] decision on a preliminary injunction is, in effect, only a prediction about the merits." *Biediger v. Quinnipac Univ.*, 691 F.3d 85, 107 (2d Cir. 2012) (internal quotation marks omitted). Thus, just like the *in limine* ruling in *Palmieri*, the district court's preemption analysis was strictly provisional and could not have "effectively dismissed" New York's case. *Palmieri*, 88 F.3d at 140.

The majority nevertheless maintains that the district court's ruling was an effective dismissal because the district court used "unequivocal" language when it said that the ABA "is conflict-preempted." Maj. Op. at 14–15 (quoting *NYSTA*,

8

544 F. Supp. 3d at 282). But the tenor of the district court's language in a preliminary injunction ruling is not enough to render the decision "final." A strong "prediction" is still only a prediction. *Biediger*, 691 F.3d at 107. Whatever the tone of the district court's order, those statements came in a preliminary injunction ruling and were necessarily provisional and "subject to change." *Hamilton Watch*, 206 F.2d at 742.

In fact, the district court's comments about the merits of preemption were, if anything, even *less* final than the evidentiary ruling in *Palmieri*, given that the preemption comments here were dicta. Because the district court needed only to find that the ABA was *likely* preempted in order to grant the preliminary injunction, any more definitive "assessment of the actual merits" of preemption was "dicta." *Fish v. Schwab*, 957 F.3d 1105, 1140 (10th Cir. 2020) (internal quotation marks omitted); *see also United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999) (any finding "not necessary" to granting a preliminary injunction is "dictum"). Palmieri could at least argue that the evidentiary rulings were provisional *holdings* on admissibility. New York cannot even claim that here. Because the district court's statements about the ultimate merits of preemption were dicta, they were not even a "decision" to begin with, let alone a final ruling. *Carroll v. Lessee of*

9

*Carroll*, 57 U.S. (16 How.) 275, 286–87 (1853) ("If [a point of law] might have been decided either way without affecting any right brought into question, then, according to the principles of common law, an opinion on such a question is not a decision.").

This conclusion – that litigants cannot take stipulated judgment appeals from dicta in a provisional order – aligns with our other precedents on this issue. As far as I can tell, none of our past cases (including those relied on by the majority) authorized a stipulated judgment appeal after a district court cast doubt on a litigant's case through provisional dicta. To the contrary, each of the appellants in those cases sustained an adverse *holding* that "effectively dismissed" his case. *See, e.g.*, *Ali*, 719 F.3d at 89 (approving stipulated judgment appeal when the district court held in a partial summary judgment order that appellant's proffered reading of a contract was foreclosed by the "express language" of the contract (internal quotation marks omitted)); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 322 (2d Cir. 2018) (approving stipulated judgment appeal after appellant was found liable by a jury); *Empire Volkswagen Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 94 (2d Cir. 1987)

(approving stipulated judgment appeal of certain claims after district court granted summary judgment on those claims).[3]

Attempting to reconcile its decision with *Palmieri*, the majority posits that the only jurisdictional defect in *Palmieri* was that the *in limine* rulings did not "plainly resolve a claim as a matter of law." Maj. Op. at 16. But that is not what *Palmieri* actually said. We instead made clear that the *in limine* rulings could not support a stipulated judgment appeal for two separate reasons: (1) the *in limine* rulings did not resolve the claim "as a matter of law," *and* (2) the *in limine* rulings were only tentative. *Palmieri*, 88 F.3d at 140. Indeed, we repeatedly stressed that the *in limine* rulings were insufficient because they were "subject to change" and not a "final ruling on admissibility." *Id.* The majority's best counter is that the

---

[3] In fact, *Empire Volkswagen* – one of our most-cited cases on stipulated judgment appeals – lends further support to the *Palmieri* rule against stipulated judgment appeals of provisional findings. There, the defendant moved for summary judgment on several of the plaintiffs' claims, and the district court granted that motion in part. *See* 814 F.2d at 93. Even though several claims survived, the plaintiffs believed that the ruling "unduly limited" those claims by "excluding" an important theory of recovery. *Id.* at 93–94. Consequently, they voluntarily dismissed the surviving claims and attempted to appeal all of the claims from the resulting stipulated judgment. *See id.* at 94. Significantly, we held that the plaintiffs could appeal the claims that were dismissed at summary judgment but could *not* appeal the voluntarily dismissed claims. We concluded that, even if the partial summary judgment order limited those surviving claims – and cast doubt on their ultimate success – the district court's order did not in fact "*decide*[]" those claims "adversely" to the plaintiffs. *Id.* It mattered not that the plaintiffs "interpret[ed] . . . [the] partial summary judgment order as an effective dismissal of [those claims]." *Id.* at 95. The only relevant inquiry was whether the district court had issued a holding that rejected those claims. *See id.* at 94 ("[W]e will consider[] only those portions of [the] order *decided* adversely to [the plaintiffs].").

11

preliminary injunction ruling here was more definitive than usual, but again that goes nowhere, because "a preliminary injunction . . . is, *by its very nature*, interlocutory, tentative, provisional, . . . not fixed or final or conclusive, characterized by its for-the-time-beingness." *Hamilton Watch Co.*, 206 F.2d at 742 (emphasis added).

As a fallback, the majority pivots to the language of the stipulated judgment, in which the district court so-ordered the parties' stipulation that, "[f]or the reasons given in the Court's [preliminary injunction] order, the Court declares that [the ABA] is preempted by federal law." J. App'x at 157. In the majority's view, the district court "determined" that the ABA was preempted as a matter of law when it signed off on the parties' stipulated language, which in turn was an effective dismissal of New York's case. Maj. Op. at 17.

But the majority misconstrues the nature of stipulated judgments. A stipulated judgment cannot "effectively dismiss" a case for the simple reason that a district court does not "determine" anything when it so-orders a stipulated judgment. That is because a stipulated judgment "is not a ruling *on the merits* of the legal issue." *Langton v. Hogan*, 71 F.3d 930, 935 (1st Cir. 1995); *see also SEC v. Petro-Suisse Ltd.*, No. 12-cv-6221 (AJN), 2013 WL 5348595, at *3 (S.D.N.Y. Sept. 25,

12

2013) ("A consent decree is 'not a ruling on the merits.'" (quoting *Langton*, 71 F.3d at 935) (alterations omitted)).  Instead, a consent judgment is the "result of private bargaining," *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976), that "normally embodies a compromise" in which "the parties each give up something they might have won had they proceeded with the litigation," *Barcia v. Sitkin*, 367 F.3d 87, 90 (2d Cir. 2004) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).  In other words, the entry of a stipulated judgment merely invites the district court to sign off on a compromise that the parties reached on their own accord.

Because the language in the stipulated judgment was the product of "consent" rather than a "decision on the merits," the district court could not have effectively dismissed New York's case merely by granting the stipulated judgment.  *HS Equities, Inc. v. Hartford Accident & Indem. Co.*, 609 F.2d 669, 674 n.8 (2d Cir. 1979) (internal quotation marks omitted).  Even though the stipulated judgment contained language declaring that the ABA was preempted, that language was not a finding or a determination by the district court.  Indeed, the preemption "declar[ation]" appeared in a portion of the stipulated judgment that was "stipulated and agreed" to by the parties (as opposed to a finding that the

13

district court had to make on its own). J. App'x at 157. The majority's only response is to suggest that the district court's "adoption" of the stipulated language reflected the "finality" of the "legal holding" from its preliminary injunction order. Maj. Op. at 17–18. But as already discussed, the district court did not "adopt" or "determine" anything in the stipulated judgment, nor was its earlier finding on preemption "final" or even a "holding." The district court merely signed off on a compromise that the parties (not the court) reached about the meaning of provisional dicta that appeared in an earlier order. That is not enough to establish finality.

To be clear, none of this means that New York was required to toil in the district court until the conclusion of a trial on the merits. New York could have pursued its interlocutory appeal of the preliminary injunction under 28 U.S.C. § 1292(a)(1) and asked this Court to dissolve it. Alternatively, it could have moved to consolidate the preliminary injunction hearing with an expedited trial on the merits under Rule 65(a)(2), which would have triggered an earlier merits ruling (and with it, an earlier appeal). Better yet, New York could have invited the district court to enter summary judgment against it *sua sponte* – which, unlike the

stipulated judgment, would have required the district court to make "an actual adjudication" on preemption. *Lipsky*, 551 F.2d at 893.

The majority says it was fine to skip those steps – and to "accelerate[]" the appeal – because it would be "pragmatic." Maj. Op. at 4, 15. But our "jurisdiction . . . does not entail an assessment of convenience." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006). Quite the opposite, we enforce our jurisdictional rules "strictly," *Muskrat v. United States*, 219 U.S. 346, 356 (1911), and this case illustrates why. By abandoning *Palmieri*'s teachings, we give the greenlight to "piecemeal appeals." *Palmieri*, 88 F.3d at 141. Like the parties here, litigants will forego the relief available under Section 1292(a)(1) – dissolution of a preliminary injunction – to proceed straight to a merits appeal through a stipulated judgment. *In limine* rulings will invite more of the same. By the majority's logic, litigants may turn to stipulated judgments merely because a judge makes critical remarks during oral argument or at a premotion conference. There may be worthy occasions for a stipulated judgment appeal, but a district court's provisional dicta is not one of them.

**B. The Stipulated Judgment Appeal Circumvents Preauthorized Rules On Interlocutory Appeals.**

In addition to lacking the finality required under *Palmieri*, the stipulated judgment also runs afoul of the Supreme Court's decision in *Microsoft v. Baker* because it was procured by subverting the established regime for interlocutory appeals.

In *Microsoft*, the Supreme Court held that parties cannot use stipulated judgments to circumvent interlocutory appeal rules that otherwise would foreclose their appeal. *See* 582 U.S. at 37. There, the plaintiffs brought a putative class action and moved to certify it. *Id.* at 33. After the district court denied that motion, the plaintiffs sought discretionary interlocutory review under Federal Rule of Civil Procedure 23(f), a special provision under which a plaintiff (or a defendant) can ask the court of appeals to immediately review a denial (or a grant) of class certification. *Id.* at 34. When the Ninth Circuit declined to hear the appeal, the plaintiffs endeavored to force a mandatory appeal through a stipulated judgment. Specifically, they moved to dismiss their case with prejudice, explaining that once the district court entered final judgment they would then "appeal the order striking their class allegations." *Id.* at 35 (alterations and internal quotation marks omitted). As requested, the district court granted the plaintiffs'

16

stipulated motion to dismiss and directed entry of final judgment. The plaintiffs

then appealed the class certification order, arguing that they were appealing from

a final judgment under section 1291 – and that the appeals court now had to hear

their appeal of the class certification denial. *See id.* The Ninth Circuit agreed that

it had jurisdiction to consider the appeal under section 1291, found that the district

court had abused its discretion in striking the class allegations, and remanded the

case to the district court for further proceedings on the merits. *See id.* at 35–36.

The Supreme Court granted certiorari on the jurisdictional question and

held that the stipulated judgment was not final – and thus not appealable – under

section 1291. *See id.* at 37. Significantly, the Court reasoned that the judgment

could not be final because the plaintiffs had procured it in a bid to "subvert[] the

final judgment rule" and the interlocutory review process Congress (in tandem

with the Rules Committee) had established. *Id.* Indeed, Rule 23(f) prescribed a

"discretionary regime" under which litigants could ask courts of appeals to review

adverse class certification decisions. *Id.* at 39. But after the Ninth Circuit exercised

that discretion and declined to review the district court's initial certification denial,

the plaintiffs sought to *force* the Ninth Circuit to hear their appeal anyway, even

though the established interlocutory rules allowed only for discretionary appeals.

17

*See id.* at 40.  In other words, the plaintiffs had sought to use a stipulated judgment to manufacture appellate rights (there, mandatory appeals) that neither Congress nor the Rules Committee had preauthorized.  Therefore, even though the stipulated judgment was "technical[ly]" compliant – in that it resolved all of the plaintiffs' claims and left nothing else for the district court to do – it still could not be truly final.  *Id.* at 41 ("[Section] 1291's firm final-judgment rule is not satisfied whenever a litigant persuades a district court to issue an order purporting to end the litigation.").

Significantly, *Microsoft* did not purport to limit this rule – that litigants cannot use stipulated judgments to subvert established interlocutory rules – to class certification appeals.  *See Trendsettah USA v. Swisher Int'l, Inc.*, 31 F.4th 1124, 1132 (9th Cir. 2020) (explaining that *Microsoft* applies when there are "similar statutory restrictions [to Rule 23(f)] that would be adversely affected by permitting voluntary dismissal of claims with prejudice").  Indeed, we ourselves have extended *Microsoft* to another context in holding that litigants cannot use stipulated judgments to subvert the interlocutory rules on orders deciding motions to compel arbitration.  *See Bynum v. Maplebear Inc.*, 698 F. App'x 23, 24 (2d Cir. 2017).  As we explained, Congress provided a special mechanism in 9 U.S.C.

§ 16 under which a defendant can immediately appeal an order denying its motion to compel arbitration. Yet Congress provided no such avenue for orders *granting* those motions. We therefore barred plaintiffs from using stipulated judgments to engineer an appeal of an otherwise unappealable interlocutory order sending plaintiffs' claims to arbitration. *See id.* (citing *Microsoft*, 582 U.S. at 27–28). Other circuits are in accord. *See Keena v. Groupon, Inc.*, 886 F.3d 360, 365 (4th Cir. 2018) (reaching the same result as *Bynum* under *Microsoft*); *Langere v. Verizon Wireless Servs., LLC*, 983 F.3d 1115, 1122 (9th Cir. 2020) (same).

*Microsoft* thus sets forth a broad rule: whenever Congress or the Rules Committee has preauthorized the right to appeal specific interlocutory orders, a litigant may not employ a stipulated judgment to seize additional appellate rights beyond those preauthorized avenues. If the interlocutory rules provide for only discretionary review of certain orders, then litigants cannot exploit stipulated judgments to secure mandatory review. And if the rules authorize interlocutory review only of orders *denying* a given motion, then litigants cannot resort to such tactics to obtain appellate review of orders granting those motions. A district court's entry of an "actual final judgment" is of no moment if that final judgment

was procured in a bid to subvert the preapproved interlocutory rules. *Microsoft*, 582 U.S. at 40 (emphasis and internal quotation marks omitted).

Because New York used a stipulated judgment to expand its preauthorized appellate rights, *Microsoft* bars our appellate jurisdiction here. Once New York was preliminarily enjoined, it had one preauthorized appellate right: to seek dissolution of the preliminary injunction under section 1292(a)(1). *See* 28 U.S.C. § 1292(a)(1) (permitting interlocutory appeal of orders "granting . . . injunctions"). Had it taken this route, New York could have argued that the district court abused its discretion in granting the preliminary injunction under the familiar four-factor test; if we agreed, we would then dissolve the injunction and send the case back to the district court for continued litigation on the merits of preemption. *See Univ. of Tex.*, 451 U.S. at 392 (listing the discretionary four-factor test for granting a preliminary injunction). But rather than take that narrow appeal, New York used a stipulated judgment to appeal the *ultimate merits* of preemption right away – that is, by asking us to issue a "final resolution" on whether the ABA is preempted as a matter of law. *Id.* That is a "significantly different" inquiry than an appeal seeking dissolution of an injunction under section 1292(a)(1). *Id.* There is thus no escaping it: section 1292(a)(1) did not preauthorize New York to appeal the

ultimate merits of preemption, yet New York has done so anyway through a stipulated judgment.

That is precisely what *Microsoft* disallowed. And just as in *Microsoft*, New York's gambit upsets the "careful calibration" of section 1292(a)(1). 582 U.S. at 31. When Congress passed this provision, it authorized interlocutory appeals of preliminary injunctions "in order to prevent the injustice of burdening a party with a manifestly erroneous decree *while the ultimate merits of a dispute are being litigated*." *Indep. Party of Richmond Cnty. v. Graham*, 413 F.3d 252, 256 (2d Cir. 2005) (emphasis added). In other words, Congress provided a limited appellate right to challenge *only* the injunction, so that a defendant would not be burdened by an erroneous restraint while it litigated the merits before the district court. If Congress had also desired for enjoined defendants to appeal the "ultimate merits" right away, then it would have authorized as much in section 1292(a). *Id.* Congress did no such thing, and that alone should foreclose New York's attempt to secure that appellate right by stipulated judgment here.

For its part, the majority suggests that *Microsoft* does not apply because we have discretion (under our "pendent appellate jurisdiction") to reach the merits when we hear an interlocutory appeal of an injunctive order under section

1292(a)(1).  *See San Filippo v. U.S. Tr. Co. of N.Y*, 737 F.2d 246, 255 (2d Cir. 1984).[4]

But that makes this case more like *Microsoft*, not less.  As already discussed,

*Microsoft* bars parties from using a stipulated judgment appeal to convert a

discretionary right to appeal into a mandatory one.  *See* 582 U.S. at 31–32

(explaining that Rule 23(f) gives appellate courts discretion to accept an appeal of

a class certification denial and rejecting plaintiffs' attempt to force an appeals court

to hear such an appeal).  That is essentially what New York has done here.  If it

had appealed the preliminary injunction under section 1292(a)(1), then we would

have had limited discretion to address the ultimate merits of preemption.  But

because New York appeals on the basis of its stipulated judgment, it now contends

that we *must* address the ultimate merits of preemption, thereby diminishing the

discretion of the Court while enhancing its own.  There is no meaningful

distinction between what the parties have done here and what the parties did in

*Microsoft*.  In both cases the parties used a stipulated judgment appeal to secure

---

[4] To be clear, we can exercise this discretionary power in contexts beyond interlocutory appeals
of injunctions; as a general matter, "once we have taken jurisdiction over one issue in a case, we
may, in our discretion, consider otherwise nonappealable issues in the case as well, where there
is sufficient overlap [between] the appealable and nonappealable issues." *San Filippo*, 737 F.2d at
255 (alterations and internal quotation marks omitted).

greater appellate rights than those preauthorized by Congress.  As the Supreme

Court made clear in *Microsoft,* that is not permitted.

## II.   The ABA Is Preempted By Federal Law.

Although the lack of appellate jurisdiction should, by itself, be dispositive

and compel dismissal of this appeal, I write briefly to respond to the majority's

resolution of the merits question concerning federal preemption of the ABA.  To

my mind, our precedents make clear that the ABA is both field- and conflict-

preempted by federal law.

*First*, the ABA is field-preempted because the Communications Act

preempts all rate regulation of interstate communication services.  By its text, the

Communications  Act  grants  the  FCC  authority  over  "all  interstate"

communication services – save for a limited set of state-law prohibitions – while

leaving to the states the power to regulate intrastate communications.  47 U.S.C.

§ 152(a)–(b) (defining the interstate and intrastate division); *id.* § 414 (preserving a

limited set of state common-law rules).  Thus, the Act prescribes that the FCC has

exclusive authority over interstate communications, except for certain areas like

consumer protection where states have traditionally exercised power.  *See, e.g.,*

*Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 443–44 (1963) (explaining

that the "savings clause" in section 414 preserved state power to regulate interstate radio advertisements).  Because rate regulation was not one of those traditional spheres of state authority, only the FCC retains the authority to regulate rates of interstate communications.[5]

Indeed, we held as much in *Ivy Broadcasting Co. v. American Telephone & Telegraph Co.*, 391 F.2d 486, 490–91 (2d Cir. 1968).  There, we explained that both the Communications Act and its predecessor (the Mann-Elkins Act) manifested "an intent on the part of Congress to occupy the field to the exclusion of state law," including with respect to the "rates" charged.  *Id.* (internal quotation marks omitted). Though the majority asserts that *Ivy Broadcasting* meant to say that this preemption covered only the rates of Title II common carriers, we have not so limited *Ivy Broadcasting* when we have cited it in the intervening decades.  *See, e.g., Glob. NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 102 n.10 (2d Cir. 2006) (citing *Ivy Broad.*, 391 F.2d at 491) (finding that a state regulatory board had

---

[5] The majority offers scant support for its claim that states have historically regulated the rates of interstate communications.  *See* Maj. Op. at 28–29.  It offers only an article noting that eleven states oversaw rate regulation of cable during the 1970s.  But limited activity in twenty percent of the states is far from a meaningful tradition.  Moreover, at the time of that rate regulation, cable was "essentially a local business," where local operators broadcast to small surrounding regions.  *TV Pix, Inc. v. Taylor*, 304 F. Supp. 459, 463 (D. Nev. 1968).  That is quite unlike the modern internet, which virtually always involves interstate communications even for the most routine tasks.  I therefore do not see a meaningful tradition of such rate regulation at the state level.

"narrowly sidestepped encroachment on the FCC's jurisdiction to set rates on interstate communications" without limiting these statements to Title II).

The structure of the Communications Act confirms its preemptive scope. When Congress defined the FCC's authority in section 152, it used language – contrasting "interstate" versus "intrastate" authority," 47 U.S.C. § 152(a)–(b) – that mirrored other statutes where Congress conferred exclusive federal authority. For instance, Congress granted the Federal Energy Regulatory Commission ("FERC") exclusive authority over interstate electricity sales when it provided that a federal statute "shall apply to the transmission of electric energy in interstate commerce," but not to "the transmission of electric energy in intrastate commerce." 16 U.S.C. § 824(b)(1); *see Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154 (2016). Congress also used such language in granting FERC "exclusive jurisdiction" over interstate natural gas sales. *Scheidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300–01, 308 (1988); *see* 15 U.S.C. § 717(b)–(c) (providing that the 1938 Natural Gas Act "shall apply to the transportation of natural gas in interstate commerce" but not to gas sales occurring "within" a state). By employing the same structure here, Congress likewise granted the FCC exclusive domain over rate regulation of interstate communications.

25

Put succinctly, in passing the Communications Act, Congress enacted a "federal law [that] occupies [the] field of [rate] regulation so comprehensively that it has left no room for supplementary state regulation." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018) (internal quotation marks omitted). Because the ABA intrudes into that field, it is preempted, and its enforcement should be enjoined.

*Second*, the ABA is conflict-preempted because it would "frustrate the purposes" of the FCC's 2018 decision to reclassify broadband as a Title I service. *SPGGC LLC v. Blumenthal*, 505 F.3d 183, 189 (2d Cir. 2007). For the purposes of conflict preemption, "[f]ederal regulations have no less preemptive effect than federal statutes." *Id.* at 188 (internal quotation marks omitted). Thus, we need not focus on whether Congress intended to "supersede state law" so much as whether the *agency* meant to do so in issuing the regulations. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982).

Here, there is little doubt that the FCC intended to preempt state laws that, like the ABA, imposed *ex ante* rate regulation on broadband. Even when the FCC briefly reclassified broadband as a Title II telecommunications service in 2015, it explained that "we do not and cannot envision adopting new *ex ante* rate

regulation of broadband [i]nternet access in the future." 30 FCC Rcd. 5601, ¶ 451 (2015); *see also id.* ¶ 382 ("There will be no rate regulation.").  And in 2018, when the FCC returned broadband to its traditional classification as a Title I information service, the agency explained that its decision was driven by "concerns" that even the *possibility* of "rate regulation" attendant to Title II common carriage status "ha[d] resulted" in "untenable social cost[s] in terms of foregone investment and innovation." 33 FCC Rcd. ¶¶ 87, 101.  To that end, the FCC's order stated its intent to "end utility-style regulation of the Internet in favor of . . . market-based policies" and a "light-touch" regulatory framework.  *Id.* ¶¶ 2, 207.

In sum, the FCC's actions and words evince an obvious "purpose[]," *SPGGC*, 505 F.3d at 188, to foster openness and investment by sheltering broadband internet service from rate regulation.  Because the ABA seeks to impose that very regulation, it is preempted.

For its part, New York insists that the FCC's 2018 Order cannot preempt state law because the FCC has no power to regulate services when they are classified under Title I, as broadband is now.  New York Br. at 50–51.  In other words, New York suggests that because the FCC currently lacks power to regulate broadband rates, it cannot prevent states from regulating those rates either.

27

That argument fails to account for the obvious fact the FCC does have the power to regulate broadband. Just as it did in 2015, the FCC could reclassify broadband as a Title II service and impose *ex ante* rate regulations on it. Yet the FCC chose not to – a choice that "takes on the character of a ruling that no such regulation is appropriate or approved." *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978). Because "federal officials affirmatively [declined] to exercise their full authority" under the Communications Act in making a discretionary choice, "[s]tates are not permitted to use their police powers to enact such a regulation" in the resulting void. *Id.*

\*     \*     \*

At bottom, we cannot hear a stipulated judgment appeal until the district court has issued a final ruling on the appealed issue. Nor can we entertain such an appeal when it is the product of an open attempt to subvert the interlocutory appellate rules. Because this appeal violates both of these precepts, I would dismiss it without reaching the merits of preemption. And even if I had to reach the merits, I would find that the ABA is preempted by federal law, as the majority's cribbed reading of the Communications Act undermines the authority of the FCC to regulate interstate communications and emboldens states like New York to

28

impose costs on broadband internet service that extend well beyond their borders.

For all these reasons, I respectfully dissent from the majority's opinion.